**Ortiz & Ortiz, L.L.P.**
35-10 Broadway
Suite 201
Astoria, New York 11106
Tel. (718) 522-1117
Norma E. Ortiz, Esq.
email@ortizandortiz.com
*Counsel to Certa Dose, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>    Certa Dose, Inc.,<br><br>        Debtor-in-Possession | Case No. 21-11045-lgb<br><br>Chapter 11 |

**DECLARATION OF DR. CALEB S. HERNANDEZ IN**
**OPPOSITION TO COPIC INSURANCE COMPANY'S**
**MOTION TO TRANSFER VENUE TO THE**
**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

Dr. Caleb S. Hernandez, president of the above-captioned debtor in possession (the "Debtor"), hereby declares as follows:

1.     I am the CEO and founder of Certa Dose, Inc. ("Certa Dose" or "Debtor"). I make this Declaration in support of my and the Debtor's opposition to the motion [Doc. No. 36] filed by COPIC Insurance Company ("COPIC"),[1] to transfer venue pursuant to 28 U.S.C.§1412 to the U.S. Bankruptcy Court for the District of Colorado (the "Motion"). Unless otherwise set forth herein, I have personal knowledge of the matters set forth herein and if called as a witness could and would testify competently thereto.

---

[1] Which is joined by Stephen R. Hoffenberg, M.D. Alan Young Synn, M.D., David K. Hurley, M.D., Brian C. Harrington, M.D. Niles Cole; Geraldinse A. Lewis-Jenkins; Matthew Flieshman, M.D. Theodore J. Clarke, M.D.; Katherin Driscoll, as Trustee of the 2015 LFD III Grat-Trust U/A/D 8/26/15; Phoebe Fisher, M.D.; Thomas S. Cowan; and Anthony R. Mayer (collectively, the "Individual Movants")

2.      I am a practing seventeen-year Doctor of Osteopathic medicine having trained and worked as an emergency room physician since 2004.  In my career as a frontline doctor, I have experienced and treated thousands of patients  As described in my Declaration made pursuant to Local Bankruptcy Rule 1007-2 [Doc. No. 12], as amended, in the course of treating my patients I witnessed first-hand the dangers posed by inadvertent overmedication (termed "dosing errors") which can routinely lead to death or serious injury.  I further learned that, in the U.S. alone,  dosing errors by medical professionals harm 140,000 children per year, 7,000 of which will result in death from such errors.

3.      These realizations led me to invent and patent the technology behind Certa Dose which is used by the company today.  I created and founded Certa Dose in 2013 and the products it sells include devices for delivering medicine to children and others in a way that significantly reduces, and virtually eliminates, the risk of life-threatening over dosing in addition to providing a much needed EpiPen alternative that is a fraction of the cost of that product, amongst other exciting products and therapeutics.

**Debtor's Choice of Venue in New York City**

4.      Although the Debtor originated in Colorado, where I practiced at the time of its inception, it was incorporated in Delaware, and its headquarters were relocated to New York in 2018.  Indeed, it was COPIC and the Debtor's former CFO, John Blood ("Mr. Blood") who insisted that I relocate to New York City full-time in 2018 to pursue the robust opportunities offered by the New York City marketplace.  Those opportunities included expanding and developing my long-time involvement with the well known pharmaceutical company Johnnson & Johnson ("J&J") through its JLabs Innovations incubator in New York City amongst others.

5.      Since my and Certa Dose's move to New York, I, on a daily basis on behalf of Certa Dose travel to the office in New York City from my home in the city[2] engage with existing and prospective business partners and customers in New York and in New Jersey, and devote my efforts as CEO of the Debtor towards growing the company here.  In fact, more than 85% of Certa Dose's revenue are generated in New York City.[3]  These include extensive meetings which often occur on very short notice with prospective partners locally.  Both the Debtor and myself pay taxes in New York City and regularly conduct business here.

6.      By way of example, in addition to its relationships with J&J, in recent weeks Certa Dose has entered into, amongs others, an extremely valuable healthcare network partnership agreement which makes Certa Dose products "preferred products" in over 5000 healthcare systems nationwide.[4]  All of the discussions involving Certa Dose's preferred status and the key persons involved are in and around New York City.  Because of its proximity and location in New York City, Certa Dose has also received interest from numerous city and state government agencies for its life-saving products including, first responders.  Certa Dose's location in New York City and the access it provides to the robust pharamecutical and life science companies based in around the tri-state area, are nothing short of critical for the companies day-to-day operation.  This includes frequent weekly trips from New York City to New Jersey known as the "Life Science State," where many pharmaceutical and life science companies have offices as well.

---

[2] Particularly now that New York City's lockdowns have been largely lifted.

[3] Debtor's inventory is not maintained in Colorado but in warehouses outside of New York City and Massachusettes primarily in the care of third-party logistics providers.

[4] In addition to the over 200 local customers (which includes the State of New York) which are all located in and around New York City.

7.      In connection with the administration of the Debtor's case, the Debtor has retained its counsel in New York City and I have also indivudally retained counsel in New York City as well.  The Debtor also does banking in New York City and receives mail in New York City.    Further in connection with the bankruptcy case, Certa Dose has already commenced making preperations for an exit from chapter 11 and in that vein has met with a number of New York City based investors and DIP lenders.[5]  My responsibilities to the Debtor including, medical research, investor relations, and other essential work require me to be in New York City.  Because of my extensive involvement with the day-to-day operations of Certa Dose, it will be difficult if not impossible to continue to attend to my daily activities with regards to the Debtor with the Debtor's bankruptcy case proceeding in Colorado.[6]

8.      Finally, a number of other shareholders in Certa Dose support venue of this proceeding in New York City as they recognize it is in the overall best interests of the Company to reorganize in a recognized and highly sophisticated judicial forum.  Annexed hereto as **Exhibit "A"** are true and accurate copies of Declartions of three separate shareholders of Certa Dose which support the companies ororganization efforts in New York City.

**The COPIC Allegations as to Venue**

9.      Following my ascendance to CEO of Certa Dose (and my move to New York City) at the behest of COPIC and Mr. Blood, Mr. Blood stepped into the role of CFO of Certa Dose.  I later learned that Mr. Blood and COPIC had intended for my absence to conceal from

---

[5] I anticipate Certa Dose will in the coming weeks bring on application for approval to the Bankrutpcy Court in this regard.

[6] Notably, Certa Dose does not even have desk space in Colorado mainting only a virtual office which costs the Debtor approximately $75.00 per month.

me and others what he and COPIC had been plotting for many months - to recklessly drive-up the Debtor's expenditures to such an extent that a valuation of Certa Dose in a forthcoming funding round would enable a hostile take-over of Certa Dose by COPIC and those individuals who appear to have conspired with COPIC.

10.     More specifically, COPIC's primary means of executing this takeover was through surruptiously maniupulating the financial position of Certa Dose following a carefully plotted Series Seed 2 Preferred Stock Purchase Agreement which was issued between May 26, 2016 and June 13, 2016 (the "Series Seed 2").  At that time, Certa Dose was represented by the Cooley LLP law firm ("Cooley"); however, Cooley was irretrievably conflicted in those transactions and rather it appears that, rather than represent Certa Does in the Series Seed 2, it Cooley attempted to deliver Certa Dose into the hands of COPIC.  This would result in extensive litigation for which the Debtor has asserted claims against those responsible.

11.     Pursuant to the Series Seed 2, Certa Dose, with Cooley LLP as its counsel, issued an Amended and Restated Investor Rights Agreement, Amended and Restated Co-Sale Agreement, Amended and Restated Voting Agreement, in addition to Note Purchase Agreements and Convertible Promissory Note (collectively, the "COPIC Agreements").  These agreements which are discussed in the Motion at least in part, while relevant to those disputes, do not bear upon the administration of Certa Dose's chapter 11 bankruptcy case.

12.     Having learned of COPIC and Mr. Blood's transgressions, I as the largest shareholder and on behalf of the those individuals and other investors who would fall victim to COPIC's plot in December of 2019 iniated protective measures for the company and

authorized the initation of a complaint in the Supreme Court of the State of New York,[7] Queens County, Commercial Division captioned C*erta Dose, Inc. vs. COPIC et al.*, Index No. 720576/2019 (the "NY Action").[8]  Though the NY Action was ultimately dismissed on the basis of forum selection clauses it was due to what the NY Court reasoned was a a question of personal jurisdiction over those defendants in light of the forum selection clauses.  Annexed hereto as **Exhibit "B"** is a true and accurate copy of the Amended Complaint in the NY Action.  In the Debtor's chapter 11 case, jurisdiction is not at issue whatsoever.

13.      On February 19, 2021, Certa Dose initiated litigation captioned *Certa Dose, Inc. vs. COPIC Insurance Co. et al.*,  Case No. 2021CV30160, in the District Court of Jefferson County Colorado ("Jefferson County Action").  A true and accurate copy of the complaint in the Jefferson County Action is annexed hereto as **Exhibit "C."**

14.      On January 19, 2021, Certa Dose initiated an action in the District Court of the City and County of Denver Colorado captioned *Certa Dose, Inc. vs. John Blood,* Case No. 2021CV30193 (the "Denver Action").  Annexed hereto as **Exhibit "D"** is a true and accurate copy of the complaint in the Denver Action.

15.      Contrary to the allegations of COPIC and the Individual Movants, it has been difficult and costly for both Certa Dose and myself to defend itself in the actions venued in Colorado due specifically to the attendant needs of Certa Dose to attend to its day to day operations.  I believe that COPIC's intention is to detract the Debtor from attending to the orderly and natural proliferation of its life-saving technology in order to stifle growth increase its debts in an blatant effort to consummate its takeover.

---

[7] Notably the Debtor then asserted New York was its principal place of business at the time of that lawsuit.

[8] At the time Certa Dose had two locations in New York, one in New York City and another in Queens.

I hereby declare that the foregoing is accurate and true to the best of my knowledge and belief.

Dated:     July 7, 2021

        New York, New York

                                       Dr. Caleb S. Hernandez

# **EXHIBIT A**

MEDINA LAW FIRM LLC
641 Lexington Avenue
Thirteenth Floor
New York, New York 10022
Tel. (212) 404-1742
Fax. (888) 833-9534
*Counsel to Dr. Caleb S. Hernandez*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>    Certa Dose, Inc.,<br><br><br>    Debtor-in-Possession | Case No. 21-11045-lgb<br><br>Chapter 11 |

<u>DECLARATION OF DANIEL EASON</u>

**DANIEL EASON,** hereby declares pursuant to 28 U.S.C. § 1746, as follows:

1.      By virtue of my interest in RBW2078 LLC, I control equity interests in the Debtor, Certa Dose, Inc. ("Debtor" or "Certa Dose"). My company owns preferred stock totaling 26,680 shares since 2017. I make this declaration in support of Dr. Caleb Hernandez and the Debtor's opposition to the motion filed by COPIC Insurance Company ("COPIC") seeking to transfer venue of Debtor's chapter 11 case to the District of Colorado.

2.      I along with my company reside in the State of Texas. I am aware of the Debtor's and Dr. Hernandez's efforts to preserve the assets of Certa Dose for all of its various stakeholders. I support the Debtor's laying of venue in the U.S. Bankruptcy Court for the Southern District of New York as Certa Dose has achieved significant milestones under Dr. Hernandez's leadership in the years since relocating to New York and I believe its presence in New York, close to key pharmaceutical partners and industry figures, is essential to its continued expansion of its key products.

{00085226 }                                                1

I hereby declare that the foregoing is accurate and true to the best of my knowledge and belief.

Dated:    July 7, 2021

<u>*/s/ Daniel Eason*</u>
Daniel Eason

MEDINA LAW FIRM LLC
641 Lexington Avenue
Thirteenth Floor
New York, New York 10022
Tel. (212) 404-1742
Fax. (888) 833-9534
*Counsel to Dr. Caleb S. Hernandez*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>    Certa Dose, Inc.,<br><br><br>    Debtor-in-Possession | Case No. 21-11045-lgb<br><br>Chapter 11 |

<u>**DECLARATION OF ANDREW GLASER**</u>

**ANDREW GLASER,** hereby declares pursuant to 28 U.S.C. § 1746, as follows:

1.      I am a stockholder of the Debtor, Certa Dose, Inc. ("Debtor" or "Certa Dose"), owning preferred stock totaling 19,352 shares.  I first invested in the Debtor in 2017.  I make this declaration in support of Dr. Caleb Hernandez and the Debtor's opposition to the motion filed by COPIC Insurance Company ("COPIC") seeking to transfer venue of Debtor's chapter 11 case to the District of Colorado.

2.      I reside in New York City.  I am aware of the Debtor's and Dr. Hernandez's efforts to preserve the assets of Certa Dose for all of its various stakeholders.  I support the Debtor's laying of venue in the U.S. Bankruptcy Court for the Southern District of New York as Certa Dose has achieved significant milestones under Dr. Hernandez's leadership in the years since relocating to New York and I believe its presence in New York, close to key pharmaceutical partners and industry figures, is essential to its continued expansion of its key products.

I hereby declare that the foregoing is accurate and true to the best of my knowledge and belief.

Dated:      July 7, 2021

_/s/ Andrew Glaser_
Andrew Glaser

MEDINA LAW FIRM LLC
641 Lexington Avenue
Thirteenth Floor
New York, New York 10022
Tel.  (212) 404-1742
Fax. (888) 833-9534
*Counsel to Dr. Caleb S. Hernandez*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 21-11045-lgb |
| Certa Dose, Inc., | Chapter 11 |
| Debtor-in-Possession | |

<u>**DECLARATION OF ROBERT WILLOUGHBY, III**</u>

**ROBERT WILLOUGHBY, III,** hereby declares pursuant to 28 U.S.C. § 1746, as follows:

1.      I am a stockholder of the Debtor, Certa Dose, Inc. ("Debtor" or "Certa Dose"), owning individually and through my company preferred stock totaling 13,128 shares.  I first invested in the Debtor in 2017.  I make this declaration in support of Dr. Caleb Hernandez and the Debtor's opposition to the motion filed by COPIC Insurance Company ("COPIC") seeking to transfer venue of Debtor's chapter 11 case to the District of Colorado.

2.      I reside in the State of Texas.  I am aware of the Debtor's and Dr. Hernandez's efforts to preserve the assets of Certa Dose for all of its various stakeholders.  I support the Debtor's laying of venue in the U.S. Bankruptcy Court for the Southern District of New York as Certa Dose has achieved significant milestones under Dr. Hernandez's leadership in the years since relocating to New York and I believe its presence in New York, close to key

pharmaceutical partners and industry figures, is essential to its continued expansion of its key products.

I hereby declare that the foregoing is accurate and true to the best of my knowledge and belief.

Dated:      July 7, 2021

_/s/Robert Willoughby_
Robert Willoughby, III

# EXHIBIT B

FILED: QUEENS COUNTY CLERK 09/09/2020 11:36 AM
NYSCEF DOC. NO. 296
INDEX NO. 720576/2019
RECEIVED NYSCEF: 09/09/2020
21-11045-lgb    Doc 54    Filed 07/09/21    Entered 07/09/21 00:10:10    Main Document
Pg 16 of 89

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS: COMMERCIAL DIVISION

-----------------------------------------------------------------X

CERTA DOSE, INC.,

                                    Plaintiff,

v.

COPIC INSURANCE COMPANY,
STEVE RUBIN, STEPHEN R. HOFFENBERG,
JOHN BLOOD, COOLEY LLP, ALAN YOUNG SYNN,
DAVIS K. HURLEY, BRIAN C. HARRINGTON,
DANIEL LEE MILLER, NILES COLE,
J. DANIEL MILLER, JEFFREY ALVIN DORSEY,
GERALDINE A. LEWIS-JENKINS, MARK A. FOGG,
MATTHEW FLEISHMAN, THEODORE J. CLARKE,
MICHAEL L. PLATT, KELLY BARTLING,
ADAM DINOW, THOMAS S. COWAN,
ANTHONY R. MAYER, PHOEBE FISHER,
LFD III GRAT-TRUST U/A 8-26-2015,
KATHERINE DRISCOLL, Trustee, and LEE F. DRISCOLL,

                                    Defendants.

-----------------------------------------------------------------X

**AMENDED AND
VERIFIED COMPLAINT,
AS PER CPLR 3025(a)**

**INDEX NO.:** 720576/2019
(Livote, J.)

**DATE OF INDEX NO. PURCHASE:**
December 9, 2019.

COMES NOW the Plaintiff, CERTA DOSE, INC., by and through undersigned counsel, and for its

amendment of the Complaint as a matter of right, made pursuant to CPLR 3025(a), which incorporates the

numbered exhibits (NYSCEF Nos. 176-252), *hereinafter the* "Complaint," it alleges:

## PARTIES

1.      Plaintiff CERTA DOSE, INC. (*hereinafter also* "CERTA DOSE" *and the* "Company"), is

a foreign business corporation from Delaware, with a New York DOS ID # of 5413489 and an initial DOS

filing date of September 20, 2018; it has a registered New York principal office in the County of Queens,

making Plaintiff's residence in Queens County pursuant to CPLR 503(a) and (c), that address being 36-11

20th Avenue 2nd Floor, Astoria, NY 11105.  It also has a New York DOS process address of: CERTA DOSE,

INC., 15 Hudson Yards 33B, New York, New York, 10001.  (**Being a Delaware corporation, Defendants**

should be on notice that Delaware law will apply to corporate law portions of Plaintiff's claims, subject to governing choice of law rules.)

2.    Defendant COPIC INSURANCE COMPANY is a Colorado corporation and a medical professional liability insurance provider that conducts business in the state of New York.

3.    With regard to the allegations of the preceding paragraph, COPIC, A RISK RETENTION GROUP (COPIC-RRG), is managed and reinsured by COPIC INSURANCE COMPANY, *hereinafter also* "COPIC," for multi-state coverage in New York. As admitted by COPIC, COPIC-RRG insureds "have direct relationships with [COPIC'S] recognized physician risk managers, claims department, underwriting staff, and other team members; and [also] have the option to access [COPIC'S] extensive patient safety and risk management resources."[1] Furthermore, COPIC'S involvement in CERTA DOSE, INC., was an extension of its investment operation business, being a subject of COPIC'S board meetings and a business concern treated at the highest level of governance within COPIC.

4.    Defendant STEVE RUBIN is a natural person who is a resident of the state of Colorado and who is employed by and/or affiliated with COPIC INSURANCE COMPANY. During his time with Plaintiff CERTA DOSE, INC., STEVE RUBIN was a COPIC-appointed Director on the CERTA DOSE Board of Directors. He was also on the Board of COPIC and its president.

5.    Defendant STEPHEN R. HOFFENBERG is a natural person who is a resident of the state of Colorado and who has worked for and/or is affiliated with COPIC INSURANCE COMPANY. During his time with Plaintiff CERTA DOSE, INC., STEVE RUBIN was a COPIC-appointed Director on the CERTA DOSE Board of Directors, although he and COPIC referred to him—*following the arrival of*

---

[1] https://www.callcopic.com/coverage-options/mpli-coverage-options/risk-retention-group (as of March 26, 2020).

*STEVE RUBIN on the CERTA DOSE Board*—as an "independent Director," despite his allegiances to COPIC, which are further referenced throughout this Complaint.

6. Defendant JOHN BLOOD is a natural person who is a resident of the state of Colorado and who, during the times identified in this Complaint, was an officer of CERTA DOSE, INC.

7. Defendant COOLEY LLP is a foreign registered limited liability partnership from California, with a New York DOS ID # of 3415752 and an initial New York DOS filing date of September 22, 2006; it has a New York DOS process address of: CORPORATION SERVICE COMPANY, 80 STATE STREET, ALBANY, NEW YORK, 12207-2543; and it has registered a Principal Executive Office in New York at: COOLEY LLP, THE GRACE BUILDING, 46TH FLOOR, 1114 AVENUE OF THE AMERICAS, NEW YORK, NEW YORK, 10036-7798.

8. Defendant ALAN YOUNG SYNN is a natural person who is a resident of the state of Colorado and who is employed by and/or affiliated with COPIC INSURANCE COMPANY.

9. Defendant DAVIS K. HURLEY is a natural person who is a resident of the state of Colorado and who is employed by and/or affiliated with COPIC INSURANCE COMPANY.

10. Defendant BRIAN C. HARRINGTON is a natural person who is a resident of the state of Colorado and who is employed by and/or affiliated with COPIC INSURANCE COMPANY.

11. Defendant DANIEL LEE MILLER is a natural person who is a resident of the state of Texas and who is a relative of STEPHEN R. HOFFENBERG.

12. Defendant NILES COLE is a natural person who is a resident of the state of Colorado and who is employed by and/or affiliated with COPIC INSURANCE COMPANY.

13. Defendant GERALDINE A. LEWIS-JENKINS is a natural person who is a resident of the state of Colorado and who is employed by and/or affiliated with COPIC INSURANCE COMPANY.

FILED: QUEENS COUNTY CLERK 09/09/2020 11:36 AM

NYSCEF DOC. NO. 296

INDEX NO. 720576/2019

RECEIVED NYSCEF: 09/09/2020

21-11045-lgb    Doc 54    Filed 07/09/21    Entered 07/09/21 00:10:10    Main Document
Pg 19 of 89

14.    Defendant MARK A. FOGG is a natural person who is a resident of the state of Colorado, is an attorney, and is employed by and/or affiliated with COPIC INSURANCE COMPANY.

15.    Defendant MATTHEW FLEISHMAN is a natural person who is a resident of the state of Colorado and who is employed by and/or affiliated with COPIC INSURANCE COMPANY.

16.    Defendant THEODORE J. CLARKE is a natural person who is a resident of the state of Colorado and who is employed by and/or affiliated with COPIC INSURANCE COMPANY.

17.    Defendant MICHAEL L. PLATT is a natural person who is a resident of the state of Colorado and an attorney with COOLEY LLP.

18.    Defendant KELLY BARTLING is a natural person who is a resident of the state of Colorado and an attorney with COOLEY LLP.

19.    Defendant ADAM DINOW is a natural person who is a resident of the state of New York and an attorney with COOLEY LLP.

20.    Defendant THOMAS S. COWAN is a natural person who is a resident of the state of Illinois. He is also an affiliate of JOHN BLOOD, as noted further in the body of this Complaint. *See, e.g.,* ¶¶ 44 and 72, *infra.*

21.    Defendant ANTHONY R. MAYER is a natural person who is a resident of the state of Colorado. He is also an affiliate of JOHN BLOOD, as noted further in the body of this Complaint. *See, e.g.,* ¶¶ 44 and 72, *infra.*

22.    Defendant PHOEBE FISHER is a resident of the commonwealth of Pennsylvania. She is a relative of KATHERINE DRISCOLL and LEE F. DRISCOLL. She is also an affiliate of JOHN BLOOD, as noted further in the body of this Complaint. *See, e.g.,* ¶¶ 44 and 72, *infra.*

23.    Defendant LFD III GRAT-TRUST U/A 8-26-2015 is a trust established under the laws of the state of Colorado with KATHERINE DRISCOLL as the trustee. In this, KATHERINE DRISCOLL is

4

# EXHIBIT C

<table>
<tr><td colspan="2">

DISTRICT COURT, JEFFERSON COUNTY, COLORADO
100 Jefferson County Parkway
Golden, CO 80401

DATE FILED: February 9, 2021 11:28 PM<br>FILING ID: 4AB17DDBB4D35<br>CASE NUMBER: 2021CV30160

</td></tr>
</table>

| | |
|---|---|
| Plaintiff:<br>CERTA DOSE, INC.,<br><br>v.<br><br>Defendants:<br>COPIC INSURANCE COMPANY, a Colorado corporation; STEVE RUBIN; STEPHEN R. HOFFENBERG; ALAN YOUNG SYNN; DAVIS K. HURLEY; BRIAN C. HARRINGTON; NILES COLE; GERALDINE A. LEWIS-JENKINS; MATTHEW FLEISHMAN; THEODORE J. CLARKE; KATHERINE DRISCOLL, Trustee of the 2015 LFD III GRAT-TRUST U/A 8.26.15; LEE F. DRISCOLL; PHOEBE FISHER; THOMAS S. COWAN; and ANTHONY R. MAYER. | |
| | ▲ COURT USE ONLY ▲ |
| ATTORNEY FOR THE PLAINTIFF:<br>NAME:JOSUE DAVID HERNANDEZ<br>ADDRESS:     P.O. Box 838<br>                Denver, CO  80201<br>*Telephone:*    720-312-9553<br>*Facsimile:*303-200-7801<br>*E-Mail:* jhernandez@DenverContractLaw.com<br>ATTORNEY REGISTRATION NUMBER: 44509 | Case Number:<br>Division:<br>Courtroom: |

| |
|---|
| **COMPLAINT WITH JURY DEMAND** |

Plaintiff, CERTA DOSE, INC., for its Complaint, states as follows:

## THE PARTIES

1.      Plaintiff CERTA DOSE, INC. (*hereinafter also* "CERTA DOSE" *and the* "Company"), is a foreign business corporation from Delaware, with a New York principal office 101 Avenue of the Americas, 3rd Floor NY, NY 10013. (**Being a Delaware corporation, Defendants should be on notice that Delaware law will apply to corporate law portions of Plaintiff's claims, subject to governing choice of law rules.**) Plaintiff has a principal Colorado office at 2590 Welton St #200, Denver, CO 80205.  Plaintiff

also has a registered agent with the Colorado Secretary of State of Registered Agents Inc. with a street address of 1942 Broadway St. STE 314C, Boulder, CO 80302.

2.      Defendant STEVE RUBIN is a natural person who is a resident of the state of Colorado and who is employed by and/or affiliated with COPIC INSURANCE COMPANY.  During his time with Plaintiff CERTA DOSE, INC., STEVE RUBIN was a COPIC-appointed Director on the CERTA DOSE Board of Directors.  He was also on the Board of COPIC and its president.

3.      Defendant STEPHEN R. HOFFENBERG is a natural person who is a resident of the state of Colorado and who has worked for and/or is affiliated with COPIC INSURANCE COMPANY.  During his time with Plaintiff CERTA DOSE, INC., STEVE RUBIN was a COPIC-appointed Director on the CERTA DOSE Board of Directors, although he and COPIC referred to him—*following the arrival of STEVE RUBIN on the CERTA DOSE Board*—as an "independent Director," despite his allegiances to COPIC, which are further referenced throughout this Complaint.

4.      Defendant ALAN YOUNG SYNN is a natural person who is a resident of the state of Colorado and who is employed by and/or affiliated with COPIC INSURANCE COMPANY.

5.      Defendant DAVIS K. HURLEY is a natural person who is a resident of the state of Colorado and who is employed by and/or affiliated with COPIC INSURANCE COMPANY.

6.      Defendant BRIAN C. HARRINGTON is a natural person who is a resident of the state of Colorado and who is employed by and/or affiliated with COPIC INSURANCE COMPANY.

7.      Defendant DANIEL LEE MILLER is a natural person who is a resident of the state of Texas and who is a relative of STEPHEN R. HOFFENBERG.

8.      Defendant NILES COLE is a natural person who is a resident of the state of Colorado and who is employed by and/or affiliated with COPIC INSURANCE COMPANY.

9.      Defendant GERALDINE A. LEWIS-JENKINS is a natural person who is a resident of the state of Colorado and who is employed by and/or affiliated with COPIC INSURANCE COMPANY.

10.     Defendant MATTHEW FLEISHMAN is a natural person who is a resident of the state of Colorado and who is employed by and/or affiliated with COPIC INSURANCE COMPANY.

11.     Defendant THEODORE J. CLARKE is a natural person who is a resident of the state of Colorado and who is employed by and/or affiliated with COPIC INSURANCE COMPANY.

12.     Defendant THOMAS S. COWAN is a natural person who is a resident of the state of Illinois. He is also an affiliate of JOHN BLOOD, as noted further in the body of this Complaint. *See, e.g.,* **EXHIBIT 1** ¶¶ 44 and 72.

13.     Defendant ANTHONY R. MAYER is a natural person who is a resident of the state of Colorado. He is also an affiliate of JOHN BLOOD, as noted further in the body of this Complaint. *See, e.g.,* **EXHIBIT 1** ¶¶ 44 and 72.

14.     Defendant PHOEBE FISHER is a resident of the commonwealth of Pennsylvania. She is a relative of KATHERINE DRISCOLL and LEE F. DRISCOLL. She is also an affiliate of JOHN BLOOD, as noted further in the body of this Complaint. *See, e.g.,* **EXHIBIT 1** ¶¶ 44 and 72.

15.     Defendant LFD III GRAT-Trust U/A 8-26-2015 is a trust established under the laws of the state of Colorado with KATHERINE DRISCOLL as the trustee. In this, KATHERINE DRISCOLL is a resident of Colorado. She is a relative of PHOEBE FISHER and LEE F. DRISCOLL. She is also an affiliate of JOHN BLOOD and has affiliated the trust, LFD III GRAT-Trust U/A 8-26-2015, with JOHN BLOOD, as noted further in the body of this Complaint. *See, e.g.,* **EXHIBIT 1** ¶¶ 44 and 72.

16.     Defendant LEE F. DRISCOLL is a resident of Colorado. He is a relative of PHOEBE FISHER and KATHERINE DRISCOLL. He is an affiliate of JOHN BLOOD, as further noted in this Complaint. *See, e.g.,* **EXHIBIT 1** ¶¶ 44 and 72.

## JURISDICTION AND VENUE

17.     Because the Defendants took actions within Colorado so as to harm the Plaintiff in the ways identified in the GENERAL ALLEGATIONS and in the CLAIMS FOR RELIEF provided below, the Defendants took actions in Colorado that constitute torts, which constitute grounds for the assertion of jurisdiction. As also noted above, the majority of Defendants are residents of Colorado.

18.     Defendants STEPHEN R. HOFFENBERG and THEODORE J. CLARKE are residents of Jefferson County, Colorado, constituting grounds for the assertion of venue in Jefferson County, Colorado.

## GENERAL ALLEGATIONS
### (Description of the events upon which the claims are based)

**I.    HIDDEN CONFLICTS OF INTEREST AND CIRCUMSTANCES RAISING THE INFERENCE OF INTENT TO TAKE THE COMPANY'S ASSETS.**

19.     Plaintiff incorporates all of the preceding allegations as though fully set forth herein.

20.     The background allegations center around the involvement that the all the Defendants had in aiding and abetting the wrongdoing of a CERTA DOSE, INC. officer and fiduciary, JOHN BLOOD, as well as the aiding and aiding and abetting the wrongdoing of Defendants STEPHEN R. HOFFENBERG and STEVE RUBIN, who were Directors of CERTA DOSE, INC. at the times concerned herein, as noted below, and who were thus fiduciaries of CERTA DOSE, INC. These background allegations are recounted in the New York Amended Complaint, annexed as **EXHIBIT 1**.

21.     JOHN BLOOD offered to help the founder and majority shareholder of CERTA DOSE, DR. CALEB HERNANDEZ (*hereinafter* "DR. HERNANDEZ"), offering to help incorporate the Company on July

3

12, 2013, which JOHN BLOOD did through his connections at COOLEY LLP, acting as incorporator. Thereafter, COOLEY LLP acted as counsel for CERTA DOSE and remained its principal counsel.

22.    With regard to the facts of the preceding paragraph, JOHN BLOOD informed DR. HERNANDEZ: that he had previously worked with the law firm COOLEY LLP; that it was the best in the business for startups; that COOLEY LLP was expensive, but that it was worth it; and that he could use his connections in COOLEY LLP to perhaps negotiate a discount.   JOHN BLOOD treated his ability to bringing on COOLEY, LLP as one of the greatest assets that he brought to the table.

23.    Upon initially meeting JOHN BLOOD'S contacts at COOLEY LLP, KELLY BARTLING and MICHAEL L. PLATT, they informed DR. HERNANDEZ that they had worked numerous times in the past with JOHN BLOOD, that they were familiar with how he did business, and that JOHN BLOOD was very knowledgeable and would be able to provide good internal legal guidance for the proposed startup. (This last statement not only served as support for JOHN BLOOD, to build confidence in him, but it is also—*as a matter of law*—a false statement: people who are not lawyers cannot provide legal guidance.)

24.    Although admittedly familiar with JOHN BLOOD'S business practices, KELLY BARTLING and MICHAEL L. PLATT failed to inform DR. HERNANDEZ about JOHN BLOOD'S practice of running up the debt of a company for his own personal benefit, *i.e.*, so as to facilitate its sale (*an arrangement that financially benefited COOLEY LLP, JOHN BLOOD and the preferred stockholder investors that benefited from the desperation, dilution and windfall resulting from the combination of JOHN BLOOD and COOLEY LLP'S efforts*), as noted further below. *See, e.g.,* **EXHIBIT 1** ¶¶ 44, 57, 67-72, 75-77, 109-111.   In fact, what they did communicated at the time was not only false, as noted above, but also served to conceal this material information.   In all of their dealings with CERTA DOSE, neither COOLEY LLP, KELLY BARTLING, MICHAEL L. PLATT, nor any other COOLEY LLP attorney ever informed CERTA DOSE of JOHN BLOOD'S *modus operandi*, despite purportedly not representing JOHN BLOOD.

25.    The facts addressed in the preceding three paragraphs—*particularly when taken in light of the totality of the circumstances addressed in this Complaint*—raise the inferences that: (**1**) COOLEY LLP'S startup practice, as well as the attorneys concerned, benefited financially from its relationship with JOHN BLOOD; (**2**) the attorneys and firm concerned treated the relationship with JOHN BLOOD as more valuable or important to them than the fiduciary obligations that they owed to a client and to a prospective client; (**3**) the attorneys and firm concerned were willing to repeatedly engage in a pattern, and in a relationship, that profited them, which involved the kinds of business practices that this Complaint attributes to JOHN BLOOD, as well as a degree of sanction for JOHN BLOOD'S business practices; (**4**) the attorneys and firm concerned were willing to conceal the material dangers implicated from those to whom they owed fiduciary obligations, showing more loyalty to JOHN BLOOD than to their fiduciary; and (**5**) the attorneys and firm concerned entered this arrangement with JOHN BLOOD knowingly and intentionally, acted with knowledge of the results that JOHN BLOOD had and would likely have, and also, therefore, acted with intent in all of their dealings, as addressed in this Complaint, *infra*.

26.    Upon the preceding facts (*e.g.,* **EXHIBIT 1** ¶¶ 26-30, *supra*), upon the totality of the circumstances, as well as upon information and belief, it is evident that COOLEY LLP and JOHN BLOOD used concealment of the actual nature of their relationship and modus operandi—*through failures to disclose, failures to give informed consent, coupled with waiver instruments such as arbitration agreements*—to preserve their ability to

gain the confidence of future startups in a pattern that benefited them financially, allowing them a continued means to serve up startups to venture capital firms and other predatory investors.

27.    In its investigation for this litigation, CERTA DOSE has discovered that COOLEY LLP has used this same model of practice with at least one other startup, further raising an inference that this is its *modus operandi* with regard to startups. *See* **EXHIBIT 1** ¶¶ 26-31, *supra*.

28.    On or about December 19, 2014 through December 22, 2019, COOLEY LLP purportedly represented CERTA DOSE in all matters concerned regarding an AMENDED AND RESTATED CERTIFICATE OF INCORPORATION OF CERT A DOSE, INC., which was amended to account for the sale of preferred stock—*through number of agreements that are incorporated herein by reference*—to Defendant COPIC INSURANCE COMPANY, who COOLEY LLP also represented. A true and accurate copy of the SERIES SEED PREFERRED STOCK FINANCING binder, containing the AMENDED AND RESTATED CERTIFICATE OF INCORPORATION at 64-81 *thereof.* The principal attorney from COOLEY LLP involved in these dealings was MICHAEL L. PLATT. JOHN BLOOD acted as President of CERTA DOSE in the transactions. These transactions and corporate actions included a SERIES SEED PREFERRED STOCK PURCHASE AGREEMENT, an INVESTOR RIGHTS AGREEMENT, a CO-SALE AGREEMENT, and a VOTING AGREEMENT, which are incorporated herein by reference.

29.    In the transactions referenced in the preceding paragraph, neither COOLEY LLP, MICHAEL L. PLATT, nor JOHN BLOOD informed CERTA DOSE, INC., including the majority shareholder of CERTA DOSE of: (**1**) the consequences that were likely, known, and which would result from the kind of preferred stock that was being provided to COPIC; or (**2**) the nature and legal significance of the anti-dilution provisions and minority stock protection provisions involved, which would work together over time to provide all of the protections of a minority to COPIC, yet made it a practical certainty that COPIC would, in time, become the majority shareholder of CERTA DOSE and own its intellectual property.

30.    Although the transactions and instruments concerned in the preceding two paragraphs required the informed consent of CERTA DOSE'S majority shareholders, the material facts mentioned and referenced in paragraphs 26-34 of **EXHIBIT 1** were never provided to, and concealed from, the majority shareholder, DR. HERNANDEZ, when his consent was sought by the Defendants and faithless fiduciaries concerned (*raising the inference that the actions taken by the Defendants and faithless fiduciaries concerned were improper, fraudulent and void*).

31.    Through the transactions referenced in the preceding three paragraphs, Defendant STEPHEN R. HOFFENBERG became a director of CERTA DOSE, INC.; nonetheless, even after becoming a fiduciary of CERTA DOSE, INC. and its shareholders, he too failed, and even refused, to disclose the nature, effect and consequences of the preferred stock concerned to CERTA DOSE'S majority shareholder, DR. HERNANDEZ, and to CERTA DOSE, INC. Similarly, STEPHEN R. HOFFENBERG failed to provide the other material facts and information addressed in this Complaint which—*due to his position with COPIC and the totality of the circumstances concerned*—he knew, withheld and concealed to the detriment of CERTA DOSE and its good faith investors.

32.    Between May 26, 2016 and June 13, 2016, the foregoing agreements and instruments were amended and restated in a SERIES SEED 2 PREFERRED STOCK PURCHASE AGREEMENT, a

CERTA DOSE, INC. AMENDED AND RESTATED INVESTOR RIGHTS AGREEMENT, a CERTA DOSE, INC. AMENDED AND RESTATED CO-SALE AGREEMENT, and a CERTA DOSE, INC. AMENDED AND RESTATED VOTING AGREEMENT. The principal attorney from COOLEY LLP involved in these dealings was MICHAEL L. PLATT.

33.    Given the totality of the circumstances surrounding the amendments and restatements referenced in the preceding paragraph (*such as the conflicts of interest concerned, factors that worked materially against the interest of CERTA DOSE, and the incentives for wrongdoing that are implicated on behalf of the Defendants concerned in these transactions*), and given the reasonable inference that an attorney understands the legal effect of his or her work product, while those not educated in the law typically do not, these facts raise the inference that COOLEY LLP and MICHAEL L. PLATT operated to benefit their client COPIC, yet at the expense of CERTA DOSE (*despite asserting that they were representing, principally or exclusively, the interests of CERTA DOSE, INC.*), while also acting to their own economic benefit. *See, e.g.*, **EXHIBIT 1** ¶¶ 26-37.

34.    In the transactions referenced in the preceding paragraph, neither COOLEY LLP, MICHAEL L. PLATT, JOHN BLOOD, nor Defendant STEPHEN R. HOFFENBERG informed CERTA DOSE'S majority shareholder or CERTA DOSE, INC. of the consequences that were likely, and known to these Defendants, which should have been known to them, and which also would almost certainly result from the kind of preferred stock that was being provided to COPIC INSURANCE COMPANY, as would be known by people with the background in business and law of these Defendants (*particularly given the advice of* COOLEY, LLP), and as also implicated by the facts referenced in ¶¶ 26-38 of **EXHIBIT 1**. (This raises the inference that the Defendants' statements as to informing the Company's majority of shares, as required by Delaware law, were deceptions and affirmative misrepresentations, and that the associated breaches of fiduciary duties were knowing and intentional, as they were conducted despite an affirmance to the contrary.)

## II.  EARLY 2018: BREACH OF FIDUCIARY DUTIES, PERMITTED WASTE, INTENT TO LOOT.

35.    CERTA DOSE began 2018 with roughly $3.5 million in convertible promissory notes that had been raised from friends and family of the shareholders, mostly the friends and family of DR. HERNANDEZ. This occurred after CERTA DOSE had been extended promising business opportunities in New York following favorable recognition in the industry, which its proprietary technology received in November of 2017. Due to the efforts and urgings of JOHN BLOOD, STEPHEN R. HOFFENBERG and COPIC INSURANCE COMPANY, the noteholders referenced in this paragraph, *i.e.*, the 2017 noteholders, were told to expect a Series A in the Fall 2018. These investors/noteholders were informed by Defendants COOLEY, LLP, MICHAEL L. PLATT, JOHN BLOOD, COPIC, and STEPHEN HOFFENBERG that they would receive preferred stock with the discounts listed in the notes. This, however, was a lie, as all those Defendants knew that by virtue of how the preferred stock provisions in the CERTIFICATE OF INCORPORATION functioned—*which these investors had not been provided nor informed of*— none of the good faith noteholders would receive preferred stock or the referenced discount. *See* ¶¶ 33-39 of **EXHIBIT 1**. JOHN BLOOD even calculated that the investors would not receive preferred stock or the discount. *See, e.g.*, **EXHIBIT 1** at ¶¶ 99, 109-110.

36.    As per the language of the note instruments, COOLEY LLP purportedly represented CERTA DOSE as its principal client, but also purported to represent the noteholders.

37.     In this, COOLEY LLP included a waiver of conflicts in the note documents; however, COOLEY LLP never actually informed CERTA DOSE, nor the noteholders, of what the conflicts were, what the nature of the conflicts were, nor did it advise any of them concerning the consequences of the language in the agreements, which ultimately implicated conflicts with the interests of COPIC, as further noted in this Complaint. *Cf. id.*

38.     At this time (*see* **EXHIBIT 1** ¶ 40), JOHN BLOOD, STEPHEN R. HOFFENBERG and COPIC INSURANCE COMPANY also asked DR. HERNANDEZ to be CEO and Chairman of CERTA DOSE, INC., yet they did so in a context where it was made clear, and understood, that he was, nonetheless, still to go to New York to further CERTA DOSE'S interests in the business opportunities concerned.

39.     With regard to the facts identified in the preceding paragraph, it later became evident to the Company—*in its subsequent investigations and through review of the corporate records and e-mails that had been hidden by the Defendants concerned, which followed the dismissal of the* COPIC-appointed Directors *and* JOHN BLOOD—that having the CEO and Chairman in New York was used by those later-dismissed fiduciaries to conceal the steps that these Defendants were taking to drive up the debt of the Company, to cause waste, and to use those circumstances as the principal means of forcing a sale of shares that would benefit their investor affiliates, *i.e.*, Defendants COPIC INSURANCE COMPANY, ALAN YOUNG SYNN, DAVIS K. HURLEY, BRIAN C. HARRINGTON, DANIEL LEE MILLER, NILES COLE, J. DANIEL MILLER, JEFFREY ALVIN DORSEY, GERALDINE A. LEWIS-JENKINS, MATTHEW FLEISHMAN, THEODORE J. CLARKE, THOMAS S. COWAN, ANTHONY R. MAYER, PHOEBE FISHER, LFD III GRAT-TRUST U/A 8-26-2015, KATHERINE DRISCOLL, Trustee, and LEE F. DRISCOLL, at the expense of CERTA DOSE, INC. (COOLEY, LLP used the distance, and the practical difficulties of assembling the entire board, which included those complained of, as a pretext for not addressing the issue in the methods required by the rules of professional conduct); *cf.* ¶¶ 53-59, 72-83 of **EXHIBIT 1**.

40.     The facts concerned therefore raise the inference that the effort of moving of DR. HERNANDEZ to New York, while also making him CEO and the Chair of the Board, were an intentional and knowing set of acts complained of, which was instrumental in the coordinated effort of the Defendants concerned to ultimately transfer the assets, shares and control of CERTA DOSE from those in the Company to whom the COPIC-appointed Directors and JOHN BLOOD owed fiduciary duties to their affiliates. *See id.* In short, encouraging DR. HERNANDEZ to move to New York allowed these Defendants to operate without oversight and to easily have secretive meetings without the knowledge and oversight of CEO and Chairman, or ultimately the Company.

41.     In January of 2018, JOHN BLOOD was also hired as COO/CFO of CERTA DOSE, following a conversation that he had with the COPIC-appointed director, Defendant STEPHEN R. HOFFENBERG, and DR. HERNANDEZ. (Although JOHN BLOOD had originally taken part in the incorporation of the Company, he had stepped away from the business after bringing in COPIC.) Once it was found that CERTA DOSE was valuable,[1] JOHN BLOOD'S interest in the Company was aroused, and

---

[1] At roughly the time that JOHN BLOOD first left CERTA DOSE, INC., he informed DR. HERNANDEZ that he had experience with a lot of companies and that his approach was to see if a company was ripe for applying his special approach to business. If a company was not ripe for his approach, JOHN BLOOD admitted that he would move on to another company with which he had

he pursued a place in the Company with a zeal that was, significantly, also aimed at dealing specifically with the funds of the 2017 notes, as noted below. *See, e.g.,* **EXHIBIT 1** ¶¶ 48-51, 57, 66-67 and 75. To gain the Company's confidence at this time, and to gain greater control over the operations and capital of the Company, JOHN BLOOD lied to DR. HERNANDEZ, stating that the prior CFO had falsified the Company's financials and that the financials were largely a work of fiction. The COPIC-appointed director, Defendant STEPHEN R. HOFFENBERG, and JOHN BLOOD both urged DR. HERNANDEZ that it was appropriate for JOHN BLOOD to rectify this problem through accounting. (As detailed below, however, JOHN BLOOD would burn through the aforementioned $3.5 million in 6 months; a fact he kept from the CEO in New York.) *See* **EXHIBIT 1** ¶¶ 40, ¶¶ 48-51, 57, 66-67 and 75. Although Company records and subsequent review by accountants reveal that JOHN BLOOD had done zero accounting, and had not even made a journal entry with regard to the finances, he stated—*at this time*—that his efforts to correct and rectify the books were akin to changing the engine on a car as it went down the road at 60 mph, and while changing the tires.

42.     JOHN BLOOD did not raise any of the aforementioned capital (*see* **EXHIBIT 1** ¶ 40). He was, however, given the task managing the financials, while helping with the organizational structure of the Company and its operations. (The COPIC-appointed Directors and JOHN BLOOD convinced DR. HERNANDEZ that it would be best for him to be in charge of new product development and product manufacturing while in New York; JOHN BLOOD would stay Colorado to run operations and what was believed at the time to be the core business, as well as sales.)

43.     When DR. HERNANDEZ first arrived in New York, JOHN BLOOD had not brought up any concern about finances, despite being asked; however, within one month, both he and STEPHEN R. HOFFENBERG told DR. HERNANDEZ that there was an urgent need to raise capital, but that the good news was that they had some of their investors on hand who could come in with that capital. At that time, JOHN BLOOD mentioned that the Company would have to do an emergency funding round, which was a surprise, as JOHN BLOOD and STEPHEN R. HOFFENBERG had actually sent some of the funding that had been raised in the 2017 notes back to investors "because they were not the kind of investors that [they] want[ed]."

44.     DR. HERNANDEZ was surprised and upset that JOHN BLOOD was not keeping him up to date on the financial state of the Company despite numerous requests. He informed both STEPHEN R. HOFFENBERG and JOHN BLOOD that there should have been  some explanation or diligence to present the situation within the 6 months concerned so that the Company could address issues appropriately and, at a minimum, do some degree of planning. STEPHEN R. HOFFENBERG responded by saying, "we all make mistakes and we need to look out for each other." DR. HERNANDEZ noted that when he asked JOHN BLOOD for information, he had simply replied, "I've got this, don't worry about this; I know what

connections where investment money was present or coming in, where he could then apply his approach to business. As noted earlier, JOHN BLOOD had a specific methodology that he applied to companies with significant investment funds; companies that could then be sold to venture capitalists with whom he and/or COOLEY, LLP had relationships, but at an artificially created discount. That methodology, however, depended on the company concerned being ripe for investment, such as when CERTA DOSE, INC. received FDA approval and industry recognition of its technology. *See, e.g.,* **EXHIBIT 1** ¶¶ 29-42, 57, 66-67.

I'm doing. You're a physician and you'd get upset if I asked you to explain yourself about medicine. I'm like a doctor when it comes to finances and I have this covered." The evident cooperation between JOHN BLOOD and STEPHEN R. HOFFENBERG seemed out of place, particularly given the fact that they were directing the rounds of funding only to their affiliates and refusing others who were interested in investing. It felt like a bit of an ambush to DR. HERNANDEZ, but he trusted these fiduciaries and they had also left no other option to the Company but what they were willing to bring in in the eleventh hour.

45.     After the capital had been raised in the 2018 notes,[2] JOHN BLOOD mentioned that he wanted to start hiring more employees. Dr. Hernandez told him that he was concerned about that, as the previous money had been used so quickly. JOHN BLOOD responded by saying, "Caleb, don't worry, even if we don't sell a single bit of product, I've already done the calculations and we have 14 months of runway. We're safe and in a good position: trust me, I know how to build world-class organizations." STEPHEN R. HOFFENBERG supported JOHN BLOOD in this position and affirmed that what he said was true.

46.     Shortly after this, DR. HERNANDEZ asked JOHN BLOOD, in the presence of STEPHEN R. HOFFENBERG about looking into changing banks. JOHN BLOOD noted that did not like the idea, but said he would look into it. He then went to the Company's controller/CPA, who had also been telling him for some time that the Company could be making more interest on the savings at another bank (2% vs. 0.1%), but JOHN BLOOD told her a different story than that he had told DR. HERNANDEZ, as recounted in the preceding paragraph. JOHN BLOOD told her, "Don't worry about it, we'll be through all this money in 4 months or so, so it's not worth it to make the change." JOHN BLOOD then came to the board with a pretext for not changing the bank that had nothing to do with what he told the controller, saying that it was "too much brain-damage" to change the bank; that it would be "incredibly distracting and time-consuming" to do so and that the Company should wait until after Series A.

47.     An employee who was also a noteholder, who is also known to all Parties to this action (CERTA DOSE'S Chief of Design at the time), also came on board with the Company in January of 2018, due to the need to have a designer involved for the products that were linked to the business opportunities

---

[2] Although the 2017 noteholders had been promised a Series A, and although the round of funding exceeded the amount needed to convert the notes, JOHN BLOOD and COPIC maneuvered the circumstances, in numerous ways, to ensure that the investment coming in was only in the form of promissory notes to their affiliates. These facts, taken in light of the totality of the circumstances (*including the referenced deception*), raise an inference that the Defendants concerned: (**1**) intended to create dept that would then be used to effect a hostile takeover; (**2**) were working with their affiliated noteholders to this end; and (**3**) the steps taken in furtherance of this coordinated effort were intentional on the part of all concerned, particularly as JOHN BLOOD disparaged the notes. (These inferences also arise from these fact that a reasonable investor—*i.e., an investor who did not know that that he or she had an agent in the Company who would drive up the debt up so as to ultimately create a Series A, down the road, that only had such an investor and their affiliates invited to it and which would produced a total change in the ownership of the Company at an artificially discounted price*—would prefer a Series A to simply purchasing notes that their ally within the Company considered to be on par with feces. It also raises the inference that these investors were working with COPIC, as its control of the notes is what made them dangerous to investors/noteholders and comparable to feces, as per JOHN BLOOD'S admissions. *See* **EXHIBIT 1** ¶¶ 61-62.

developing in New York.  (By the end of 2019, the New York-based operations would be the core business of CERTA DOSE, INC., bringing in 85% of the Company's revenue. Previously, and during this time, the aforementioned employee who was also a noteholder was an investor in the Company through the aforementioned convertible promissory notes.  He had also worked earlier on CERTA DOSE projects as a third-party contractor.

48.      When the aforementioned employee who was also a noteholder entered the agreements concerned in the aforementioned convertible promissory notes—*which he entered into with all of the other parties to the note agreements on March 7, 2017 through December 15, 2017, July 2-16, 2018, and March 14 through April 19, 2019, as noted in the Company's bridge financing binders*—he was sent the agreements and instruments concerned in New York, which he executed in New York and then mailed back to CERTA DOSE, INC. (ERIC EISBRENNER and LARRY MILLER, who executed for CERTA DOSE, INC., were in Texas at the time).  Nonetheless, the convertible promissory note instruments were, by their end, agreements that were governed by common provisions, which included covenants that were made by and between STEPHEN R. HOFFENBERG, CERTA DOSE, COPIC, COOLEY LLP, MICHAEL L. PLATT, ALAN YOUNG SYNN, DAVIS K. HURLEY, BRIAN C. HARRINGTON, DANIEL LEE MILLER, NILES COLE, J. DANIEL MILLER, JEFFREY ALVIN DORSEY, GERALDINE A. LEWIS-JENKINS, MATTHEW FLEISHMAN, THEODORE J. CLARKE,  THOMAS S. COWAN, ANTHONY R. MAYER, PHOEBE FISHER,  LFD III GRAT-TRUST U/A 8-26-2015,  KATHERINE DRISCOLL, Trustee, LEE F. DRISCOLL and all of the other noteholders (*of whom three were New York residents*).  The aforementioned employee who was also a noteholder's dealings on all but the first convertible promissory note were with JOHN BLOOD.

49.      As noted in the preceding paragraph, all of the parties to the promissory note agreements exchanged covenants with New York residents, as with the aforementioned employee who was also a noteholder.

50.      After the aforementioned employee who was also a noteholder had become an employee of CERTA DOSE, JOHN BLOOD contacted the aforementioned employee who was also a noteholder about amending the notes and informed the aforementioned employee who was also a noteholder that the notes could be amended merely with his signature and the approval of COPIC, but that if the aforementioned employee who was also a noteholder did not sign, that the notes would nonetheless be amended (*indicating that COPIC essentially held the power to amend the notes at will*). *See also* **EXHIBIT 1** ¶¶ 52-53.

51.      With regard to the facts referenced in the preceding paragraph, JOHN BLOOD also used his position as a superior officer to pressure the aforementioned employee who was also a noteholder into signing an amendment of the notes that kept them from maturing or converting into equity, intimating that there could be negative consequences for the aforementioned employee who was also a noteholder's employment if he did not comply.

52.      Because JOHN BLOOD took steps with the COPIC-affiliated Directors to keep the 2017 notes from converting into equity—*despite the fact that those noteholders, aside from COPIC, all wished to become equity*—insisting that the 2017 notes remain debt instead of being converted into equity with the promised Series A, it is evident that JOHN BLOOD and COPIC were on the same page of creating debt that brought no benefit to the noteholders or the Company, but which would benefit COPIC, JOHN BLOOD, and their affiliates.  (COPIC specifically noted that it would oppose efforts to convert the debt into equity.)  This not

10

only shows that COPIC, JOHN BLOOD and STEPHEN R. HOFFENBERG all deceived the Company and the 2017 noteholders, with the help of COOLEY, LLP, but these inferences are also bolstered by the fact that JOHN BLOOD spent the $3.5 raised through the 2017 notes in 6 months. (**The 2017 notes included the retirements and savings of over 24 people and trusts, raising the inference that the wrongdoing concerned was committed with a depraved heart.**) This, in turn, also shows that JOHN BLOOD and COPIC had no intention of spending the money concerned in accordance with any duty of care, as he deceptively indicated with his lies as to the previous accounting, but that COPIC and JOHN BLOOD, instead, had the intention—*from the beginning*—of bringing in new investment, in the form of promissory notes on account of the debt, which would be funneled only to their affiliates. *See* **EXHIBIT 1** ¶¶ 46-51.

53.      This was concealed from the CEO and Chairman of CERTA DOSE (*who was in New York*), as it was revealed in the later investigation that: (**1**) JOHN BLOOD'S subordinate employees were told by him not to communicate this information to the CEO; (**2**) the CEO was told something materially different as to the status of the money raised in the 2017 notes;[3] and (**3**) being in New York, the CEO and Chairman did not have access to seeing what was happening in the Colorado office and depended upon JOHN BLOOD, the rest of the board, and the information he was provided by employees. The efforts that JOHN BLOOD would take to control employees at the Colorado office and to conceal information from the New York office is recounted in DR. HERNANDEZ'S annexed affidavits. These efforts were, thus, used to conceal the material information at issue from the Company.

54.      With regard to the facts referenced in paragraphs 52-53 of **EXHIBIT 1**, the aforementioned employee who was also a noteholder made it clear to JOHN BLOOD that he preferred to have his notes either mature or become an equitable interest, given that the funds that were being invested in the bridge rounds could have simply been treated as a conversion event under a good faith view of the provisions of the contract (*if all concerned were treating each other fairly*). At the time, the actions simply did not make sense to the aforementioned employee who was also a noteholder, as the facts that would ultimately lead to the understanding the significance of these circumstances had not been revealed by COOLEY LLP or its attorneys, COPIC, JOHN BLOOD or the COPIC-affiliated Directors, nor had it been revealed by the troubling circumstances leading to the removal of the COPIC-affiliated Directors and JOHN BLOOD, nor the investigation that followed, making any purported prior representations of disclosure affirmative misrepresentations. The aforementioned employee who was also a noteholder's referenced confusion was representative of the confusion experienced by the other 2017 noteholders, who had been kept in the dark of the material information concerned by the Defendants: something that would come to light in the investigation following the suspension of JOHN BLOOD.

55.      In the interactions referenced in the preceding three paragraphs, JOHN BLOOD did not inform the aforementioned employee who was also a noteholder of the evident intentions that he or COPIC, or their affiliated investors had with regard to the notes, which is something that was discovered later when the aforementioned employee who was also a noteholder later became the COO of CERTA DOSE and had access to JOHN BLOOD'S documents following JOHN BLOOD'S suspension. Similarly, when the aforementioned employee who was also a noteholder purchased the notes (*and even after he became a shareholder prior to his notes converting on November 15, 2019*), JOHN BLOOD refused to share the material information concerned as to his intentions for the notes (*or the intentions of COPIC and COOLEY LLP*), for CERTA

---

[3] *See, e.g.,* **EXHIBIT 1** ¶¶ 48-51.

DOSE, to create debt and waste, and to disavow any duties of good faith to the noteholders, particularly the 2017 noteholders.

56.     After JOHN BLOOD'S suspension, CERTA DOSE discovered that JOHN BLOOD would openly tell the COPIC-appointed Directors that the promissory notes were horrible, actually comparing them to feces, in crude terms, and that he could not imagine why anyone would be so "stupid" as to buy them.  JOHN BLOOD would, however, then turn around and tell investors that the notes were amazing and that they were one of the best investments imaginable.  This information was discovered by interviewing JOHN BLOOD'S subordinates, whom he had also instructed not to disclose information concerning his activities to the CEO.  Because the notes concerned had so many terms that were against the interests of CERTA DOSE and in the favor of COPIC (*although COOLEY LLP had purportedly written them to the principal benefit of CERTA DOSE*), this strange behavior from JOHN BLOOD would otherwise simply be perplexing, were it were not for the fact that he knew COPIC could amend the notes at will to make the notes and their terms essentially meaningless, constantly extending them or changing the terms of their promised payment.  A strong inference, therefore, arises that JOHN BLOOD made affirmative misrepresentations to both CERTA DOSE, INC. and any good faith noteholders, *i.e.*, those who were not affiliated with COPIC and JOHN BLOOD, through his efforts to sell the notes, especially as only one of his conflicting statements could be true. (Because these acts were done in furtherance of the scheme, all those who took part in the scheme, or who aided and abetted those involved, are also liable for this misrepresentation.)

57.     The inferences of wrongdoing and bad faith identified in the preceding paragraph became further evident when CERTA DOSE discovered an e-mail from JOHN BLOOD to the COPIC-affiliated Directors, dated September 17, 2019, indicating that they would use a $97 Million valuation to value the interests of those who were not their affiliates, whereas their affiliates—*as noted below*—were to receive a valuation of roughly $15 Million. *See also* **EXHIBIT 1** ¶¶ 99, 110.

58.     Upon facts such as those of the preceding paragraph, it became evident to CERTA DOSE—*in its investigation following the suspension of JOHN BLOOD and the COPIC-appointed Directors*—that the referenced faithless fiduciaries intended to apply different terms to the noteholders in a Series A than they would apply to their affiliated investors and that, intrinsically, the affiliated investors of these faithless fiduciaries intended to apply different terms to themselves in a Series A than they would to the noteholders.

59.     The aforementioned employee who was also a noteholder informed CERTA DOSE that he would never have invested in CERTA DOSE if the intentions of JOHN BLOOD and the COPIC-affiliated Directors had been disclosed to him.  Because the associated concealment was managed by JOHN BLOOD and the COPIC-affiliated Directors in furtherance of the hostile takeover scheme, all those who took part in the scheme, or who aided and abetted it, are also liable for the associated deception, and this also serves to show that but for the concealment and deception, the 2017 noteholders would not have been deprived of the value of their investment.

60.     The facts concerned in the preceding ten paragraphs also raise the inference that COPIC, JOHN BLOOD and the COPIC-affiliated Directors all knew the significance of provisions that had actually been written in their favor and in the favor of their affiliates, yet to the detriment of CERTA DOSE and the good faith noteholders, *i.e.*, those who were not receiving the preferential treatment that JOHN BLOOD and the COPIC-affiliated Directors were giving to COPIC, its affiliates and JOHN BLOOD'S affiliates.  These

facts—*especially when considered in light of its concealment on behalf of JOHN BLOOD, COPIC, their affiliated investors, and the COPIC-appointed Directors*—also indicate that COOLEY had likely written the documents concerned to the benefit of COPIC, JOHN BLOOD and their affiliated investors (*who it turns out would be the only parties invited to a Series A financing round*), particularly in light of the fact that COOLEY, LLP knew of JOHN BLOOD'S method of operation.

61.      While DR. HERNANDEZ was in New York (*following the aforementioned January 2018 meetings*), JOHN BLOOD began to spend inordinate and unsound amounts of the Company's funds, as evidenced by Company records and also by the later review of accountants.  For example, it was discovered in CERTA DOSE, INC.'S investigation, and in reviewing billings that COOLEY, LLP sent to JOHN BLOOD, that JOHN BLOOD allowed COOLEY LLP to begin billing at higher prices than their engagement letter, with his evident knowledge, while not bringing that to the Company's attention (*something that benefited both of these fiduciaries at the expense of the Company, particularly when considered in light of the totality of the circumstances*).  (As also noted, JOHN BLOOD and COOLEY, LLP took efforts to conceal this information and its significance from the Company.) *See, e.g.,* **EXHIBIT 1** ¶¶ 26-42, 77-83.

62.      Among other things, JOHN BLOOD took the actions complained of in the preceding paragraph by: (**1**) working with STEVE RUBIN and STEPHEN R. HOFFENBERG to keep the promissory notes from becoming equity—*pushing strongly under the threat of COPIC'S displeasure if the wishes of the COPIC-appointed Directors were not complied with*—to have the notes remain debt whenever a vote of the matter arose; (**2**) expending a fortune in legal fees to COOLEY LLP, spending roughly $30,000 a month—*and more than twice as much as other firms ultimately offered to charge for the same work*—because of the understanding that COOLEY LLP was somehow, in an undefined way, essential for the success of the startup operation;  (**3**) pushing for, and hiring, a giant cast of employees and paying them well above the market rate—*salary with benefits*—for jobs that were previously done on an "as needed" basis by outsourced services at a fraction of the cost, something that could not have been done without the pressure of JOHN BLOOD and the COPIC-affiliated Directors working within the Company to achieve these ends.  In short, JOHN BLOOD worked, intentionally, and even against the wishes of the CEO—*his superior officer*—to spend through the roughly $8,000,000 dollars of funds that had ultimately been raised through all the convertible promissory notes by August of 2019, spending at a burn rate of roughly $500,000 a month, which JOHN BLOOD did with the full knowledge of COPIC, the COPIC-affiliated Directors and noteholders, along with the JOHN BLOOD-affiliated noteholders/investors.  This was all in accordance with his admitted *modus operandi* of driving up the debt of a Company to then profit when it was sold to investors with whom he had a relationship, who would then compensate him at that point (*which he confessed to a subordinate employee, as discovered in the investigation following his suspension*). *See, e.g.,* **EXHIBIT 1** ¶ 68.

63.      It was later discovered, in the investigation following JOHN BLOOD'S suspension, that the accountant and controller who worked under JOHN BLOOD—*and whom he, as a habit, continually intimidated so as to conceal his activities*—had informed him repeatedly that the burn rate was fiscally unsound, yet that JOHN BLOOD, nonetheless, insisted on operating the Company at that burn rate.  (Because JOHN BLOOD depended on the expertise of this accountant and controller—*being that she was an actual accountant, and was accomplished and competent in the requisite proficiencies, and in light of the fact that accountants would generally view it as dishonest for JOHN BLOOD to refer to himself as an accountant, given his measurable lack of necessary and marketable skills in that regard, as ultimately discovered in the Company's investigation*—the facts concerned in this paragraph

demonstrate that JOHN BLOOD acted knowingly, wantonly, for his own profit, and intentionally when acting in opposition to the controller's warnings.) *See also* **EXHIBIT 1** ¶¶ 48-51.

64.     Before his suspension, JOHN BLOOD informed employees and investors that a large pharmaceutical company would be doing the Series A investment, wherein he spoke of this Series as if it were a foregone conclusion. Once he was suspended, however, the Company discovered that there was never an offer on the table and that the large pharmaceutical company concerned never even reached the point of anything approaching a serious conversation on the topic, nor did any decisionmaker with apparent power at that company ever make such a communication. Nonetheless, JOHN BLOOD used this as an excuse with some of those who questioned him to continue to spend as if such a Series A were a sure thing even though the Company was bleeding financially due to JOHN BLOOD'S efforts. This was also further deception hiding the fact that he intended, all along, for it to be his affiliates and the COPIC-affiliated investors who came in on the Series A. These facts raise an inference of JOHN BLOOD'S statements being deception that concealed what he was actually doing and that bought him time in doing so. This set of facts also raises the inference that is was his intention to actually create debt within the Company through waste, beginning expensive projects that had no reasonable likelihood of achieving their ends before the money devoted to them was spent, but which certainly achieved the end of creating debt through such waste of the note funds.

65.     As another example, although JOHN BLOOD communicated to others that the business would be selling product with the JIT (just in time) business model, wherein product would be produced just in time for the distributors as orders came in, that was actually a deception. To inflate the sales numbers, JOHN BLOOD had actually purchased more than 20,000 vials of epinephrine and had placed a purchase order to produce 20,000 kits. In this, JOHN BLOOD wasted money and product, further evidence of his methodology to create debt/waste in the Company for his own, ultimate personal benefit. In this, JOHN BLOOD took these actions with distributors so that it appeared as if the Company had consumer sales, which JOHN BLOOD both knew not to be the case and which he actually took steps against, keeping the waste increasing, while limiting the securing of revenue to the Company (*which would have hindered his aim and methodology of creating debt so that he could profit in the forced sale of a company to investors with whom he had a relationship*).

66.     It was later discovered, as evidenced by Company records that had been kept hidden by JOHN BLOOD, as well as interview with employees, that JOHN BLOOD had communicated secretly with his affiliated investor Defendants: THOMAS S. COWAN; ANTHONY R. MAYER; PHOEBE FISHER; LFD III GRAT-TRUST U/A 8-26-2015, KATHERINE DRISCOLL, Trustee; and LEE F. DRISCOLL, informing them of the debt within the Company, of the control they would receive in a Series A round that would be based on a low valuation of the Company (*due to the debt JOHN BLOOD was creating*), and of his efforts to ensure that only they, their affiliates, COPIC, and its affiliates knew of the state of the COMPANY and would be invited to the Series A round of financing. *See, e.g.,* **EXHIBIT 1** ¶¶ 48-51, 99, 109-111. These facts, along with the fact that JOHN BLOOD continually and evidently acted as an agent for these investors within the Company—*by, for example, giving them preference above other investors and by computing capitalization tables for their benefit*—serve to demonstrate that JOHN BLOOD had an interest in these affiliates reaping a benefit from the waste and detriment inflicted upon CERTA DOSE by JOHN BLOOD'S actions, and which he oversaw, particularly as they fit within his pattern and admitted methodology of purposefully creating debt within a company to benefit from its sale in a Series A round of financing to investors with whom he was affiliated. *See also* **EXHIBIT 1** ¶¶ 22, 44, 57, 60, 67, 69-70, 77, and 109-111.

67.    The facts concerned in the preceding paragraph also raise the inference of a *quid pro quo* between JOHN BLOOD and his affiliated investors, as well as the inherent and significant support offered to JOHN BLOOD through the security that his efforts would be rewarded in taking such a risk—particularly as the relationships with these affiliated investors were ultimately described by JOHN BLOOD in economic terms and the efforts taken against CERTA DOSE, INC., through JOHN BLOOD'S actions, would make no economic sense without there being such a *quid pro quo*. *See* **EXHIBIT 1** ¶¶ 22, 44, 57, 60, 67, 69-70. This inference is also bolstered by the fact that the group of investors concerned, THOMAS S. COWAN; ANTHONY R. MAYER; PHOEBE FISHER; LFD III GRAT-TRUST U/A 8-26-2015, KATHERINE DRISCOLL, Trustee; and LEE F. DRISCOLL, knew of the debt, were kept informed by JOHN BLOOD of the debt (*which they knew he caused*), and affirmatively told the Company that one of their demands was that JOHN BLOOD remain within the Company (*despite the Company's protests about JOHN BLOOD'S misfeasance*), thereby providing support to JOHN BLOOD'S efforts to further the hostile takeover scheme, not merely through purchasing the securities concerned and through actions that would—*absent for the scheme*—be contrary to their interest, but through efforts to maintain their agent within CERTA DOSE, INC., continuing the efforts of the hostile takeover scheme. The fact that investors from this group had worked with JOHN BLOOD previously, which he and they admitted to the Company, also serves as evidence that this support of the JOHN BLOOD was knowing and intentional.

68.    It was also later discovered, in CERTA DOSE'S investigation following the suspension of JOHN BLOOD, that he communicated on an almost daily basis with then Director STEPHEN R. HOFFENBERG, doing so outside of the normal and proper channels, outside of Board meetings, outside of the presence of the Chair of the Board (*to an extensive degree*), and outside of the regular accountability that is created when a board functions as a body (*as opposed to individual board members taking unsanctioned action*). It was evident to employees who were subordinate to JOHN BLOOD, and who had been intimidated by JOHN BLOOD (*from the nature of the communications and the circumstances concerned*), when these employees relayed this information to CERTA DOSE during its investigation, that STEPHEN R. HOFFENBERG was managing JOHN BLOOD and monitoring the state of the Company on behalf of COPIC, the COPIC-affiliated investors, and its interests.

69.    As with the facts referenced in the preceding paragraph, STEVE RUBIN, who was a CPA, would also meet with JOHN BLOOD and would also review the state of the Company on the evident behest of COPIC. (This raises an inference that he and COPIC, along with their affiliated investors, indeed knew the state of the Company and what was being done to it by JOHN BLOOD'S efforts, which makes STEVE RUBIN'S efforts to keep the other noteholders from knowing this information evidence of concealment of the scheme and understanding to achieve a hostile takeover to the benefit of COPIC, its affiliated investors, and JOHN BLOOD'S affiliated investors.)

70.    The facts referenced in the preceding two paragraphs raise the inference that there was full knowledge among the Defendants concerned of the harm being done to the Company and to its good faith investors by JOHN BLOOD'S actions, particularly when those facts are considered in light of the circumstances, which also raise the inference of these Defendants' knowledge as to the benefit that they and their affiliates would reap from the harm concerned. (As noted, the 2017 notes included the retirements and savings of over 24 people and trusts, which JOHN BLOOD had deceptively burned through in 6 months to place his and COPIC'S affiliates in a favorable position.) *See* **EXHIBIT 1** ¶¶ 49-53 and 57. It also raises the inference that the referenced efforts in favor of waste and the associated hostile takeover were intentional and

were being kept from the Company by keeping their treatment out of the proper channels that a company needs to address such matters, *e.g.*, bringing matters to the attention of upper management and Company governance, or bringing these matters up in board meetings, so as to remedy them. This concealment would not have been possible without the transfer of the CEO and Chairman of the Board to New York and these Defendants took advantage of the CEO and Chairman of the Board's presence in New York to manage and oversee the creation of the debt and to keep it hidden from the parts of the Company's body that were needed to address the scheme, *e.g.*, the CEO and Chairman of the Board.

71.    JOHN BLOOD also took other efforts to create waste by sabotaging opportunities that the Company had to create revenue and also did so by alienating investors who were not his affiliated investor Defendants, *i.e.*, those noted in ¶ 53 of **EXHIBIT 1**, including extremely bizarre actions such as leveling racial insults at pharmaceutical executives.

72.    As per Company documents, numerous concerns raised by the facts referenced in the preceding paragraph were brought to the attention of the COPIC-appointed board members and to COOLEY LLP, yet no action or investigation was taken by these fiduciaries to stop JOHN BLOOD. To the contrary, the COPIC-appointed board members fought the efforts to address JOHN BLOOD'S waste (*even cryptically stating that the entire operation depended on JOHN BLOOD, which would only make sense if the operation involved driving up the debt and using that as a basis for selling control of the intellectual property to COPIC and those with which it was aligned*), which constituted support of his aforementioned efforts. *See, e.g., id.* Similarly, COOLEY, LLP, through Defendants MICHAEL L. PLATT and KELLY BARTLING *refused* to advise on the issue without the entire board being present, which they did despite being warned by DR. HERNANDEZ that the COPIC-appointed Directors were resistant to having the issue brought to the attention of the Board in any formal capacity, which would require it take action on the best advice of counsel. In this, Defendants MICHAEL L. PLATT and KELLY BARTLING took steps in contravention of Colo. RPC 1.13(a)-(d) and (f).

73.    Similarly, in the late summer and early fall of 2019, on a date known to ADAM DINOW, DR. HERNANDEZ approached ADAM DINOW in New York on CERTA DOSE'S behalf about the Company's concerns and about the steps that KELLY BARTLING was evidently taking to shelter JOHN BLOOD'S actions from being addressed by counsel, so that those actions could then receive proper attention on the Board. In response, ADAM DINOW portrayed that he was fully aware of the circumstances (*which raises an inference that he knew everything that* Defendants MICHAEL L. PLATT *and* KELLY BARTLING *knew, as noted, above*), yet he too refused to advise the Company as to how to deal with the circumstances concerned and also failed to take steps to rule out the likelihood of wrongdoing on the part of KELLY BARTLING. As alleged, these actions were in violation of the duties placed on ADAM DINOW by New York Rules of Professional Conduct 1.13(b). Instead, ADAM DINOW sent the matter back to MICHAEL L. PLATT. (Because ADAM DINOW was evidently familiar with the circumstances, an inference is raised that he knew of the wrongdoing and simply covered it up, internally, despite the aforementioned duty to speak and address the issues, and by actively steering it once more into the control of a co-conspirator in the hostile takeover scheme of COPIC and the JOHN BLOOD-affiliated investors: something that violates the standards required of an attorney and which also raises the inference that COOLEY, LLP, as an organization, was aware of the troubling circumstances and supported the scheme through concealment, obfuscation and retained control.)

16

74.     Under the totality of the circumstances, these aforementioned repeated refusals on the part of the COOLEY-affiliated attorney Defendants concerned to advise the Company when advice was requested by Company agents who certainly had the authority to request advice under the governing law and rules—*and the fact that the refusal was on bases that violated the applicable and governing standards of conduct*—raise the inference that the excuses given were pretextual and deceptive, and were, thus, affirmative steps in favor of a scheme from which COOLEY, LLP profited (*meant to avoid advising* CERTA DOSE, INC. *about a material conflict of interest that* COOLEY LLP *had on account of its relationship with* COPIC).

75.     This determined refusal to address the dangers to CERTA DOSE, as also noted in the preceding paragraph, served to insulate COPIC'S actions from proper treatment and discovery at a time when CERTA DOSE still had enough money to operate for about a year without needing further investment, if run properly: a factor that would not only have thwarted the evident takeover attempts by JOHN BLOOD, COPIC, STEVE RUBIN, STEPHEN HOFFENBERG and their affiliated investors earlier, but which also would have minimized the associated financial harms that the Company suffered from the efforts that JOHN BLOOD and the COPIC-affiliated Director Defendants continued to engage in to bring about that harm.  These determined refusals also show that COOLEY, LLP and its attorneys knew of these conflicts before all of the money concerned was spent, going back to its initial concealment, but had determinedly kept those issues from CERTA DOSE, INC., to whom it owed fiduciary duties of loyalty and candor. *See also* **EXHIBIT 1** ¶¶ 26-33, 37, 53.

76.     The financial harm associated with the wrongs referenced in the preceding two paragraphs would have been avoided if proper action had been taken by the attorney Defendants concerned.  Because these attorney Defendants were also informed by the Company of the difficulty that the complained of circumstances were creating for investment that coincided with its appraised value, *i.e.*, the Scalar valuation, the attorney Defendants were on notice that their excuses, obfuscation, concealment and refusal to comport with their legal and fiduciary duties of loyalty, care and candor—*as well as their duties to disclose the true nature of any conflict of interest involving* COPIC—also contributed to the loss of value that the Company suffered as the COPIC and JOHN BLOOD-affiliated Defendants created that loss of value so as to later profit from it in a Series A financing that provided an artificial discount to the COPIC and JOHN BLOOD-affiliated investors.

77.     The facts concerned in the preceding paragraph illustrate another example of COOLEY LLP and the attorneys concerned using legal pretext to conceal their improper relationships with the Defendants, *or other similarly-situated predatory investors*, and, as a result, the benefits that those involved in the improper relationships would all receive through the aid of this particular kind of  concealment. *See, e.g.,* **EXHIBIT 1** ¶¶ 26-42.

78.     The facts concerned in the preceding three paragraphs also illustrate examples of how COOLEY LLP and the attorney Defendants concerned provided aid to faithless fiduciaries and their affiliates, doing so to the detriment of a client, CERTA DOSE, to whom they owed fiduciary duties.

79.     In the late Summer of 2019, investors affiliated with COPIC and JOHN BLOOD made what appeared by all reasonable accounts to be a coordinated hostile takeover attempt, as JOHN BLOOD had coordinated meetings with those involved, which were kept secret from CERTA DOSE'S CEO and Chair of the Board, coordinating efforts between his affiliated investors, STEVE RUBIN, STEPHEN R. HOFFENBERG, COPIC, as well as COPIC'S affiliated investors.

80.     With regard to the facts of the preceding paragraph, a demand was made by CERTA DOSE for candor form the referenced fiduciaries—*JOHN BLOOD, STEPHEN R. HOFFENBERG and STEVE RUBIN*—as to the nature of their dealings with the affiliated investors, and further requesting candor with regard to the aims that the faithless fiduciaries and affiliated investors concerned had for the Company. Nonetheless, the demand was not honored, nor was the requested material information turned over to the Company or provided by the fiduciaries concerned (*despite the explicit acknowledgement by those fiduciaries that their fiduciary duties did indeed require them to provide candor to the Company*).

81.     The outright refusal to comply with candor requirements reference in the preceding paragraph—*particularly in light of the recognition by those fiduciaries of such obligations, as well as in light of statements which indicated that the COPIC-affiliated Directors intended to take part in the transaction concerned, along with statements that they also intended to invite only a specially invited list of family members and close affiliates, accidental admissions that they had discussed more with COPIC and the affiliated investors than they were willing to share with CERTA DOSE, INC., as well as the fact of the coordination between JOHN BLOOD, STEVE RUBIN, STEPHEN R. HOFFENBERG, COPIC and their related camps of secretly invited investors, which ultimately resulted in the hostile takeover offers that were made to CERTA DOSE, INC. progressively becoming worse through the elimination of any competition between these two camps*—raises the inference that there was self-dealing on the part of these evidently faithless fiduciaries and it also raises an inference that all of those involved in the two camps of affiliated investors were supporting the waste created by JOHN BLOOD, were benefiting from that waste, and were operating in an illicit manner that was benefited by the various forms of concealment employed by the various Defendants. *See also* **EXHIBIT 1** ¶¶ 22, 44, 57, 60, 67, 69-70. These circumstances also demonstrate a certain meeting of the minds between all of the Defendants concerned and further demonstrate that there was mutual support in a material and significant way that benefited all of the Defendants in the hostile takeover scheme.

82.     Given the circumstances raised in the preceding paragraph, an inference is also raised by the facts involved that the Defendants concerned significantly supported the breach of fiduciary duties concerned by *coordinating with the evidently faithless fiduciaries* for mutual reward at the expense of CERTA DOSE, INC., through a meeting of the minds with those faithless fiduciaries, and through taking part in a common plan and scheme—*evidencing a meeting of the minds*—which would not have been possible if the parties concerned had refused to so aid the faithless fiduciaries involved or contribute to their efforts in the ways referenced. *See, e.g., id.*; **EXHIBIT 1** ¶¶ 48-53.

83.     In September of 2019, the Board of CERTA DOSE voted to investigate the relationship between JOHN BLOOD, STEPHEN R. HOFFENBERG and STEVE RUBIN, as well as the true nature of the offers that were being assembled for the Series A round. The Chair of the Board, DR. HERNANDEZ, who had urged the investigation and pushed through the vote for an investigation, noted to the Board that its members owed a duty to the noteholders and to the shareholders to make sure that their investments were protected.

84.     With regard to the facts of the preceding paragraph, CERTA DOSE'S outside counsel at the time, COOLEY LLP (*through* KELLY BARTLING), who was also a longtime associate of JOHN BLOOD, had suggested, in prior Board meetings, that there was no such duty owed to noteholders. Nonetheless, the Chair of the Board took issue with that statement, even though COOLEY LLP'S aforementioned position—*presented through KELLY BARTLING*—was also voiced, and approved of, by the

18

Directors that opposed the investigation, *i.e.*, Defendants STEVE RUBIN and STEPHEN R. HOFFENBERG.

85.     Ultimately, and outside of the Board meeting, CERTA DOSE'S counsel at the time (KELLY BARTLING of COOLEY LLP), after being confronted by CERTA DOSE'S Chairman, had to admit that there indeed was a duty owed to the noteholders to protect their investment, but this admission was only made to DR. HERNANDEZ after he had pressed her repeatedly outside of the Board meetings for clarity on the point she had previously offered as advice to the Board. (This, along with the fact that COOLEY, LLP refused to take action outside of board meetings, raises the strong inference not only that COOLEY, LLP had previously lied in the board meetings concerned, but that it was using the very mechanisms of the Company to actively avoid its legal obligations and to conceal its role in assisting COPIC and JOHN BLOOD in their hostile takeover efforts.)

86.     In subsequent meetings and communications to the other directors and to COOLEY LLP, the Chair of the Board noted that that the red flags and irregularities surrounding the apparent coordination between JOHN BLOOD, the waste he created and the offers of apparent hostile takeover, all indicated that there was danger, which should be investigated, that threatened the value of the investments that those who had already invested in the Company had made, and that such danger should be looked into before simply proceeding, blindly, with a sale round that was surrounded by warning signs.

87.     With regard to the facts of the preceding paragraph, there were also other indications, as noted from what was advocated by JOHN BLOOD, STEPHEN R. HOFFENBERG and STEVE RUBIN in Company meetings, that the promissory notes would not actually be treated with the same terms or ultimate valuation that was to be provided to the potential COPIC and JOHN BLOOD-affiliated investors, who were being jockeyed by the COPIC-affiliated Directors and JOHN BLOOD to come in on the Series A round. *See* **EXHIBIT 1** ¶ 62.

88.     As could also be noted from the positions that the Defendants concerned took as to the danger noted by DR. HERNANDEZ, the Directors who opposed the investigation (STEPHEN R. HOFFENBERG and STEVE RUBIN), as well as JOHN BLOOD, were evidently working with certain of the "potential Series A investors," *i.e.*, those other Defendants in this litigation who are not attorneys, to eliminate the normal market factors and to drive down the value of CERTA DOSE'S stock, thereby driving down the value of the investments that had previously been made into the Company, while also driving down the value of the Company itself for all but those who would capitalize on the lowered value. *See, e.g.,* **EXHIBIT 1** ¶¶ 48-53.

89.     JOHN BLOOD did not communicate to the good-faith noteholders, either before or after cooperating with COPIC to extend the note maturity dates, that the only investors for a Series A would be his and the COPIC-affiliated investors.  In short, although the affiliated investors were purportedly offered the chance to take part in the Series A, the other note holders were not offered the same opportunity. *See also id.* Conversely, and as noted above, JOHN BLOOD, the COPIC-affiliated Directors and COOLEY, LLP were unified in opposing disclosure to the 2017 noteholders of the opportunity or of other issues that greatly affected their investment.  (This further raises the inference that the waste that JOHN BLOOD and the COPIC-affiliated Directors wrought upon the funds that had been provided through the notes was to benefit their affiliated noteholders, both creating an opportunity for them and allowing *only* them to benefit in this

opportunity to purchase the Company stock at an artificially discounted rate.)  In this way, these interested parties used unjust/deceptive measures, benefiting themselves while systematically neglecting or harming weaker groups (*i.e.*, the investors who did not have similar influence within the Company on account of lacking involvement in the scheme), and the public good.

90.     Nonetheless, instead of even extending the notes another 6 months and/or doing another bridge round of investment (*as they had done before*), JOHN BLOOD and the COPIC-affiliated Directors moved to extend the maturity of the notes by only 45 days.  This was exactly enough time to "squeeze" CERTA DOSE, financially, into taking a bad deal to survive.  In September of 2019, the aforementioned employee who was also a noteholder asked DR. HERNANDEZ, "How many times did John and Steve mention the Company would be insolvent today if you didn't take the deal?" DR. HERNANDEZ responded, "At least 200 times today."  In this, it was evident that 45 days was just enough time to close a Series A deal with JOHN BLOOD'S friends and repel any existing/active, and then courting, investors due to the weak cash position. *See, e.g.,* **EXHIBIT 1** ¶¶ 48-53.    DR. HERNANDEZ and the aforementioned employee who was also a noteholder were desperately trying to attract investors, yet JOHN BLOOD used some of his various financials to counter these efforts, only now he was using the Company's "high month" cash spend and its last cash position to give potential Series A investors a picture that would cause them to run from CERTA DOSE.

91.     CERTA DOSE'S outside counsel at the time, *i.e.*, the named attorney Defendants other than MARK A. FOGG of COPIC, refused to answer direct questions as to the likely harm that these circumstances posed for investors and the Company; nonetheless, the COOLEY Defendants concerned had previously admitted, after being pressed significantly, that the circumstances were generally problematic and suggestive of abuse. (Thus, they were willing to concede that there was a troubling set of issues present, but they still refused to help address the problem, as noted earlier, *supra*.)

92.     With regard to the facts referenced in the preceding paragraph, the COOLEY LLP counsel concerned had also noted that they represented COPIC, for which the two Directors who voted against the investigation worked or had worked (*Defendants STEVE RUBIN and STEPHEN R. HOFFENBERG*); similarly, and as also stated in the convertible promissory notes, COOLEY LLP purported to represent the noteholders, although it had never notified the Company or the noteholders of how these provisions would negatively affect and/or impact the Company or the noteholders. *See, e.g.,* footnote 5 of **EXHIBIT 1**.

93.     Similarly, it should also be noted that MARK A. FOGG had previously given legal advice to CERTA DOSE, *i.e.*, before the hostile takeover attempts referenced in **EXHIBIT 1** to this COMPLAINT, conveying upon it an attorney-client relationship which was dishonored by the acts and omissions referenced in this Complaint, as well as in **EXHIBIT 1** to this COMPLAINT, so as to bring about harm to the Company while also breaching fiduciary duties that were owed to the Company.  He and COPIC were similarly asked to provide relevant information based on the duties of good faith and loyalty that they owed CERTA DOSE, INC., but they refused to provide the relevant information and continued to conceal COPIC'S efforts.

94.     At about this time (*August of 2019 through September of 2019*), Defendant COPIC had ordered an appraiser's valuation of CERTA DOSE, which came back at between $67 Million and $120 Million. Although it was evident that the COPIC-affiliated Directors certainly intended to use this valuation for setting the value that some investors would receive, it was also clear that they planned to offer a roughly $15 Million

valuation to their affiliated investors, with whom they had close ties. *See, e.g.,* **EXHIBIT 1** ¶ 62.   Thus, the existence and apparent significance of these two different valuations, among other factors which indicated that the noteholders would probably not be receiving the benefits that the COPIC and JOHN BLOOD-affiliated investors would be receiving, presented a potential for abuse that could not be ignored. *See id.*  It also raises an inference that the faithless fiduciaries concerned sought to benefit from the waste caused by JOHN BLOOD under the watch of the COPIC-affiliated Directors and that they also intended such waste as a means to benefit themselves and their affiliates at the expense of CERTA DOSE, INC.  (As such, the Chair of the Board pressed the issue of the investigation with COOLEY LLP and with the COPIC-affiliated Directors, reminding them all of the fiduciary duties implicated.) This raises an inference that the acts and omissions of the Defendants concerned, both before and after being pressed by DR. HERNANDEZ, were knowing and intentional.

95.     Nonetheless, and despite the aforementioned vote for an investigation, the COPIC-affiliated Directors, who had opposed the investigation concerned, attempted to hold a meeting at COPIC headquarters in Colorado, on October 4, 2019, with the apparent intent of forcing the sale on through without an investigation. (Because the COPIC-affiliated Directors lacked the votes to do this, there were other circumstances and factors present which indicated that the meeting was suspect, irregular, and was being scheduled to facilitate the apparent hostile takeover concerned.)

96.     Because of the danger that proceeding without vetting a sale, or looking into potential self-dealing, posed for the Company and its investors, shareholder action was taken on October 4, 2019, supported by an action without vote of the majority of shares in the Company, to suspend the COPIC-affiliated Directors and JOHN BLOOD. These evidently faithless fiduciaries were also asked by the Company to provide copies of the communications that they had exchanged with the potential Series A investors to whom they had close ties, *i.e.*, their affiliates, thus being further asked by the Company to comply with their duty of candor.  The evidently faithless fiduciaries concerned did not comply with these requests, resulting in admissions by silence of their involvement in the referenced hostile takeover.

97.     Defendants STEVE RUBIN and STEPHEN R. HOFFENBERG refused to turn over the requested communications and, instead, on October 21, 2019, attempted to conduct another meeting at which it appeared quite evident that they were seeking to force a sale through without an investigation.

98.     In similar fashion to the breach of fiduciary duties referenced in the preceding paragraph, and instead of providing advice to the sitting Board (*now that its prior excuses for refusing to give advice on the dangers to the Company had been removed by the suspension*), COOLEY LLP resigned as counsel for CERTA DOSE without addressing the pending questions that it had been asked, which was highly irregular given the requirements placed upon COOLEY LLP by the rules of professional conduct.  As such, these circumstances also raise a further inference that COOLEY LLP had been avoiding disclosure of the nature of its conflicts, *i.e.*, what COPIC was planning to do to CERTA DOSE, and that COOLEY LLP was, thus, working to conceal its role in the efforts of JOHN BLOOD, COPIC and their affiliates to prey upon CERTA DOSE (*to whom COOLEY LLP owed the duties of a fiduciary*), as these acts of avoidance amount to an admission of silence and *also* raise the inference that COOLEY, LLP was providing support for those involved in the referenced hostile takeover, supporting the efforts at earlier stages, including those efforts that the other Defendants took to bring about waste in the Company, as well as through obfuscation, concealment and even advice to COPIC and/or JOHN BLOOD'S affiliates. *See, e.g.,* ¶¶ 53-56 of **EXHIBIT 1**.

99.     With further regard to concealment, the investigation following JOHN BLOOD'S suspension revealed that budgets, which JOHN BLOOD had shown investors, the Board of Directors and the controller are missing, including the vast body of Company documents that JOHN BLOOD kept on a hard drive he brought into the Company's Denver office.  It is evident that JOHN BLOOD did not save these materials on Company computers and that a fair amount of financial work which was in JOHN BLOOD'S direct control went missing when he was suspended.  Neither the controller nor the interim COO were able to find the entire collection of JOHN BLOOD'S spreadsheets.  This all raises an inference of concealment, which raises inferences of intent and malfeasance on JOHN BLOOD'S part (*not merely misfeasance*).

100.    To prevent the unauthorized act of the suspended Directors referenced in ¶ 102, *supra*, and to provide the proper oversight (*especially as the unauthorized act was being taken by suspended fiduciaries before a sale's actual terms could be vetted*), the shareholder majority took additional action to remove the two suspended members of the Board.  Nonetheless, these removed, COPIC-affiliated Directors were once more asked to provide their communications with potential/affiliated investors to the Company, which, once more, they refused to do.

101.    To fill these vacancies, new Board members were selected according to the governance provisions to help the Company investigate the issues concerned and to provide additional guidance and oversight.  Following these appointments, the Board, with its new members and new counsel, became aware that certain provisions within the AMENDED AND RESTATED CERTIFICATE OF INCORPORATION, which had been amended with COOLEY LLP'S help between May 26, 2016 and June 13, 2016 in the aforementioned SERIES SEED 2 PREFERRED STOCK PURCHASE AGREEMENT that COPIC insisted was valid, were written to prevent the noteholders from being issued preferred stock on the terms they had been offered in their agreements (*or from receiving the discount that they had been offered*).  CERTA DOSE'S prior outside counsel, COOLEY LLP, who had written both the notes and the aforementioned Certificate of Incorporation, evidently never informed the Company of this issue, as noted by the investigation and review of the Directors on the new Board.  Similarly, it became evident to the new Board, from the circumstances concerned, that the provisions concerned were not made known to the noteholders at the time they signed their agreements, nor at any time thereafter.  (This seemed exceptionally unfair to the new Board, as it further raised the inference that the waste of the funds of the noteholders, while keeping them out of equity, were being used to facilitate the evident hostile takeover attempt involving COPIC, JOHN BLOOD and their affiliated investors, while also raising the significant inference that the good faith noteholders would not be treated equally with the COPIC and JOHN BLOOD-affiliated investors and noteholders.)  In this, it was also evident that the COPIC and JOHN BLOOD-affiliated noteholders, who included Defendant STEPHEN R. HOFFENBERG, although knowing of the waste, nonetheless expected to receive a significant benefit from the waste.  (The fact that the COPIC and JOHN BLOOD-affiliated noteholders were the only noteholders being invited by JOHN BLOOD and the COPIC-affiliated Directors to take part in the Series-A financing—*placing more money into CERTA DOSE, INC., despite the waste that their fiduciaries concerned supported*—further adds to these inferences.)  Furthermore, JOHN BLOOD tacitly admitted that the consequences of his actions were that the CERTA DOSE, INC. shareholders would be receiving a "haircut," which was a reference to significantly or extremely diluting their ownership and control in the Company.

22

102.    With regard to the facts of the preceding paragraph, it became clear to the new Board that the noteholders had not been informed of these secret provisions, as the provisions were presented in a separate instrument that they were never provided or informed of—despite COOLEY, LLP'S statements to the contrary, *i.e.*, the CERTIFICATE OF INCORPORATION—which would actually override the noteholders' rights and what the noteholders had agreed to receive in the notes, *i.e.*, preferred stock and the promised discount. *See also* ¶ 97 of **EXHIBIT 1**. (If it had not ultimately been due to new legal advice, this would not have become evident to the Company, as the restrictions on acquiring preferred stock were well hidden in pages upon pages of the aforementioned Certificate of Incorporation.) *See id.*

103.    The removed Directors and JOHN BLOOD hired attorneys that threatened the Company with litigation if these matters were disclosed, further raising an inference of coordinated efforts and coordinated concealment on the part of these Defendants.

104.    Nonetheless, it was also discovered at this time, *i.e.*, in the investigation following the suspension of JOHN BLOOD and the COPIC-affiliated Directors, that JOHN BLOOD knew about the fact that the noteholders would not get preferred stock and had even planned that result out by calculating the noteholders' equity as common stock in spreadsheets identifying what would occur on the Series A round (*noteholders would evidently not receive the preferred stock that was promised to them in their note agreements*). *See also* ¶¶ 40-53, 110-113 of **EXHIBIT 1**.

105.    Documents and e-mail discovered on JOHN BLOOD'S computer and related accounts also revealed that he had been calculating the financial benefit to his associated investor affiliates, as well as the related loss to the Company's majority shareholder, for about as long as he had been at the Company following his return in early 2018. For example, one spreadsheet that JOHN BLOOD had calculated for Defendants LEE F. DRISCOLL, ANTHONY R. MAYER and PHOEBE FISHER—*a document titled "Certa Dose_Funding Calculations_9.3.19," which was made without Board approval and concealed from both the Board and the CEO*—listed a valuation for the Company of $15,000,000 on September 3, 2019, although the Board was still purportedly running due diligence following the Scalar valuation and ultimately determined, later that month, that it would endeavor for a market valuation. The document *only* calculated the gains in the Company that Defendants LEE F. DRISCOLL, ANTHONY R. MAYER and PHOEBE FISHER would have at a valuation of $15,000,000, which was the valuation that all of those involved in the hostile takeover scheme ultimately used, although it bore no relationship to the appraised value and had an explicit and recognized connection to a change in the ownership structure of the Company. As noted in the previous paragraph, the documents had the notes converting as common stock instead of preferred. JOHN BLOOD also created a similar calculation for the COPIC-affiliated Defendants, raising the inference that the two groups were coordinating information and a common scheme to profit from a Series A funding round that would be sold to them at an artificial discount created by means of: (**1**) notes they purchased; (**2**) which were then knowingly converted into looming debt that brought no legitimate benefit to the Company on account of the management and fostering of that debt/waste by fiduciaries in the Company with whom these complicit noteholders were affiliated; (**3**) supporting the maintenance of those faithless fiduciaries within the Company; and (**4**) those faithless fiduciaries then setting an coordinating a low valuation of the Company from within, while inviting only their affiliated noteholders to the Series A financing at the exclusion of other investors and noteholders.

106.    Based on the best information that the Company has, stemming from its investigation after the suspension of JOHN BLOOD, JOHN BLOOD had also stated openly to subordinates who he intimidated that his goal was to drive up the debt of the Company so as to achieve the kind of Series A that he was trying to bring about, *i.e.*, one where the Company was forced to sell in a state of desperation to his associates and others with whom the associates cooperated, *i.e.*, the COPIC-affiliated investors. Although he kept this secret from upper management and the complete body of the Board (*except, evidently, for the removed COPIC-affiliated Directors, with whom, it was later found out, he spoke on a consistent basis in their unofficial, individual capacities, outside of Board meetings*), JOHN BLOOD'S actions, as referenced here and elsewhere in the Complaint, indicate that he actually intended to spend away the investment provided to the Company in the form of the notes, using it as a mechanism to lower the immediate value of the Company and provide it at a discount to his affiliates. *See, e.g.,* **EXHIBIT 1** ¶¶ 44-53.

107.    In October and November of 2019, CERTA DOSE further cemented the evidentiary basis for the combined efforts of JOHN BLOOD, COPIC and their affiliated investors to assist the waste created by JOHN BLOOD and the other efforts that he had taken, with the COPIC-affiliated Directors to facilitate the hostile takeover of CERTA DOSE. CERTA DOSE did this by requesting further assurances from the investors affiliated with COPIC and JOHN BLOOD, as per the terms of the convertible note agreements and as per the requirements of the UCC, which also indicated that the failure to respond would be taken as an admission by silence of aiding and abetting JOHN BLOOD, COPIC, and the COPIC-appointed Directors in their efforts to cause and exploit waste to effect a hostile takeover. The COPIC and JOHN BLOOD-affiliated investors, however, refused and otherwise failed to comply with these requests, establishing admissions by silence, while also raising further inferences of their participation and support of the evident scheme to exploit waste caused by the CERTA DOSE fiduciaries who were affiliated with the investors that refused to provide further assurances.

108.    In short, and with reference to the facts noted in the preceding three paragraphs, noteholders expecting to receive preferred stock at the conversion of their notes in a Series A round would have, instead, received common stock, despite the representations that had been made to them earlier. *See, e.g.,* **EXHIBIT 1** ¶ 97. The noteholders would have also been subject to a host of dilutive vehicles and provisions in the Certificate of Incorporation that COPIC and COOLEY LLP intended to enforce, of which the noteholders had evidently never been notified. (The new Board discovered these facts in November of 2019, although COOLEY LLP, the firm that purportedly represented CERTA DOSE and even the noteholders, stated in the convertible notes that it had notified everyone concerned of what was really going on, despite the fact it had not actually provided any of the advice that would be necessary for there to be informed consent to either the good-faith noteholders or CERTA DOSE.) As discovered once CERTA DOSE was able to speak with new counsel, the restrictive provisions and legends of the aforementioned Certificate of Incorporation would have pushed down the common stockholders and the noteholders' value, greatly diluting the value of their investment: doing so immediately, but, even more so, over time.

109.    There were also provisions within the note agreements themselves that, under the totality of the circumstances—*as discovered after JOHN BLOOD and the COPIC-appointed Directors had been removed*—had been used to prevent the conversion of the notes. (This primarily took the form of a $1.5 Million Series A minimum requirement, which was purportedly there to help value the round, but which was instead used by COPIC to prevent the other 2017 noteholders from becoming equity holders as part of a scheme to gain control of the Company at the expense of shareholders and the 2017 noteholders.) It became clear to the

new CERTA DOSE Board, however, that this provision would not give the same benefit to noteholders that it would give to the potential investors to whom the removed Directors and suspended officer evidently had close ties, *i.e.*, the COPIC and JOHN BLOOD-affiliated investors. (All of the factors noted before made this readily evident in the late October and early November phases of CERTA DOSE'S 2019 investigation into these matters.)

110.     Based on the totality of the circumstances, the Board determined that the barrier to conversion had been used as an excuse to prevent the conversion of notes for some time, even though greater than $1.5 million had been raised at various times before the push for the Series A round. Because the provisions had evidently been drafted by COOLEY LLP to the benefit of COPIC and its affiliated investors, it became evident that COOLEY LLP had coordinated with COPIC and JOHN BLOOD to both instruct them as to the provisions and the best means to use them to accomplish their evident combined ends, while affirmatively telling CERTA DOSE, INC. and the noteholders the opposite in the instruments concerned.

111.     To address the problems created by the instruments concerned (*as noted, supra*), the Board was limited by a number of obstacles that had evidently been worked into the instruments by COOLEY LLP to the benefit of COPIC and its affiliated investors. Thus, even though the 2017 noteholders had stated numerous times that they wished to convert the debt of their notes into equity, they had—*as per the direction of JOHN BLOOD, COPIC and COOLEY LLP*—simply agreed to push the notes back via previous amendments, without removing this barrier provision. Ultimately, the Board had to ask all the noteholders who had acted in good faith (*those who were not affiliated and/or evidently cooperating with COPIC and JOHN BLOOD in their efforts*), if they agreed to amend the notes and be released from that restrictive provision. Greater than 50% of these required holders consented, as measured by the amount of investment held in the notes concerned, and did so despite the previous amendments, agreeing to have that provision amended in the notes.

112.     This alone, however, would not have conclusively and absolutely removed the provisions from the aforementioned Certificate of Incorporation that COPIC, through COOLEY LLP'S aid, evidently sought to prevent the notes—*no matter how hard the Board may have otherwise tried*—from having the ability to become preferred stock with the negotiated 20% discount. The legal steps that were needed to prevent that injustice were taken by the Board on November 15, 2019 and are a matter of public record, as recorded in the state of Delaware. Those instruments, which had also been shared with the Defendants prior to the initiation of this litigation, are also incorporated herein by reference.

### FIRST CLAIMS FOR RELIEF
### AGAINST DEFENDANTS STEVE RUBIN AND STEPHEN R. HOFFENBERG
### (Breach of Fiduciary Duties)

113.     Plaintiff repeats the foregoing paragraphs with the same effect as if fully set forth herein.

114.     As alleged, all of the aforementioned fiduciary Defendants referenced in these FIRST CLAIMS FOR RELIEF were agents of the principal, CERTA DOSE, INC., owing it fiduciary duties.

115.     Nonetheless, the Defendants referenced in these FIRST CLAIMS FOR RELIEF acted in a manner that breached their fiduciary duties to their principal, Plaintiff CERTA DOSE, INC., by acting

adversely towards that principal's interests, by acting in bad faith, by acting in a manner inconsistent with their agency to the principal and/or by omitting to disclose interests which would naturally influence the conduct of the agents concerned when dealing within the scope of their agency, wherein disloyalty permeated the service of these agents in the most material and substantial part, substantially violating their contracts for service with CERTA DOSE, INC. *See, e.g.,* ¶¶ 30-31, 36, 44-53, 57-58, 60, 64-71, 76-82, 86, 90-91, 94, 98-99, 103-104, 106, 108, 110-112, 125, footnote 5 of **EXHIBIT 1**.

116.   Given the facts referenced in the preceding paragraph and throughout this Complaint, the Defendants referenced in these FIRST CLAIMS FOR RELIEF forfeited all right to payment and compensation, as their conduct substantiality violated their contracts and agency relationships with CERTA DOSE, INC. (This fact supports relief that CERTA DOSE, INC. seeks defensively with regard to any claims for payment that the faithless fiduciaries may bring.)

117.   All of the Defendants referenced in these FIRST CLAIMS FOR RELIEF were also fiduciaries of the Plaintiff, yet held on to undisclosed conflicts of interest and associated material facts that would have helped the Plaintiff avoid harm, by virtue of the facts alleged above and as created by COOLEY, LLP'S failure to comply with its obligations to obtain informed consent of any conflict waivers concerned, which were known of and aided by the other faithless fiduciaries concerned, *i.e.,* STEVE RUBIN. STEPHEN R. HOFFENBERG and JOHN BLOOD.

118.   Additionally, the Defendants referenced in these FIRST CLAIMS FOR RELIEF had actual knowledge, notice and/or constructive knowledge that diversion, misappropriation and waste of Company funds was occurring, especially as facts sufficient to cause a reasonably prudent person to suspect that funds were being misappropriated and wasted, and which would trigger a duty of inquiry on the part of agents owing a fiduciary duty, had come to their attention. *See, e.g.,* **EXHIBIT 1** ¶¶ 44-53, 60, 69-71, 76-77, 86, 91, 94, 99, 103, 106, 112.

119.   Furthermore, the Defendants referenced in these FIRST CLAIMS FOR RELIEF failed to conduct a reasonable inquiry and, as a result, are nonetheless charged with such knowledge as inquiry would have disclosed. *See, e.g.,* ¶¶ 44, 60, 69, 70-71, 76-77, 86, 91, 94, 99, 103, 106, 112 of **EXHIBIT 1**.

120.   As is evident, the Defendants referenced in these FIRST CLAIMS FOR RELIEF concealed significant and material facts from Plaintiff CERTA DOSE, INC. in order to mislead or defraud said Plaintiff, wherein CERTA DOSE, INC. and the majority stockholders reasonably relied upon the Defendants concerned and suffered damage as a result of the reliance, thereby causing damages to the Company. *See, e.g.,* ¶¶ 30-31, 36, 44, 48-51, 57-58, 64-69, 74-83, 86, 90, 98, 103-104, 108, 110-112, 125, and footnote 5 of **EXHIBIT 1**. In this, the damages concerned include, but are not limited to those referenced in ¶ 185 of **EXHIBIT 1**. (Nonetheless, damages would, of course, at a minimum include nominal damages.)

121.   As is evident, the Defendants referenced in these FIRST CLAIMS FOR RELIEF concealed significant and material facts from CERTA DOSE, the aforementioned employee who was also a noteholder and the other 2017 noteholders in order to mislead or defraud them, wherein CERTA DOSE and the good faith 2017 noteholders reasonably relied upon the Defendants concerned and suffered damage as a result of the reliance. *See, e.g., id.; see also* ¶¶ 53-57 and footnote 5 of **EXHIBIT 1**. In this, the damages concerned include, but are not limited to, those referenced in ¶ 185 of **EXHIBIT 1**. (Nonetheless, damages would, of course, at a minimum include nominal damages.)

122.    As per the facts recounted above, the Defendants named in this FIRST CAUSE OF ACTION were, at best, willfully blind and/or overlooked the careless, reckless, willful and/or intentional efforts of JOHN BLOOD to drive up the debt of the Company and to cause waste of the Company's assets (*which, itself, is a breach of fiduciary duties*); thus, placing the Company in a position where it was weakened, had lost available revenue and funds, and where it's control and assets could more easily be taken over and/or away from its good faith shareholders and its good faith investors. *See, e.g.,* **EXHIBIT 1** ¶¶ 29, 44, 57, 60, 67, 69-71, 77, 109-111.  This was particularly the case because these fiduciary Defendants had failed to take proper action, had failed to disclose material information that these Defendants knew and/or should have known would have helped the Company to avoid harm, and because these Defendants even failed to inform or advise the Company as to dangers about which they were specifically asked to address. *See, e.g., id.*; ¶ of **EXHIBIT 1** ¶¶ 72-83.

123.    Furthermore, STEVE RUBIN and STEPHEN R. HOFFENBERG and JOHN BLOOD worked and/or coordinated with entities and persons, *i.e.,* the other non-attorney Defendants listed in ¶¶ 129 and 131 of **EXHIBIT 1**, to lower the value of the Company's stock and the value or its shares via—*among other things*—endeavoring to coordinate the offers that said investors made to the Company in such a way as to remove the market force of competition, thereby manipulating the value of the Company's stock in a way that was improper and to the detriment of CERTA DOSE, INC.  *See, e.g.,* ¶¶ 29, 44-57, 60-62, 67, 69, 70, 71-72, 77, 85, 88, 96, 98-102, 108-110 of **EXHIBIT 1**.  (This set of facts incorporates the facts referenced in an e-mail that was sent on September 24, 2019, at 7:58 a.m. to COOLEY LLP, KELLY BARTLING and MICHAEL L. PLATT, as well as the inferences that arise from the behavior of the parties after receiving the e-mail.  As such, all of these Defendants took advantage of the waste that STEVE RUBIN, STEPHEN R. HOFFENBERG and JOHN BLOOD had created and/or facilitated, as well as the debt that had been driven up by JOHN BLOOD, and also endeavored to conceal those efforts from the Company.

124.    Despite being on CERTA DOSE'S  Board of Directors, STEVE RUBIN and STEPHEN R. HOFFENBERG exercised greater loyalty to Defendant COPIC INSURANCE COMPANY and a group of affiliated investors—*including* ALAN YOUNG SYNN, DAVIS K. HURLEY, BRIAN C. HARRINGTON, DANIEL LEE MILLER, NILES COLE, J. DANIEL MILLER, JEFFREY ALVIN DORSEY, GERALDINE A. LEWIS-JENKINS, MARK A. FOGG, MATTHEW FLEISHMAN, *and* THEODORE J. CLARKE—than they showed to CERTA DOSE, thereby acting as agents to benefit these other Defendants at the expense of Plaintiff CERTA DOSE, INC. and doing so in a number of transactions between CERTA DOSE, INC. and COPIC INSURANCE COMPANY, and, ultimately, doing so through the harm that they caused as part of their efforts to bring about a transaction, evidenced by a hostile takeover offer, that these Defendants sought to enter in late September of 2019 and October of 2019 for the purchase of CERTA DOSE'S stock. (The transactions referenced in this paragraph include the agreements and instruments identified in ¶¶ 33, 37 and 53 of **EXHIBIT 1**, which are incorporated herein by reference.) *See also, e.g.,* **EXHIBIT 1** ¶¶ 44-53, 61 and footnote 5.

125.    By exercising greater loyalty to Defendant COPIC INSURANCE COMPANY and the group of affiliated investors referenced in the preceding subparagraph, STEVE RUBIN and STEPHEN R. HOFFENBERG breached their duty of loyalty to CERTA DOSE, doing so through conflicts of interest, through self-dealing, and through the harms referenced in the preceding paragraph, as well as through the damages to CERTA DOSE which stemmed from the other harms attributed to STEVE RUBIN and STEPHEN R. HOFFENBERG in this COMPLAINT. *See id.*

126.    Despite being an officer and CFO of Plaintiff CERTA DOSE, INC., JOHN BLOOD exercised greater loyalty to a group of outside investors with whom he was affiliated—*including* ANTHONY R. MAYER,  PHOEBE FISHER, LFD III GRAT-TRUST U/A 8-26-2015 (KATHERINE DRISCOLL, Trustee), *and* LEE F. DRISCOLL—than he gave to CERTA DOSE, INC., doing so to the direct detriment of the CERTA DOSE, INC., which he did by acting as an agent to the benefit of these Defendants, yet at the expense of Plaintiff CERTA DOSE, INC., which he also did by endeavoring, within CERTA DOSE, INC., to position these investors in a place where they could more easily gain control, and have a better position than the shareholders of, and good-faith investors in, CERTA DOSE, as well as any other interested investors who were providing and/or offering benefits and/or better terms to the Company and the interests of its shareholders that JOHN BLOOD'S affiliated investors were evidently willing to offer. *See, e.g.,* ¶¶ 29, 44, 57, 60, 67, 69-71, 77, 109-111 of **EXHIBIT 1**.

127.    In addition to the waste he caused within the Company (*so as to better the position of himself and his affiliated investors*), JOHN BLOOD purposefully and intentionally neglected and endeavored to waste opportunities that came to the Company from other outside sources, doing so to benefit the aforementioned affiliated investors, which he ultimately did as a part of the harm that he brought to CERTA DOSE, INC. in his efforts to bring about a transaction that his affiliated investor Defendants sought to enter with the Company in late September of 2019 and October of 2019, which included the purchase of Plaintiff CERTA DOSE'S stock. *See, e.g.,* ¶¶ 29, 44, 57, 60, 67, 69-71, 77, 109-111 of **EXHIBIT 1**.

128.    By the actions identified in the preceding two paragraphs, JOHN BLOOD breached his duty of loyalty to CERTA DOSE through conflicts of interest, through self-dealing, and through the harms referenced in the preceding two subparagraphs, as well as through the damage to CERTA DOSE that ultimately stems from the harms attributed to JOHN BLOOD in this COMPLAINT.

129.    With specific regard to the aforementioned actions of COPIC INSURANCE COMPANY, STEVE RUBIN, STEPHEN R. HOFFENBERG and JOHN BLOOD, as referenced in this Complaint, COOLEY LLP, MICHAEL L. PLATT and KELLY BARTLING even failed to comport themselves with the minimum standards of how an attorney should behave in such circumstances, as judged under the applicable rules of professional conduct, including how an attorney must act when advising a client like CERTA DOSE: (**1**) as to the *particular nature* of a conflict of interest and/or potential conflict of interest; (**2**) as to material matters affecting a client's interests; and (**3**) as to danger and/or potential danger to a corporation. (This set of facts incorporates an e-mail that was sent on September 24, 2019, at 7:58 a.m. to COOLEY LLP, KELLY BARTLING and MICHAEL L. PLATT, which is incorporated herein by reference as **EXHIBIT 1** (Part One) to this COMPLAINT.) *See, e.g.,* ¶¶ 26, 42, 72-83, 103 and footnote 5 of **EXHIBIT 1**.

130.    COOLEY LLP, MICHAEL L. PLATT and KELLY BARTLING continued to hold themselves out as principal counsel for CERTA DOSE despite holding a conflict of interest that interfered with their duty of loyalty and their duty of candor to CERTA DOSE, INC., especially as they also represented COPIC INSURANCE COMPANY and wrote every contract between CERTA DOSE, INC. and COPIC INSURANCE COMPANY to the overwhelming and condemnable benefit of COPIC INSURANCE COMPANY, doing so to the point of writing agreements that were even unconscionable and fraudulent under the circumstances, as COOLEY LLP, MICHAEL L. PLATT and KELLY BARTLING did not advise CERTA DOSE, INC. as to the material terms the agreements and instruments concerned (*see, e.g.,* the agreements and instruments listed in ¶¶ 33, 37 and 53 of **EXHIBIT 1**), nor of the material facts

affecting the CERTA DOSE'S interests in the instruments concerned. *See also* ¶¶ 26-44, 61, 65-67, 77-83, 90-91, 94, 96-99, 103, 106-107, 113-117, footnote 5 of **EXHIBIT 1**.

131.    With respect to the allegations of preceding paragraph, COOLEY LLP, MICHAEL L. PLATT and KELLY BARTLING all failed to follow the applicable rules of professional conflict regarding how an attorney should act when advising clients as to the particular nature of a conflict of interest and/or potential conflicts of interest, as to material matters affecting the client, and as to danger and/or potential danger to a corporation. *See, e.g., id.* (The facts concerned include those facts noted in an e-mail that was sent on September 24, 2019, at 7:58 a.m. to COOLEY LLP, KELLY BARTLING and MICHAEL L. PLATT, all of which are incorporated herein by reference.) Given the facts that were evidently know to these attorney Defendants, the conflicts of interest concerned in the referenced instruments were evident to them, as an attorney *with such knowledge* would readily recognize the features that implicated these conflicts on the face of the agreements and instruments listed in ¶¶ 33, 37 and 53 of **EXHIBIT 1**.

132.    In this, COOLEY, LLP was a significant part of gaining the confidence of the noteholders, thus developing a confidential relationship and being complicit in that, which was further exacerbated by its communications with the noteholders, such as that it "is … now … represent[ing] … Purchasers … in matters unrelated to the transactions contemplated by this Agreement (the "Note Financing"), including representation … in matters of a similar nature to the Note Financing," the gaining of confidence references, and the referenced affirmative communications that COOLEY, LLP did things that it did not in fact do—*such as following the proposed rules of professional conduct*—gave the impression that COOLEY, LLP represented purchasers affiliated with CERTA DOSE, INC. and would inform them, as such, of any actual or pertinent conflict. *See, e.g.,* ¶¶ 52-57, footnote 5 of **EXHIBIT 1**.    These circumstances created a relationship approaching privity, as there was a writing evidencing obligations between COOLEY, LLP and such noteholders/purchasers, which obligations COOLEY, LLP breached. As noted, these Defendants failed to inform the aforementioned employee who was also a noteholder and the other similar noteholders of the matters affecting his interests implicated in the facts of the two preceding paragraphs. *See also, e.g.,* footnote 5 of **EXHIBIT 1**.

133.    Thus, as alleged above and summarized in the preceding eighteen (18) paragraphs, Defendants STEVE RUBIN, STEPHEN R. HOFFENBERG, JOHN BLOOD, COOLEY LLP, MICHAEL L. PLATT and KELLY BARTLING breached the duty of care, the duty of prudence, the duty of loyalty, the duty of confidentiality, the duty of good faith, the duty of disclosure and the duty of candor, which they owed to Plaintiff CERTA DOSE, INC. as fiduciaries, harming it, its shareholders and its investors.

134.    As such, the Defendants referenced in these FIRST CLAIMS FOR RELIEF were a foreseeable, probable, effective, natural and direct cause of the harm suffered by the Plaintiff and therefore (*in addition to the liability they share for the economic harm, devaluation and damages caused to Plaintiff CERTA DOSE, INC.*), caused damage whenever they received and/or charged for services, which were rendered meaningless due to said Defendants' disloyalty.

135.    Thus, the Defendants referenced in these FIRST CLAIMS FOR RELIEF, although being fiduciaries of Plaintiff CERTA DOSE, INC., acted in ways that constituted misconduct, in ways that included self-dealing and personal interest conflicts, wherein the Defendants concerned acted contrary to the

interests of CERTA DOSE, INC. and its shareholders, to whom they owed duties of loyalty, candor and care, and whom they ultimately caused damages on account of said breaches of their fiduciary duties, including, but not limited to: (**1**) waste of the $8,000,000 invested in CERTA DOSE, INC. via the promissory notes; (**2**) holding the Company back from what would otherwise be its realized value of $127,000,000, and bringing it to a point where it had to settle with noteholders at a negotiated value of $25,000,000, a difference of $102,000,000; and (**3**) lost revenues in an amount to be provided in discovery. *See* ¶¶ 185, 44-57, footnote 4 of **EXHIBIT 1**.

136.   In the alternative, the Defendants referenced in these FIRST CLAIMS FOR RELIEF have caused the Plaintiff—*at the very least*—nominal damages.

**SECOND CLAIMS FOR RELIEF**
AGAINST COPIC INSURANCE COMPANY, STEVE RUBIN, STEPHEN R. HOFFENBERG, ALAN YOUNG SYNN, DAVIS K. HURLEY, BRIAN C. HARRINGTON, NILES COLE, GERALDINE A. LEWIS-JENKINS, MATTHEW FLEISHMAN, THEODORE J. CLARKE, MICHAEL L. PLATT, KELLY BARTLING, THOMAS S. COWAN, ANTHONY R. MAYER, PHOEBE FISHER, LFD III GRAT-TRUST U/A 8-26-2015
(KATHERINE DRISCOLL, TRUSTEE), AND LEE F. DRISCOLL
**(Aiding and Abetting a Breach of Fiduciary Duties)**

137.   Plaintiff repeats the foregoing paragraphs with the same effect as if fully set forth herein.

138.   Defendants COPIC INSURANCE COMPANY, STEVE RUBIN, STEPHEN R. HOFFENBERG, JOHN BLOOD, COOLEY LLP, ALAN YOUNG SYNN, DAVIS K. HURLEY, BRIAN C. HARRINGTON, DANIEL LEE MILLER, NILES COLE, J. DANIEL MILLER, JEFFREY ALVIN DORSEY, GERALDINE A. LEWIS-JENKINS, MARK A. FOGG, MATTHEW FLEISHMAN, THEODORE J. CLARKE, MICHAEL L. PLATT, KELLY BARTLING, THOMAS S. COWAN, ANTHONY R. MAYER, PHOEBE FISHER, LFD III GRAT-TRUST U/A 8-26-2015 (KATHERINE DRISCOLL, Trustee), LEE F. DRISCOLL aided and abetted the aforementioned breaches of fiduciary duties, in that:

a.   All of the Defendants referenced in ¶ 143 of **EXHIBIT 1** sought to take advantage of the breaches of fiduciary duties by STEVE RUBIN, STEPHEN R. HOFFENBERG and/or JOHN BLOOD referenced in the FIRST CLAIMS FOR RELIEF, *supra*, seeking to take advantage of the harm that those fiduciaries had caused the Company: harm of which the Defendants referenced in ¶ 143 knew and/or were aware of, and which they encouraged and aided for their own enrichment and/or for the enrichment of their affiliates (*who are also included in the list of Defendants referenced in ¶¶ 129 and 131 of EXHIBIT 1*). *See, e.g.,* **EXHIBIT 1** ¶¶ 71, 29, 44, 57, 60, 65, 67-74, 77-78, 80-83, 90-91, 94, 99, 109-112, 128-131.

b.   As a related matter, Defendants COPIC INSURANCE COMPANY, STEVE RUBIN, STEPHEN R. HOFFENBERG and JOHN BLOOD all took advantage of, and aided, the breach of fiduciary duties by COOLEY LLP, MICHAEL L. PLATT and KELLY BARTLING, doing so for their own enrichment and/or for the enrichment of their affiliates (*who are also included in the list of Defendants above*), in that they—*among other things*—knowingly approved of, and facilitated, steps taken by COOLEY

LLP, MICHAEL L. PLATT and KELLY BARTLING to draft agreements and instruments in the favor of COPIC INSURANCE COMPANY, but that were determinantal to the CERTA DOSE, INC. (*see, e.g.*, the agreements and instruments listed in ¶¶ 33, 37 and 53, of **EXHIBIT 1**). Defendants COPIC INSURANCE COMPANY, STEVE RUBIN, STEPHEN R. HOFFENBERG and JOHN BLOOD did his in the ways identified, *supra*. *See, e.g.*, ¶¶ 120-140 of **EXHIBIT 1**.

139. With regard to the preceding paragraph, the instruments concerned were procured without the informed consent and/or informed waiver of Plaintiff CERTA DOSE, INC. and/or the majority of its shareholders, being that these fiduciary Defendants kept pertinent and material information concerned in the instruments and/or transactions from the Company and from the majority shareholder(s) whose informed consent was needed for such consents as per Delaware law. *See, e.g.*, ¶¶ 26-38 of **EXHIBIT 1**. (This raises the inference that the Defendants' statements as to informing the Company's majority of shares, as required by Delaware law, was deception and affirmative misrepresentation and that the associated breaches of fiduciary duties were knowing and intentional, as they were conducted despite an affirmance to the contrary.)

a. Even after being notified of the circumstances, the Defendants listed in subparagraph (c) of the FIRST CLAIMS FOR RELIEF, *supra*, chose to use the detrimental nature of the debt created and fomented by JOHN BLOOD as a form of leverage (*under the supervision and complicit approval of* STEVE R. HOFFENBERG *and* STEVE RUBIN, *a* CPA), and as a variety of "weapon" against the interests of CERTA DOSE, INC., attempting to use it as a means of pressuring CERTA DOSE to acquiesce to the takeover attempts advanced by the Defendants and their affiliates, and to the efforts that they had been making against the Company. *See, e.g.*, ¶¶ 36-43, 47-53, 61 of **EXHIBIT 1**.

140. As such, the Defendants referenced in these SECOND CLAIMS FOR RELIEF induced and/or knowingly participated in the breach of fiduciary duties concerned.

141. As such, the Defendants referenced in these SECOND CLAIMS FOR RELIEF also provided substantial assistance to the primary violators identified in the FIRST CLAIMS FOR RELIEF, *supra*, by helping to conceal and by failing to act when otherwise required to do so, and by failing to act in good faith and fair dealing with Plaintiff, and by failing and refusing to act in the ways referenced with regard to each Defendants referenced in these SECOND CLAIMS FOR RELIEF despite the contractual duty to do so. *See, e.g., id.*

142. As noted in the facts recounted above, Plaintiff suffered damages as a result of the breaches concerned as these harms were used as a mechanism to: waste their investment; waste operational funds that would have otherwise gone to building the aspects of the parts of the business that the funds were purportedly going toward; and place them in a position of having to recoup and salvage the wasted investment and operational funds. *See* ¶¶ 44-53, 61, footnote 4 of **EXHIBIT 1**. _Said Defendants' actions also kept the investment from maturing as it otherwise would have absent the attack upon the value of the investment that was furthered by the waste concerned. *See id.* In this, it is evident the scheme for a hostile takeover would not have been possible without purchasers, such as the COPIC and JOHN BLOOD-affiliated investors, who would coordinate with COPIC, the COPIC-affiliated Directors and JOHN BLOOD to then coordinate a discounted purchase of the Company after artificially weakening it through the waste favoring only those parties. As such, the purchase of the notes concerned was substantial support of the scheme.

143.    Thus, the Defendants referenced in these SECOND CLAIMS FOR RELIEF, although being fiduciaries of Plaintiff CERTA DOSE, INC. and/or parties that owed a duty of good faith and fair dealing, acted in ways that constituted misconduct and bad faith, in ways that included self-dealing and personal interest conflicts, in ways that were contrary to the interests of CERTA DOSE, INC., to whom they owed a duties of loyalty, candor and care, and ultimately caused damages to the Plaintiff on account of said breaches of said Defendants' fiduciary and/or good faith duties, including: (**1**) waste of the $8,000,000 invested in CERTA DOSE, INC.; (**2**) holding the Company back from what would otherwise be its realized value of $127,000,000, and bringing it to a point where it had to settle with noteholders at a negotiated value of $25,000,000, a difference of $102,000,000; and (**3**) lost revenues. *See* ¶ 185 of **EXHIBIT 1**.

144.    In the alternative, the Defendants referenced in these SECOND CLAIMS FOR RELIEF have caused the Plaintiff—*at the very least*—nominal damages.

### THIRD CLAIMS FOR RELIEF
AGAINST ALL THE DEFENDANTS
**(Breach of the Covenant and Duty of Good Faith and Fair Dealing)**

145.    Plaintiff repeats the foregoing paragraphs with the same effect as if fully set forth herein.

146.    At all times herein reference, Plaintiff acted in good faith and performed its part of the contracts and instruments referenced.

147.    By taking part in the aiding and abetting of a breach of fiduciary duties, as referenced above, by taking part in an improper takeover attempt (*as summarized in the* EIGHTH CLAIMS FOR RELIEF, *infra*), and as otherwise noted in the circumstances that are alleged in this Complaint, all of the named Defendants acted improperly and/or in bad faith and, therefore, are subject to claims for breach of the implied covenant of good faith and fair dealing as well as the associated duty of good faith and fair dealing, which these Defendants breached in all of the contracts in which they are parties with the Plaintiff.

148.    As such, the actions and omissions of the Defendants, and their associated actions constituting breaches, which are summarized and recounted in ¶¶ 120-148 of **EXHIBIT 1**, caused damages to the Plaintiff in the ways recounted above, including, but not limited to those referenced in ¶ 185 of **EXHIBIT 1**. In the alternative, the Defendants concerned should not be able to enforce any provision of any contract that they have with the Plaintiff, against the Plaintiff, as per the first breach rule and should also lose the right to enforce all equitable rights against the Plaintiff.

### FOURTH CLAIMS FOR RELIEF
AGAINST ALL DEFENDANTS
**(Breach of Contract)**

149.    Plaintiff repeats the foregoing paragraphs with the same effect as if fully set forth herein.

150.    At all times herein reference, the Plaintiff acted in good faith and performed its part of the contracts and instruments referenced. *See, e.g.,* EXHIBIT 11 (Part One) at 9 ¶ 5, EXHIBIT 11 (Parts Two-Three) at 9 ¶ 5.5 (as later amended 9 ¶¶ 5.6 and 5.5); EXHIBIT 2 (Part One) at 010-362; all of **EXHIBIT 1**. This includes the aforementioned convertible promissory notes referenced in this Complaint.

151.    By breaching the implied covenant and duty of good faith and fair dealing through the actions that the Defendants took, as noted above, and ***by failing to provide further assurances*** as identified EXHIBIT 18 (Parts One-Ten) of **EXHIBIT 1**, which all of the Defendants have previously been served with in New York, all of the Defendants breached and repudiated their duties to the Plaintiff in the respective contracts and agreements concerned through anticipatory breach, as recognized in the common law and the UCC (*by their conduct and by their refusal to give further assurances*), thereby **demonstrating** that they had breached the purposes of the agreements, which involved, as an implicit terms, that the Defendants would not taking part in the hostile takeover, contribute to and/or cause waste to the funds provided through the notes, or interfere in such a way as to cause interference with the economic and prospective economic (*as later evidenced by the Defendants' failure to provide further assurances and/or through their associated admissions by silence, which breached a specific term in the agreements*). (The Defendants, therefore, cannot enforce the terms of the contracts against the Plaintiff, having repudiated the agreements through anticipatory breach.)

152.    As such, all of the Defendants are subject to claims for breach of contract, including a breach of all the securities instruments and other agreements that the Defendants entered into with the Plaintiff, which include the CERTA DOSE, INC. NOTE PURCHASE AGREEMENT, the CONVERTIBLE PROMISSORY NOTE, the SERIES SEED 2 PREFERRED STOCK PURCHASE AGREEMENT, the AMENDED AND RESTATED CERTIFICATE OF INCORPORATION OF CERTA DOSE, INC., the CERTA DOSE, INC. AMENDED AND RESTATED INVESTOR RIGHTS AGREEMENT, the CERTA DOSE, INC. AMENDED AND RESTATED CO-SALE AGREEMENT, the CERTA DOSE, INC. AMENDED AND RESTATED VOTING AGREEMENT, as well as all the amendments and restatements to all of the securities instruments and agreements that the Defendants entered into with Plaintiff.

153.    As such, the Defendants concerned harmed the Plaintiff and caused damages to Plaintiff, including damages to the Plaintiff's interests in the investments concerned, as referenced in this Complaint, especially as the Defendants caused measurable damage to the Company itself. *See* ¶ 185 of **EXHIBIT 1**. *infra.* The Defendants, therefore, cannot enforce the terms of the contracts against the Plaintiff, having repudiated the agreements through anticipatory breach. Furthermore, the Defendants are at least liable for nominal damages.

## FIFTH CLAIMS FOR RELIEF
## AGAINST ALL DEFENDANTS

### (Fraud, Constructive Fraud, and Aiding and Abetting Fraud and/or Constructive Fraud)

154.    Plaintiff repeats the foregoing paragraphs with the same effect as if fully set forth herein, including, but not limited to the allegations that identify fiduciaries, facts that would—*as a matter of law*—require disclosure by the Defendants, and those facts depicting deception, affirmative misrepresentation and a failure to disclose material facts and information to the Plaintiff. *See, e.g.,* ¶¶ 30-31, 36, 48-53, 57-58, 64-69, 74-83, 86, 90, 98, 103-104, 108, 110-112 of **EXHIBIT 1**.

155.    By keeping material information from the Company, although they were Company fiduciaries who owed a duty of candor, in the case of JOHN BLOOD, STEVE RUBIN, STEPHEN HOFFENBERG, COOLEY LLP, MICHAEL L. PLATT and KELLY BARTLING, and/or by taking

advantage of the information that had been withheld from the Company by the aforementioned fiduciaries and the deception provided through those fiduciaries—*using those fiduciaries as a mechanism for fraud*—in the case of COPIC INSURANCE COMPANY, STEVE RUBIN, STEPHEN R. HOFFENBERG, JOHN BLOOD, COOLEY LLP, ALAN YOUNG SYNN, DAVIS K. HURLEY, BRIAN C. HARRINGTON, DANIEL LEE MILLER, NILES COLE, J. DANIEL MILLER, JEFFREY ALVIN DORSEY, GERALDINE A. LEWIS-JENKINS, MARK A. FOGG, MATTHEW FLEISHMAN, THEODORE J. CLARKE, MICHAEL L. PLATT, KELLY BARTLING, THOMAS S. COWAN, ANTHONY R. MAYER, PHOEBE FISHER, LFD III GRAT-TRUST U/A 8-26-2015 (KATHERINE DRISCOLL, Trustee), LEE F. DRISCOLL—*including the information listed below*—the Defendants harmed CERTA DOSE, INC. when they deprived the Company of funds and assets after it reasonably relied on communications that were false and/or false in the absence of the material information withheld, as noted above, subjecting said Defendants to claims for fraud, constructive fraud and/or aiding and abetting such fraud and/or constructive fraud, including the Defendants' inducement of the Plaintiff to enter the agreements and instruments listed, *supra*, and the withholding of the following material information:

a. Information wherein the Company's counsel, COOLEY LLP, was cooperating with COPIC INSURANCE COMPANY to draft Plaintiff's corporate instruments identified in ¶¶ 33, 37 and 53 of **EXHIBIT 1**, in a way that would ultimately provide all ownership of the Company, and ownership of its assets, to COPIC INSURANCE COMPANY—*in a hostile takeover*—if the transactions were entered (*something that went against the legitimate and purported intent of the transactions and which COOLEY, LLP specifically stated was not the case, providing affirmative misrepresentations*);

b. The coordination and cooperation that the parties took part in with regard to the actions referenced in the EIGHTH CLAIMS FOR RELIEF, *infra*, which are—*by definition*—deceptive acts. General Business Law § 349; N.Y. Bus. Corp. Law § 1609(c); Delaware Tender Offer Act, 8 Del.C. § 203; *Showpiece Homes Corp. v. Assurance Co. of Am.*, 38 P.3d 47, 54 (Colo.2001); FTC POLICY STATEMENT ON DECEPTION, October 14, 1983, appended to *Cliffdale Associates, Inc.*, 103 F.T.C. 110, 174 (1984).

c. Relevant and material information as to the intentional and the artificial nature of JOHN BLOOD'S efforts to drive up of debt and to create waste, which JOHN BLOOD performed with the knowledge and/or approval of STEVE RUBIN and STEPHEN HOFFENBERG, thereby preventing the Company from having rightful access to material information that would have changed how it approached all of the transactions that involved any of the Defendants concerned, including those transactions listed in ¶¶ 33, 37 and 53 of **EXHIBIT 1**, which specifically include dates of the transactions wherein such material information was withheld from Plaintiff (*see, e.g.*, ¶¶ 42-53, 72-83 of **EXHIBIT 1**); and

d. That JOHN BLOOD created and used multiple copies of the Company's books, with competing and inconsistent information, to conceal the true nature of JOHN BLOOD'S efforts at CERTA DOSE, INC., and which he used to conceal true and material information from the Company that would have alerted it as to his aims. *See, e.g.*, **EXHIBIT 1** ¶ 159.

e. As such, *i.e.*, in these ways, the Defendants concerned made representations of fact that were either untrue or recklessly made;

f.   As such, the Defendants concerned made false and misleading statements to the Plaintiff;

g.   As such, the Defendants concerned made misrepresentation of fact that they knew to be false and/or deceitful, and which were made with intent to induce the Plaintiff's reliance upon such statements; and

h.   Plaintiff justifiably relied upon the Defendants' false, deceitful and misleading statements, especially as the deceptions were based on the Defendants gaining the confidence of the Plaintiff, *i.e.*, confidential relationships, the use of agents, and also made use of fiduciaries and attorneys on matters in which it is the rule that one should be able to trust the party making the communication and/or should trust that all material information needed for one's own good is provided and not intentionally withheld. *See, e.g.,* **EXHIBIT 1** ¶ 159.

156.   As such, by their actions the Defendants concerned were the cause of damages to the Plaintiff and were liable for such damages. *See* ¶ 185 of **EXHIBIT 1**.

### SIXTH CLAIMS FOR RELIEF
### <u>AGAINST ALL THE DEFENDANTS</u>
### (Conversion and/or Aiding and Abetting Conversion)

157.   Plaintiff repeats the foregoing paragraphs with the same effect as if fully set forth herein.

158.   By aiding and abetting JOHN BLOOD'S efforts to drive up the debt of the Company through their aforementioned efforts to benefit from JOHN BLOOD'S endeavors to weaken the Company, and too cooperate with him in his own aims for the Company, the Defendants received a benefit to themselves in the form of strengthening their position to take over the Company; thus, JOHN BLOOD converted Company funds which he did not have a right to so convert, and the Defendants aided and abetted JOHN BLOOD in that conversion, subjecting JOHN BLOOD and these other Defendants to claims for conversion and aiding and abetting conversion. *See, e.g.,* ¶¶ 42-53, footnote 4, 60, 69, 70-71, 76-77, 86, 91, 91, 94, 99, 103, 106, 112 of **EXHIBIT 1**.

a.   In the ways identified, the Defendants took part in unauthorized dominion over identifiable funds, particularly the $8 Million in investment funds, to which the Plaintiff had an immediate and superior right of possession.

159.   By substantially supporting the waste concerned, and by attempting to acquire a benefit therefrom, the Defendants caused damages to the Plaintiff in the ways otherwise recounted in the Complaint, including but not limited to the foreseeable damages to the Company that stemmed from the waste of the roughly $8 Million invested in CERTA DOSE, INC. *See* ¶ 185 of **EXHIBIT 1**.

### SEVENTH CLAIMS FOR RELIEF
### <u>AGAINST COPIC INSURANCE COMPANY,  STEVE RUBIN,</u>
### <u>STEPHEN R. HOFFENBERG, ALAN YOUNG SYNN, DAVIS K. HURLEY, BRIAN C.</u>
### <u>HARRINGTON, NILES COLE, GERALDINE A. LEWIS-JENKINS, MATTHEW FLEISHMAN,</u>
### <u>THEODORE J. CLARKE, THOMAS S. COWAN, ANTHONY R. MAYER, PHOEBE FISHER, LFD</u>
### <u>III GRAT-TRUST U/A 8-26-2015, KATHERINE DRISCOLL, TRUSTEE, AND LEE F. DRISCOLL</u>

**(Equitable Relief, Amotion, Disgorgement of Shares and Loss of Status as Stockholders)**

160.    Plaintiff repeats the foregoing paragraphs with the same effect as if fully set forth herein.

161.    Given the above-referenced breaches of good faith and fair dealing, the breaches of fiduciary duties, and the aiding and abetting of the breach of those duties—*all of which are inequitable*—all the named Defendants who have argued to own stock, interest, or equity in Plaintiff, CERTA DOSE, INC., *i.e.*, COPIC INSURANCE COMPANY, STEVE RUBIN, STEPHEN R. HOFFENBERG, ALAN YOUNG SYNN, DAVIS K. HURLEY, BRIAN C. HARRINGTON, NILES COLE, GERALDINE A. LEWIS-JENKINS, MATTHEW FLEISHMAN, THEODORE J. CLARKE, THOMAS S. COWAN, ANTHONY R. MAYER, PHOEBE FISHER, LFD III GRAT-TRUST U/A 8-26-2015, KATHERINE DRISCOLL, trustee, and LEE F. DRISCOLL, have broken the bonds essential to membership and to being part of a company, and are, therefore, subject to claims for amotion.

162.    Given that all the named Defendants purporting to own stock, some stake, interest or equity in Plaintiff, CERTA DOSE, INC., have broken the bonds essential to membership, equity, recoupment, profit, and even to being part of a company, have caused the Company damages in excess of the value of their stocks; and given that it would be improper to permit such disloyal and faithless Defendants to maintain a benefit in any instrumentality of their wrongdoing, said Defendants are subject to claims for disgorgement of their stock and shares, unjust enrichment, equitable fraud, and estoppel, particularly as, by their aforementioned actions which are recounted here by incorporation, the Defendants concerned were the cause of damages and harm to the Plaintiff. *See* ¶ 185 of **EXHIBIT 1**.

163.    PLAINTIFF ALSO PRAYS FOR ALL EQUITABLE RELIEF THAT MAY APPLY UNDER THE FACTS ALLEGED IN THE BACKGROUND ALLEGATIONS, INCLUDING ESTOPPEL, PROMISSORY ESTOPPEL AND UNJUST ENRICHMENT, AS THE DEFENDANTS MADE REPRESENTATIONS AND/OR PROMISES TO THE PLAINTIFF THAT THEY DID NOT INTEND TO KEEP IN AN EQUITABLE AND FAIR MANNER AND AS THEY PROFITED FROM HARM AGAINST THE PLAINTIFF IN WHICH THEY TOOK PART.

**EIGHTH CLAIMS FOR RELIEF**
AGAINST COPIC INSURANCE COMPANY, STEVE RUBIN, STEPHEN R. HOFFENBERG, ALAN YOUNG SYNN, DAVIS K. HURLEY, BRIAN C. HARRINGTON, NILES COLE, GERALDINE A. LEWIS-JENKINS, MATTHEW FLEISHMAN, THEODORE J. CLARKE, THOMAS S. COWAN, ANTHONY R. MAYER, PHOEBE FISHER, LFD III GRAT-TRUST U/A 8-26-2015 (KATHERINE DRISCOLL, TRUSTEE), AND LEE F. DRISCOLL
**(Civil Conspiracy, Including Conspiracy to Improperly Buy Securities During Corporate Takeover and/or analogous cause of action under Delaware Law, Delaware Tender Offer Act,)**

164.    Plaintiff repeats the foregoing paragraphs with the same effect as if fully set forth herein.

165.    Defendants COPIC INSURANCE COMPANY, STEVE RUBIN, STEPHEN R. HOFFENBERG, JOHN BLOOD, ALAN YOUNG SYNN, DAVIS K. HURLEY, BRIAN C. HARRINGTON, DANIEL LEE MILLER, NILES COLE, J. DANIEL MILLER, JEFFREY ALVIN DORSEY, GERALDINE A. LEWIS-JENKINS, MATTHEW FLEISHMAN, THEODORE J. CLARKE, THOMAS S. COWAN, ANTHONY R. MAYER, PHOEBE FISHER, LFD III GRAT-TRUST U/A 8-26-

2015 (KATHERINE DRISCOLL, Trustee), LEE F. DRISCOLL improperly bought securities during a corporate takeover, in that:

166.    Said Defendants were in possession of material information relating to a takeover bid (*see, e.g.,* ¶¶ 29, 44, 57, 60, 67, 69-71, 77, 109-112 of **EXHIBIT 1**.

167.    Wherein said Defendants knew that that information was nonpublic;

168.    Wherein the information concerned was acquired before and/or after a takeover bid and said Defendants knew or had reason to know that the information was acquired directly or indirectly from: (**1**) an offeror; (**2**) the target company, *i.e.*, CERTA DOSE, INC.; and/or (**3**) an officer, director, or any other person acting on behalf of the offeror or target company;

169.    Wherein said Defendants sought to use the information concerned to purchase and/or sell, or cause to be purchased or sold, the target company, *i.e.*, CERTA DOSE, INC.;

170.    Wherein Defendants' actions happened both within and without the state of New York; and

171.    Wherein circumstances concerned securities that were sought and/or which were to be sought by such takeover bid, and/or any securities convertible into or exchangeable for any such securities or any option or right to obtain or to dispose of any such securities.

172.    As noted herein, the actions of these Defendants were in violation of New York Business Corporation Law § 1609(b), the Delaware Tender Offer Act, and analogous common law obligations.

173.    As noted above, the Defendants also conspired to commit the above-referenced torts and improper purposes referenced in the preceding CLAIMS FOR RELIEF, which are also purposes against public policy, doing so knowingly and willingly.

174.    As such, by their actions the Defendants concerned were the proximate cause of damages to the Plaintiff. *See* ¶ 185 of **EXHIBIT 1**.

## STATEMENT AS TO THE RESULTS
## OF THE DEFENDANTS' AFOREMENTIONED ACTIONS

175.    Plaintiff repeats the foregoing paragraphs with the same effect as if fully set forth herein.

176.    By the breaches referenced above, and by the actions and omissions referenced, the Defendants breached duties owed to the Plaintiff, and to society, and were the actual, expected, foreseeable, natural, direct and proximate cause of the associated damages referenced, including those damages referenced in the relief requested, *supra*. In short, the Defendants caused waste of the funds borrowed from investors, charged for services for which they, given their faithlessness and disloyalty, they had no right, and caused the Company to reach a position where its value was treated as roughly $15 Million, ultimately necessitating the Company to settle with most good faith investors at a valuation of $25 Million. In this, the Defendants caused the Company to be set back in reaching the full potential of the objective valuation of roughly $127 Million, a present difference of roughly $100 Million, as well as the waste of roughly $8 Million in investments

previously referenced. These numbers are supported by an accountant's review of where the Company would be and would also likely be in the absence of the harms perpetrated, an accounting of the damages stemming from those harms, and as also based on the appraisals of the Company that were made by a licensed appraisal firm, *i.e.*, Scalar. Furthermore, because the damages were a result of wanton and reckless behavior, and of malicious acts, it is just to punish the Defendants to protect society from similar acts.

### PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff seeks relief from the Court that includes judgement against the Defendants on all of the claims and CLAIMS FOR RELIEF referenced above, for money damages of $102,500,000 (*and the highest amount permitted, if ultimately including punitive damages that may be awarded by the Court*), for interest thereon, respectively, from the date of December 20, 2014, as well as for equitable relief in the form of amotion, disgorgement of shares and recognition of disenfranchisement in the status of a stockholder in CERTA DOSE, INC., for the costs in this action, for all equitable remedies affordable to the Plaintiff on the facts alleged, and for any and all other relief or claims that may be just and proper under the circumstances and/or facts referenced in this Complaint.

### JURY DEMAND

PLAINTIFFS DEMAND TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

DATED: February 9, 2021.

Respectfully submitted,

*/s/ Josue David Hernandez*
JOSUE D. HERNANDEZ
P.O. Box 838
Denver, CO  80201
*Telephone*:  (720) 312-9553
*Facsimile*:  (303) 200-7801
jhernandez@DenverContractLaw.com
CO BAR No. 44509

ATTORNEY FOR THE PLAINTIFF

PLAINTIFF'S ADDRESS:

CERTA DOSE, INC.
101 Avenue of the Americas,
3rd Floor
NY, NY 10013

# EXHIBIT "D"

{00052609 }

<table>
<tr><td>
DISTRICT COURT, CITY AND COUNTY OF DENVER,
COLORADO<br>
1437 Bannock St., Room 256<br>
Denver, CO 80202
</td><td>
DATE FILED: January 19, 2021 11:53 PM<br>
FILING ID: 6D0FB5D0BCB3F<br>
CASE NUMBER: 2021CV30193
</td></tr>
</table>

|  |  |
|---|---|
| Plaintiff:<br>CERTA DOSE, INC.,<br><br>v.<br><br>Defendant:<br>JOHN BLOOD. |  |
|  | ▲ COURT USE ONLY ▲ |
| ATTORNEY FOR THE PLAINTIFF:<br><br>NAME:    JOSUE DAVID HERNANDEZ<br><br>ADDRESS:    P.O. Box 838<br>            Denver, CO 80201<br>*Telephone*:   720-312-9553<br>*Facsimile*:   303-200-7801<br>*E-Mail*: jhernandez@DenverContractLaw.com<br>ATTORNEY REGISTRATION NUMBER:  44509 | Case Number:<br>Division:<br>Courtroom: |
| **COMPLAINT WITH JURY DEMAND** | |

Plaintiff, CERTA DOSE, INC., for its Complaint, states as follows:

### THE PARTIES

1. Plaintiff CERTA DOSE, INC. (*hereinafter also* "CERTA DOSE" *and the* "Company"), is a foreign business corporation from Delaware, with a New York principal office 101 Avenue of the Americas, 3rd Floor NY, NY 10013. (**Being a Delaware corporation, Defendants should be on notice that Delaware law will apply to corporate law portions of Plaintiff's claims, subject to governing choice of law rules.**)

2. Defendant JOHN BLOOD is a natural person who is a resident of the state of Colorado and who, during the times identified in this Complaint, was an officer of CERTA DOSE, INC.

## JURISDICTION AND VENUE

3.      Because the Defendant took actions within Colorado so as to harm Plaintiff in the ways identified in the GENERAL ALLEGATIONS and in the CLAIMS FOR RELIEF provided below, the Defendant took actions in Colorado that constitute torts, which constitute grounds for the assertion of jurisdiction. The Defendant also lives in Colorado, and in the City and County of Denver.

4.      Defendant JOHN BLOOD resides in the City and County of Denver, constituting grounds for the assertion of venue in the City and County of Denver.

## GENERAL ALLEGATIONS

5.      Plaintiff incorporates all of the preceding allegations as though fully set forth herein.

6.      Defendant JOHN BLOOD offered to help the founder and majority shareholder of CERTA DOSE, DR. CALEB HERNANDEZ (*hereinafter* "DR. HERNANDEZ"), incorporating the Company on July 12, 2013, which JOHN BLOOD did through his connections at COOLEY LLP, acting as incorporator. Thereafter, COOLEY LLP acted as counsel for CERTA DOSE and remained its principal counsel.

7.      With regard to the facts of the preceding paragraph, JOHN BLOOD informed DR. HERNANDEZ: that he had previously worked with a law firm, COOLEY LLP; that it was the best in the business for startups; that COOLEY LLP was expensive, but that it was worth it; and that he could use his connections in COOLEY LLP to perhaps negotiate a discount.  JOHN BLOOD treated his ability to bring on COOLEY, LLP as one of the greatest assets that he could bring to the table.

8.      Upon initially meeting JOHN BLOOD'S contacts at COOLEY LLP, attorneys KELLY BARTLING and MICHAEL L. PLATT, they informed DR. HERNANDEZ that they had worked numerous times in the past with JOHN BLOOD, that they were familiar with how he did business, and that JOHN BLOOD was very knowledgeable and would be able to provide good internal legal guidance for the proposed startup.  (This last statement not only served as support for JOHN BLOOD, to build confidence in him, but it is also—*as a matter of law*—a false statement: people who are not lawyers cannot provide legal guidance.)

9.      Although admittedly familiar with JOHN BLOOD'S business practices, KELLY BARTLING and MICHAEL L. PLATT failed to inform DR. HERNANDEZ about JOHN BLOOD'S practice of running up the debt of companies he helped start up for his own personal benefit, *i.e.*, so as to facilitate its sale (*an arrangement that financially benefited COOLEY LLP, JOHN BLOOD and the preferred stockholder investors that benefited from the desperation, dilution and windfall resulting from the combination of JOHN BLOOD and COOLEY LLP'S efforts*), as noted further below. In fact, what they did communicated at the time was not only false, as noted above, but also served to conceal this material information.  In all of their dealings with CERTA DOSE, neither COOLEY LLP, KELLY BARTLING, MICHAEL L. PLATT, nor any other COOLEY LLP attorney ever informed CERTA DOSE of JOHN BLOOD'S *modus operandi*, despite purportedly not representing JOHN BLOOD.

10.     The facts addressed in the preceding three paragraphs—*particularly when taken in light of the totality of the circumstances addressed in this Complaint*—raise the inferences that: (**1**) COOLEY LLP'S startup practice, as well as the attorneys concerned, benefited financially from its relationship with JOHN BLOOD; (**2**) the attorneys and firm concerned treated the relationship with JOHN BLOOD as more valuable or important to them than the fiduciary obligations that they owed to a client and to a prospective client; (**3**) the attorneys and firm concerned were willing to repeatedly engage in a pattern, and in a relationship, that profited them, which involved the kinds of business practices that this Complaint attributes to JOHN BLOOD, as well as a degree of sanction for JOHN BLOOD'S business practices; (**4**) the attorneys and firm concerned were willing to conceal the material dangers implicated from those to whom they owed fiduciary obligations, showing more loyalty to JOHN BLOOD than to their fiduciary; and (**5**) the attorneys and firm concerned entered this arrangement with JOHN BLOOD knowingly and intentionally, acted with knowledge of the results that JOHN BLOOD had and would likely have, and also, therefore, acted with intent in all of their dealings, as addressed in this Complaint, *infra*.

11.     Upon the preceding facts, upon the totality of the circumstances, as well as upon information and belief, it is evident that COOLEY LLP and JOHN BLOOD used concealment of the actual nature of their relationship and modus operandi—*through failures to disclose, failures to give informed consent, coupled with waiver instruments such as arbitration agreements*—to preserve their ability to gain the confidence of future startups in a pattern that benefited them financially, allowing them a continued means to serve up startups to venture capital firms and other predatory investors.

12.     On or about December 19, 2014 through December 22, 2019, COOLEY LLP purportedly represented CERTA DOSE in all matters concerned regarding an AMENDED AND RESTATED CERTIFICATE OF INCORPORATION OF CERT A DOSE, INC., which was amended to account for the sale of preferred stock—*through number of agreements that are incorporated herein by reference*—to Defendant COPIC INSURANCE COMPANY, who COOLEY LLP also represented.  The principal attorney from COOLEY LLP involved in these dealings was Defendant MICHAEL L. PLATT. Defendant JOHN BLOOD acted as President of CERTA DOSE in the transactions, although he kept his intentions and his secret knowledge of COOLEY, LLP'S intentions secret from the Plaintiff.

13.     In the transactions referenced in the preceding paragraph, neither COOLEY LLP, Defendant MICHAEL L. PLATT, nor Defendant JOHN BLOOD informed CERTA DOSE, INC., including the majority shareholder of CERTA DOSE of: (**1**) the consequences that were likely, known, and which would result from the kind of preferred stock that was being provided to the venture capital investor, COPIC; or (**2**) the nature and legal significance of the anti-dilution provisions and minority stock protection provisions involved, which would work together over time to provide all of the protections of a minority to COPIC, yet made it a practical certainty that COPIC would, in time, become the majority shareholder of CERTA DOSE and own its intellectual property.

14.     Although the transactions and instruments concerned in the preceding two paragraphs required the informed consent of CERTA DOSE'S majority shareholders, the material facts mentioned and referenced, *supra*, were never provided to the majority shareholder, DR. HERNANDEZ, when his consent was sought by the Defendants concerned (*meaning and raising the inference that the actions taken by the Defendants concerned were improper, fraudulent and void*).

15.     Between May 26, 2016 and June 13, 2016, the foregoing agreements and instruments were amended and restated in a SERIES SEED 2 PREFERRED STOCK PURCHASE AGREEMENT, a CERTA DOSE, INC. AMENDED AND RESTATED INVESTOR RIGHTS AGREEMENT, a CERTA DOSE, INC. AMENDED AND RESTATED CO-SALE AGREEMENT, and a CERTA DOSE, INC. AMENDED AND RESTATED VOTING AGREEMENT. The principal attorney from COOLEY LLP involved in these dealings was MICHAEL L. PLATT.

16.     Given the totality of the circumstances surrounding the amendments and restatements referenced in the preceding paragraph (*such as the conflicts of interest concerned, factors that worked materially against the interest of CERTA DOSE, and the incentives for wrongdoing that are implicated on behalf of the Defendants concerned in these transactions*), and given the reasonable inference that an attorney understands the legal effect of his or her work product, while those not educated in the law typically do not, these facts raise the inference that COOLEY LLP and MICHAEL L. PLATT operated to benefit their client COPIC, yet at the expense of CERTA DOSE (*despite asserting that they were representing, principally or exclusively, the interests of CERTA DOSE, INC.*), while also acting to their own economic benefit. *See, e.g.,* ¶¶ 26-37 of **EXHIBIT 1**.

17.     In the transactions referenced in the preceding paragraph, neither COOLEY LLP, MICHAEL L. PLATT, nor Defendant JOHN BLOOD informed CERTA DOSE'S majority shareholder or CERTA DOSE, INC. of the consequences that were likely, and known to these Defendants, which should have been known to them, and which also would almost certainly result from the kind of preferred stock that was being provided to COPIC INSURANCE COMPANY, as would be known by people with the background in business and law of these Defendants (*particularly given the advice of* COOLEY, LLP), and as also implicated by the facts referenced in ¶¶ 26-38 of **EXHIBIT 1**. (This raises the inference that the statements as to informing the Company's majority of shares, as required by Delaware law, were deceptions and affirmative misrepresentations, and that the associated breaches of fiduciary duties were knowing and intentional, as they were conducted despite an affirmance to the contrary.)

18.     CERTA DOSE began 2018 with roughly $3.5 million in convertible promissory notes that had been raised from friends and family of the shareholders, mostly the friends and family of DR. HERNANDEZ. This occurred after CERTA DOSE had been extended promising business opportunities in New York following favorable recognition in the industry, which its proprietary technology received in November of 2017. Due to the efforts and urgings of JOHN BLOOD, the noteholders referenced in this paragraph, *i.e.,* the 2017 noteholders, were told to expect a Series A in the Fall 2018. These investors/noteholders were informed by COOLEY, LLP, MICHAEL L. PLATT, and JOHN BLOOD that they would receive preferred stock with the discounts listed in the notes. This, however, was a lie, as JOHN BLOOD knew that by virtue of how the preferred stock provisions in the CERTIFICATE OF INCORPORATION functioned—*which these investors had not been provided nor informed of*—none of the good faith noteholders would receive preferred stock or the referenced discount. JOHN BLOOD even calculated that the investors would not receive preferred stock or the discount.

19.     As per the language of the note instruments, COOLEY LLP purportedly represented CERTA DOSE as its principal client, but it also purported to represent the noteholders.

20.     In this, COOLEY LLP included a waiver of conflicts in the note documents; however, COOLEY LLP never actually informed CERTA DOSE, nor the noteholders, of what the conflicts were, what the nature of the conflicts were, nor did it advise any of them concerning the consequences of the language in the agreements, which ultimately implicated conflicts with the interests of COPIC, as further noted in this Complaint. *Cf. id.*

21.     At this time (*see* ¶ 40 of **EXHIBIT 1**), JOHN BLOOD also asked DR. HERNANDEZ to be CEO and Chairman of CERTA DOSE, INC., yet did so in a context where it was made clear, and understood, that DR. HERNANDEZ was, nonetheless, still to go to New York to further CERTA DOSE'S interests in the business opportunities concerned.

22.     With regard to the facts identified in the preceding paragraph, it later became evident to the Company—*in its subsequent investigations and through review of the corporate records and e-mails that had been hidden by the Defendants concerned, which followed the dismissal of the COPIC-appointed Directors and JOHN BLOOD*—that having the CEO and Chairman in New York was used by those later-dismissed fiduciaries to conceal the steps that JOHN BLOOD was taking to drive up the debt of the Company, to cause waste, and to use those circumstances as the principal means of forcing a sale of shares that would benefit his investor affiliates. COOLEY, LLP used the distance, and the practical difficulties of assembling the entire board, which included those complained of, as a pretext for not addressing the issue in the methods required by the rules of professional conduct. *See* ¶¶ 53-59, 72-83 of **EXHIBIT 1**.

23.     The facts concerned therefore raise the inference that the effort of moving of DR. HERNANDEZ to New York, while also making him CEO and the Chair of the Board, were an intentional and knowing set of acts complained of, which was instrumental in the coordinated effort of the Defendants concerned to ultimately transfer the assets, shares and control of CERTA DOSE from those in the Company to whom the COPIC-appointed Directors and JOHN BLOOD owed fiduciary duties to their affiliates. In short, encouraging DR. HERNANDEZ to move to New York allowed these Defendants to operate without oversight and to easily have secretive meetings without the knowledge and oversight of CEO and Chairman, or ultimately the Company.

24.     In January of 2018, Defendant JOHN BLOOD was also hired as COO/CFO of CERTA DOSE, following a conversation that he had with the COPIC-appointed director, Defendant STEPHEN R. HOFFENBERG, and DR. HERNANDEZ. (Although Defendant JOHN BLOOD had originally taken part in the incorporation of the Company, he had stepped away from the business after bringing in COPIC.) Once it was found that CERTA DOSE was valuable,[1] JOHN BLOOD'S interest in the Company was aroused, and

---

[1] At roughly the time that JOHN BLOOD first left CERTA DOSE, INC., he informed DR. HERNANDEZ that he had experience with a lot of companies and that his approach was to see if a company was ripe for applying his special approach to business. If a company was not ripe for his approach, JOHN BLOOD admitted that he would move on to another company with which he had connections where investment money was present or coming in, where he could then apply his approach to business. As noted earlier, JOHN BLOOD had a specific methodology that he applied to companies with significant investment funds; companies that could then be sold to venture capitalists with whom he and/or COOLEY, LLP had relationships, but at an artificially created discount. That methodology, however, depended on the company concerned being ripe for

he pursued a place in the Company with a zeal that was, significantly, also aimed at dealing specifically with the funds of the 2017 notes, as noted below. *See, e.g.,* ¶¶ 48-51, 57, 66-67 and 75 of **EXHIBIT 1**. To gain the Company's confidence at this time, and to gain greater control over the operations and capital of the Company, JOHN BLOOD lied to DR. HERNANDEZ, stating that the prior CFO had falsified the Company's financials and that the financials were largely a work of fiction. A COPIC-appointed director and JOHN BLOOD both urged DR. HERNANDEZ that it was appropriate for JOHN BLOOD to rectify this problem through accounting. (As detailed below, however, JOHN BLOOD would burn through the aforementioned $3.5 million in 6 months; a fact he kept from the CEO in New York.) *See* ¶ 40, ¶¶ 48-51, 57, 66-67 and 75 of **EXHIBIT 1**. (However, Company records and subsequent review by accountants reveal that JOHN BLOOD had done zero accounting, and had not even made a journal entry with regard to the finances, he stated—*at this time*—that his efforts to correct and rectify the books were akin to changing the engine on a car as it went down the road at 60 mph, and while changing the tires.)

25.    Defendant JOHN BLOOD did not raise any of the aforementioned capital. *See* ¶ 40 of **EXHIBIT 1**. He was, however, given the task managing the financials, while helping with the organizational structure of the Company and its operations. (The COPIC-appointed Directors and JOHN BLOOD convinced DR. HERNANDEZ that it would be best for him to be in charge of new product development and product manufacturing while in New York; Defendant JOHN BLOOD would stay Colorado to run operations and what was believed at the time to be the core business, as well as sales.)

26.    When DR. HERNANDEZ first arrived in New York, JOHN BLOOD had not brought up any concern about finances, despite being asked; however, within one month, he told DR. HERNANDEZ that there was an urgent need to raise capital, but that the good news was that they had some of their investors on hand who could come in with that capital. At that time, JOHN BLOOD mentioned that the Company would have to do an emergency funding round, which was a surprise, as JOHN BLOOD had actually sent some of the funding that had been raised in the 2017 notes back to investors "because they were not the kind of investors that [they] want[ed]."

27.    DR. HERNANDEZ was surprised and upset that JOHN BLOOD was not keeping him up to date on the financial state of the Company despite numerous requests. He informed JOHN BLOOD that there should have been some explanation or diligence to present the situation within the 6 months concerned so that the Company could address issues appropriately and, at a minimum, do some degree of planning. The COPIC-affiliated Director working with JOHN BLOOD responded by saying, "we all make mistakes and we need to look out for each other." DR. HERNANDEZ noted that when he asked JOHN BLOOD for information, he had simply replied, "I've got this, don't worry about this; I know what I'm doing. You're a physician and you'd get upset if I asked you to explain yourself about medicine. I'm like a doctor when it comes to finances and I have this covered." The evident cooperation between JOHN BLOOD and the COPIC-affiliated Director seemed out of place, particularly given the fact that they were directing the rounds of funding only to their affiliates and refusing others who were interested in investing. It felt like a bit of an ambush to DR. HERNANDEZ, but he trusted these fiduciaries and they had also left no other option to the Company but what they were willing to bring in the eleventh hour.

---

investment, such as when CERTA DOSE, INC. received FDA approval and industry recognition of its technology. *See, e.g.,* ¶¶ 29-42, ¶¶ 57, 66-67 of **EXHIBIT 1**.

28.    After the capital had been raised in the 2018 notes,[2] JOHN BLOOD mentioned that he wanted to start hiring more employees. DR. HERNANDEZ told him that he was concerned about that, as the previous money had been used so quickly. JOHN BLOOD responded by saying, "Caleb, don't worry, even if we don't sell a single bit of product, I've already done the calculations and we have 14 months of runway. We're safe and in a good position: trust me, I know how to build world-class organizations."

29.    Shortly after this, DR. HERNANDEZ asked JOHN BLOOD about looking into changing banks. JOHN BLOOD noted that he did not like the idea, but said he would look into it. He then went to the Company's controller/CPA, who had also been telling him for some time that the Company could be making more interest on the savings at another bank (2% vs. 0.1%), but JOHN BLOOD told her a different story than that he had told DR. HERNANDEZ, as recounted in the preceding paragraph. JOHN BLOOD told her, "Don't worry about it, we'll be through all this money in 4 months or so, so it's not worth it to make the change." JOHN BLOOD then came to the Board with a pretext for not changing the bank that had nothing to do with what he told the controller, saying that it was "too much brain-damage" to change the bank; that it would be "incredibly distracting and time-consuming" to do so and that the Company should wait until after Series A.

30.    An employee who was also a noteholder, who is also known to all Parties to this action (CERTA DOSE'S Chief of Design at the time), also came on board with the Company in January of 2018, due to the need to have a designer involved for the products that were linked to the business opportunities developing in New York. (By the end of 2019, the New York-based operations would be the core business of CERTA DOSE, INC., bringing in 85% of the Company's revenue.) Previously, and during this time, the aforementioned employee, who was also a noteholder, was an investor in the Company through the aforementioned convertible promissory notes.

31.    When the aforementioned employee who was also a noteholder entered the agreements concerned in the aforementioned convertible promissory notes—*which he entered into with all of the other parties to the note agreements on March 7, 2017 through December 15, 2017, July 2-16, 2018, and March 14 through April 19, 2019,*

---

[2] Although the 2017 noteholders had been promised a Series A, and although the round of funding exceeded the amount needed to convert the notes, JOHN BLOOD and COPIC maneuvered the circumstances, in numerous ways, to ensure that the investment coming in was only in the form of promissory notes to their affiliates. *See* **EXHIBIT 1** (Part Three). These facts, taken in light of the totality of the circumstances (*including the referenced deception*), raise an inference that the Defendants concerned: (**1**) intended to create dept that would then be used to effect a hostile takeover; (**2**) were working with their affiliated noteholders to this end; and (**3**) the steps taken in furtherance of this coordinated effort were intentional on the part of all concerned, particularly as JOHN BLOOD disparaged the notes. (These inferences also arise from these fact that a reasonable investor—*i.e., an investor who did not know that that he or she had an agent in the Company who would drive up the debt up so as to ultimately create a Series A, down the road, that only had such an investor and their affiliates invited to it and which would produced a total change in the ownership of the Company at an artificially discounted price*—would prefer a Series A to simply purchasing notes that their ally within the Company considered to be on par with feces. It also raises the inference that these investors were working with COPIC, as its control of the notes is what made them dangerous to investors/noteholders and comparable to feces, as per JOHN BLOOD'S admissions. *See* ¶¶ 61-62 of **EXHIBIT 1**.

*as noted in the Company's bridge financing binders*—he was sent the agreements and instruments concerned in New York, which he executed in New York and then mailed back to CERTA DOSE, INC. The aforementioned employee who was also a noteholder's dealings on all but the first convertible promissory note were with JOHN BLOOD. *See id.*

32.　　After the aforementioned employee who was also a noteholder had become an employee of CERTA DOSE, JOHN BLOOD contacted the aforementioned employee who was also a noteholder about amending the notes and informed the aforementioned employee who was also a noteholder that the notes could be amended merely with his signature and the approval of COPIC, but that if the aforementioned employee who was also a noteholder did not sign, that the notes would nonetheless be amended (*indicating that COPIC essentially held the power to amend the notes at will*). *See also* ¶¶ 52-53 of **EXHIBIT 1**.

33.　　With regard to the facts referenced in the preceding paragraph, JOHN BLOOD also used his position as a superior officer to pressure the aforementioned employee who was also a noteholder into signing an amendment of the notes that kept them from maturing or converting into equity, intimating that there could be negative consequences for the aforementioned employee who was also a noteholder's employment if he did not comply.

34.　　Because JOHN BLOOD took steps with the COPIC-affiliated Directors to keep the 2017 notes from converting into equity—*despite the fact that those noteholders, aside from COPIC, all wished to become equity*—insisting that the 2017 notes remain debt instead of being converted into equity with the promised Series A, it is evident that JOHN BLOOD and COPIC were on the same page of creating debt that brought no benefit to the noteholders or the Company, but which would benefit COPIC, JOHN BLOOD, and their affiliates. This not only shows that JOHN BLOOD deceived the Company and the 2017 noteholders, with the help of COOLEY, LLP, but these inferences are also bolstered by the fact that JOHN BLOOD spent the $3.5 raised through the 2017 notes in 6 months. (**The 2017 notes included the retirements and savings of over 24 people and trusts, raising the inference that the wrongdoing concerned was committed with a depraved heart.**) This, in turn, also shows that JOHN BLOOD had no intention of spending the money concerned in accordance with any duty of care, as he deceptively indicated with his lies as to the previous accounting, but that JOHN BLOOD, instead, had the intention—*from the beginning*—of bringing in new investment, in the form of promissory notes on account of the debt, which would be funneled to his affiliates. *See* ¶¶ 46-51 of **EXHIBIT 1**.

35.　　This was concealed from the CEO and Chairman of CERTA DOSE (*who was in New York*), as it was revealed in the later investigation that: (**1**) JOHN BLOOD'S subordinate employees were told by him not to communicate this information to the CEO; (**2**) the CEO was told something materially different as to the status of the money raised in the 2017 notes;[3] and (**3**) being in New York, the CEO and Chairman did not have access to seeing what was happening in the Colorado office and depended upon JOHN BLOOD, the rest of the board, and the information he was provided by employees. The efforts that JOHN BLOOD would take to control employees at the Colorado office and to conceal information from the New York office is recounted in DR. HERNANDEZ'S annexed affidavits. These efforts were, thus, used to conceal the material information at issue from the Company.

---

[3] *See, e.g.,* ¶¶ 48-51 of **EXHIBIT 1**.

36.     With regard to the facts referenced above (*see* ¶¶ 52-53 of **EXHIBIT 1**), the aforementioned employee who was also a noteholder made it clear to JOHN BLOOD that he preferred to have his notes either mature or become an equitable interest, given that the funds that were being invested in the bridge rounds could have simply been treated as a conversion event under a good faith view of the provisions of the contract (*if all concerned were treating each other fairly*). At the time, the actions simply did not make sense to the aforementioned employee who was also a noteholder, as the facts that would ultimately lead to the understanding the significance of these circumstances had not been revealed by COOLEY LLP or its attorneys, COPIC, JOHN BLOOD or the COPIC-affiliated Directors, nor had it been revealed by the troubling circumstances leading to the removal of the COPIC-affiliated Directors and JOHN BLOOD, nor the investigation that followed, making any purported prior representations of disclosure affirmative misrepresentations.[4] The aforementioned employee who was also a noteholder's referenced confusion was representative of the confusion experienced by the other 2017 noteholders, who had been kept in the dark of the material information concerned by the Defendants: something that would come to light in the investigation following the suspension of JOHN BLOOD.

37.     In the interactions referenced in the preceding three paragraphs, JOHN BLOOD did not inform the aforementioned employee who was also a noteholder of the evident intentions that he or COPIC, or their affiliated investors had with regard to the notes, which is something that was discovered later when the aforementioned employee who was also a noteholder later became the COO of CERTA DOSE and had access to JOHN BLOOD'S documents following JOHN BLOOD'S suspension. Similarly, when the aforementioned employee who was also a noteholder purchased the notes (*and even after he became a shareholder prior to his notes converting on November 15, 2019*), JOHN BLOOD refused to share the material information concerned as to his intentions for the notes (*or the intentions of COPIC and COOLEY LLP*), for CERTA DOSE, to create debt and waste, and to disavow any duties of good faith to the noteholders, particularly the 2017 noteholders.

38.     After JOHN BLOOD'S suspension, CERTA DOSE discovered that JOHN BLOOD would openly tell the COPIC-appointed Directors that the promissory notes were horrible, actually comparing them to feces, in crude terms, and that he could not imagine why anyone would be so "stupid" as to buy them. JOHN BLOOD would, however, then turn around and tell investors that the notes were amazing and that they were one of the best investments imaginable. This information was discovered by interviewing JOHN BLOOD'S subordinates, whom he had also instructed not to disclose information concerning his activities to the CEO. Because the notes concerned had so many terms that were against the interests of CERTA DOSE and in the favor of COPIC (*although COOLEY LLP had purportedly written them to the principal benefit of CERTA DOSE*), this strange behavior from JOHN BLOOD would otherwise simply be

---

[4] Although COOLEY, LLP professed to follow the applicable rules of professional conflict, it and its involved attorneys had not complied with them, which it is evident that they all knew, as the adverse consequences were not provided to the Plaintiff or to the good faith noteholders. Furthermore, it is evident that although COOLEY, LLP professed to have solely represented CERTA DOSE, INC.'S best interests in the note transactions, it did not disclose what representation it was actually providing for COPIC or the other parties that were taking part in the hostile takeover through their purchase of the notes and involvement in JOHN BLOOD and COPIC'S scheme, nor did COOLEY, LLP disclose what the adverse consequences of this were.

perplexing, were it were not for the fact that he knew COPIC could amend the notes at will to make the notes and their terms essentially meaningless, constantly extending them or changing the terms of their promised payment.  A strong inference, therefore, arises that JOHN BLOOD made affirmative misrepresentations to both CERTA DOSE, INC. and any good faith noteholders, *i.e.*, those who were not affiliated with COPIC and JOHN BLOOD, through his efforts to sell the notes, especially as only one of his conflicting statements could be true. (Because these acts were done in furtherance of the scheme, all those who took part in the scheme, or who aided and abetted those involved, are also liable for this misrepresentation.)

39.    The inferences of wrongdoing and bad faith identified in the preceding paragraph became further evident when CERTA DOSE discovered an e-mail from JOHN BLOOD to the COPIC-affiliated Directors, dated September 17, 2019, indicating that they would use a $97 Million valuation to value the interests of those who were not their affiliates, whereas their affiliates—*as noted below*—were to receive a valuation of roughly $15 Million. *See also* ¶¶ 99, 110 of **EXHIBIT 1**.

40.    Upon facts such as those of the preceding paragraph, it became evident to CERTA DOSE—*in its investigation following the suspension of JOHN BLOOD and the COPIC-appointed Directors*—that the referenced faithless fiduciaries intended to apply different terms to the noteholders in a Series A than they would apply to their affiliated investors and that, intrinsically, the affiliated investors of these faithless fiduciaries intended to apply different terms to themselves in a Series A than they would to the noteholders.

41.    The aforementioned employee who was also a noteholder informed CERTA DOSE that he would never have invested in CERTA DOSE if the intentions of JOHN BLOOD and the COPIC-affiliated Directors had been disclosed to him.  Because the associated concealment was managed by JOHN BLOOD and the COPIC-affiliated Directors in furtherance of the hostile takeover scheme, all those who took part in the scheme, or who aided and abetted it, are also liable for the associated deception, and this also serves to show that but for the concealment and deception, the 2017 noteholders would not have been deprived of the value of their investment.

42.    The facts concerned in the preceding ten paragraphs also raise the inference that COPIC, JOHN BLOOD and the COPIC-affiliated Directors all knew the significance of provisions that had actually been written in their favor and in the favor of their affiliates, yet to the detriment of CERTA DOSE and the good faith noteholders, *i.e.*, those who were not receiving the preferential treatment that JOHN BLOOD and the COPIC-affiliated Directors were giving to COPIC, its affiliates and JOHN BLOOD'S affiliates.  These facts—*especially when considered in light of its concealment on behalf of JOHN BLOOD, COPIC, their affiliated investors, and the COPIC-appointed Directors*—also indicate that COOLEY had likely written the documents concerned to the benefit of COPIC, JOHN BLOOD and their affiliated investors (*who it turns out would be the only parties invited to a Series A financing round*), particularly in light of the fact that COOLEY, LLP knew of JOHN BLOOD'S method of operation.

43.    While DR. HERNANDEZ was in New York (*following the aforementioned January 2018 meetings*), JOHN BLOOD began to spend inordinate and unsound amounts of the Company's funds, as evidenced by Company records and also by the later review of accountants. For example, it was discovered in CERTA DOSE, INC.'S investigation, and in reviewing billings that COOLEY, LLP sent to JOHN BLOOD, that JOHN BLOOD allowed COOLEY LLP to begin billing at higher prices than their engagement letter, with

10

his evident knowledge, while not bringing that to the Company's attention (*something that benefited both of these fiduciaries at the expense of the Company, particularly when considered in light of the totality of the circumstances*).  (As also noted, JOHN BLOOD and COOLEY, LLP took efforts to conceal this information and its significance from the Company.)

44.     Among other things, JOHN BLOOD took the actions complained of in the preceding paragraph by: (**1**) working with the COPIC-affiliated Directors to keep the promissory notes from becoming equity—*pushing strongly under the threat of COPIC'S displeasure if the wishes of the COPIC-appointed Directors were not complied with*—to have the notes remain debt whenever a vote of the matter arose; (**2**) expending a fortune in legal fees to COOLEY LLP, spending roughly $30,000 a month—*and more than twice as much as other firms ultimately offered to charge for the same work*—because of the understanding that COOLEY LLP was somehow, in an undefined way, essential for the success of the startup operation; (**3**) pushing for, and hiring, a giant cast of employees and paying them well above the market rate—*salary with benefits*—for jobs that were previously done on an "as needed" basis by outsourced services at a fraction of the cost, something that could not have been done without the pressure of JOHN BLOOD and the COPIC-affiliated Directors working within the Company to achieve these ends.  In short, JOHN BLOOD worked, intentionally, and even against the wishes of the CEO—*his superior officer*—to spend through the roughly $8,000,000 dollars of funds that had ultimately been raised through all the convertible promissory notes by August of 2019, spending at a burn rate of roughly $500,000 a month, which JOHN BLOOD did with the full knowledge of COPIC, the COPIC-affiliated Directors and their affiliated noteholders, along with the JOHN BLOOD-affiliated noteholders/investors.  This was all in accordance with his admitted *modus operandi* of driving up the debt of a Company to then profit when it was sold to investors with whom he had a relationship, who would then compensate him at that point (*which he confessed to a subordinate employee, as discovered in the investigation following his suspension*). *See, e.g.,* ¶ 68 of **EXHIBIT 1**.

45.     It was later discovered, in the investigation following JOHN BLOOD'S suspension, that the accountant and controller who worked under JOHN BLOOD—*and whom he, as a habit, continually intimidated so as to conceal his activities*—had informed him repeatedly that the burn rate was fiscally unsound, yet that JOHN BLOOD, nonetheless, insisted on operating the Company at that burn rate.  (Because JOHN BLOOD depended on the expertise of this accountant and controller—*being that she was an actual accountant, and was accomplished and competent in the requisite proficiencies, and in light of the fact that accountants would generally view it as dishonest for JOHN BLOOD to refer to himself as an accountant, given his measurable lack of necessary and marketable skills in that regard, as ultimately discovered in the Company's investigation*—the facts concerned in this paragraph demonstrate that JOHN BLOOD acted knowingly, wantonly, for his own profit, and intentionally when acting in opposition to the controller's warnings.) *See also* ¶¶ 48-51 of **EXHIBIT 1**.

46.     Before his suspension, JOHN BLOOD informed employees and investors that a large pharmaceutical company would be doing the Series A investment, wherein he spoke of this Series as if it were a foregone conclusion.  Once he was suspended, however, the Company discovered that there was never an offer on the table and that the large pharmaceutical company concerned never even reached the point of anything approaching a serious conversation on the topic, nor did any decisionmaker with apparent power at that company ever make such a communication.  Nonetheless, JOHN BLOOD used this as an excuse with some of those who questioned him to continue to spend as if such a Series A were a sure thing even though the Company was bleeding financially due to JOHN BLOOD'S efforts.  This was also further deception

hiding the fact that he intended, all along, for it to be his affiliates and the COPIC-affiliated investors who came in on the Series A. These facts raise an inference of JOHN BLOOD'S statements being deception that concealed what he was actually doing and that bought him time in doing so. This set of facts also raises the inference that is was his intention to actually create debt within the Company through waste, beginning expensive projects that had no reasonable likelihood of achieving their ends before the money devoted to them was spent, but which certainly achieved the end of creating debt through such waste of the note funds.

47.     As another example, although JOHN BLOOD communicated to others that the business would be selling product with the JIT (just in time) business model, wherein product would be produced just in time for the distributors as orders came in, that was actually a deception. To inflate the sales numbers, JOHN BLOOD had actually purchased more than 20,000 vials of epinephrine and had placed a purchase order to produce 20,000 kits. In this, JOHN BLOOD wasted money and product, further evidence of his methodology to create debt/waste in the Company for his own, ultimate personal benefit, while doing the opposite of the JIT business model. In this, JOHN BLOOD took these actions with distributors so that it appeared as if the Company had consumer sales, which JOHN BLOOD both knew not to be the case and which he actually took steps against, keeping the waste increasing, while limiting the securing of revenue to the Company (*which would have hindered his aim and methodology of creating debt so that he could profit in the forced sale of a company to investors with whom he had a relationship*).

48.     It was later discovered, as evidenced by Company records that had been kept hidden by JOHN BLOOD, as well as interview with employees, that JOHN BLOOD had communicated secretly with his affiliated investors, informing them of the debt within the Company, of the control they would receive in a Series A round that would be based on a low valuation of the Company (*due to the debt JOHN BLOOD was creating*), and of his efforts to ensure that only they, their affiliates, COPIC, and its affiliates knew of the state of the COMPANY and would be invited to the Series A round of financing. *See, e.g.,* ¶¶ 48-51, ¶¶ 99, 109-111 of **EXHIBIT 1**. These facts, along with the fact that JOHN BLOOD continually and evidently acted as an agent for these investors within the Company—*by, for example, giving them preference above other investors and by computing capitalization tables for their benefit*—serve to demonstrate that JOHN BLOOD had an interest in these affiliates reaping a benefit from the waste and detriment inflicted upon CERTA DOSE by JOHN BLOOD'S actions, and which he oversaw, particularly as they fit within his pattern and admitted methodology of purposefully creating debt within a company to benefit from its sale in a Series A round of financing to investors with whom he was affiliated. *See also* ¶¶ 22, 44, 57, 60, 67, 69-70, 77 and 109-111 of **EXHIBIT 1**.

49.     The facts concerned in the preceding paragraph also raise the inference of a *quid pro quo* between JOHN BLOOD and his affiliated investors, as well as the inherent and significant support offered to JOHN BLOOD through the security that his efforts would be rewarded in taking such a risk—particularly as the relationships with these affiliated investors were ultimately described by JOHN BLOOD in economic terms and the efforts taken against CERTA DOSE, INC., through JOHN BLOOD'S actions, would make no economic sense without there being such a *quid pro quo*. *See* **EXHIBIT 1** at ¶¶ 22, 44, 57, 60, 67, 69-70. This inference is also bolstered by the fact that the group of investors concerned, knew of the debt, were kept informed by JOHN BLOOD of the debt (*which they knew he caused*), and affirmatively told the Company that one of their demands was that JOHN BLOOD remain within the Company (*despite the Company's protests about JOHN BLOOD'S misfeasance*), thereby providing support to JOHN BLOOD'S efforts to further the hostile takeover scheme, not merely through purchasing the securities concerned and through actions that would—*absent for the scheme*—be contrary to their interest, but through efforts to maintain their agent within CERTA

DOSE, INC., continuing the efforts of the hostile takeover scheme. The fact that investors from this group had worked with JOHN BLOOD previously, which he and they admitted to the Company, also serves as evidence that this support of the JOHN BLOOD was knowing and intentional.

50.     It was also later discovered, in CERTA DOSE'S investigation following the suspension of JOHN BLOOD, that he communicated on an almost daily basis with a then COPIC-affiliated Director, doing so outside of the normal and proper channels, outside of Board meetings, outside of the presence of the Chair of the Board (*to an extensive degree*), and outside of the regular accountability that is created when a board functions as a body (*as opposed to individual board members taking unsanctioned action*).  It was evident to employees who were subordinate to JOHN BLOOD, and who had been intimidated by JOHN BLOOD (*from the nature of the communications and the circumstances concerned*), when these employees relayed this information to CERTA DOSE during its investigation, that STEPHEN R. HOFFENBERG was managing JOHN BLOOD and monitoring the state of the Company on behalf of COPIC, the COPIC-affiliated investors, and its interests.

51.     As noted, the 2017 notes included the retirements and savings of over 24 people and trusts, which JOHN BLOOD had deceptively burned through in 6 months to place his and COPIC'S affiliates in a favorable position.) *See* **EXHIBIT 1** at ¶¶ 49-53 and 57.  The preceding paragraph also raises the inference that the referenced efforts in favor of waste and the associated hostile takeover were intentional and were being kept from the Company by keeping their treatment out of the proper channels that a company needs to address such matters, *e.g.*, bringing matters to the attention of upper management and Company governance, or bringing these matters up in board meetings, so as to remedy them.  This concealment would not have been possible without the transfer of the CEO and Chairman of the Board to New York and these Defendants took advantage of the CEO and Chairman of the Board's presence in New York to manage and oversee the creation of the debt and to keep it hidden from the parts of the Company's body that were needed to address the scheme, *e.g.*, the CEO and Chairman of the Board.

52.     JOHN BLOOD also took other efforts to create waste by sabotaging opportunities that the Company had to create revenue and also did so by alienating investors who were not his affiliated investor Defendants, *i.e.*, those noted in ¶ 53 of **EXHIBIT 1**, including extremely bizarre actions such as leveling racial insults at pharmaceutical executives.

53.     As per Company documents, numerous concerns raised by the facts referenced in the preceding paragraph were brought to the attention of the COPIC-appointed board members and to COOLEY LLP, yet no action or investigation was taken by these fiduciaries to stop JOHN BLOOD.  To the contrary, the COPIC-appointed board members fought the efforts to address JOHN BLOOD'S waste (*even cryptically stating that the entire operation depended on JOHN BLOOD, which would only make sense if the operation involved driving up the debt and using that as a basis for selling control of the intellectual property to COPIC and those with which it was aligned*), which constituted support of his aforementioned efforts. *See, e.g., id.*  Similarly, COOLEY, LLP, through Defendants MICHAEL L. PLATT and KELLY BARTLING *refused* to advise on the issue without the entire board being present, which they did despite being warned by DR. HERNANDEZ that the COPIC-appointed Directors were resistant to having the issue brought to the attention of the Board in any formal capacity, which would require it take action on the best advice of counsel.  In this, MICHAEL L. PLATT and KELLY BARTLING took steps in contravention of Colo. RPC 1.13(a)-(d) and (f), further raising the inference that their *refusal* to provide advice on an issue that they were actually required to give advice on was

knowingly supportive of the efforts of the COPIC-appointed Directors and JOHN BLOOD to not have these issues actually treated by the Company.

54.    Under the totality of the circumstances, these aforementioned repeated refusals on the part of the COOLEY-affiliated attorney Defendants concerned to advise the Company when advice was requested by Company agents who certainly had the authority to request advice under the governing law and rules—*and the fact that the refusal was on bases that violated the applicable and governing standards of conduct*—raise the inference that the excuses given were pretextual and deceptive, and were, thus, affirmative steps in favor of a scheme from which COOLEY, LLP profited (*meant to avoid advising* CERTA DOSE, INC. *about a material conflict of interest that* COOLEY LLP *had on account of its relationship with* COPIC).

55.    This determined refusal to address the dangers to CERTA DOSE, as also noted in the preceding paragraph, served to insulate COPIC'S actions from proper treatment and discovery at a time when CERTA DOSE still had enough money to operate for about a year without needing further investment, if run properly: a factor that would not only have thwarted the evident takeover attempts by JOHN BLOOD, COPIC, the COPIC-affiliated Directors and their affiliated investors earlier, but which also would have minimized the associated financial harms that the Company suffered from the efforts that JOHN BLOOD and the COPIC-affiliated Director Defendants continued to engage in to bring about that harm. These determined refusals also show that COOLEY, LLP and its attorneys knew of these conflicts before all of the money concerned was spent, going back to its initial concealment, but had determinedly kept those issues from CERTA DOSE, INC., to whom it owed fiduciary duties of loyalty and candor. *See also* ¶¶ 26-33, 37, 53 of **EXHIBIT 1**.

56.    The financial harm associated with the wrongs referenced in the preceding two paragraphs would have been avoided if proper action had been taken by the attorneys concerned.  Because these attorney Defendants were also informed by the Company of the difficulty that the complained of circumstances were creating for investment that coincided with its appraised value, *i.e.*, the Scalar valuation, the attorney Defendants were on notice that their excuses, obfuscation, concealment and refusal to comport with their legal and fiduciary duties of loyalty, care and candor—*as well as their duties to disclose the true nature of any conflict of interest involving* COPIC—also contributed to the loss of value that the Company suffered as the COPIC and JOHN BLOOD-affiliated Defendants created that loss of value so as to later profit from it in a Series A financing that provided an artificial discount to the COPIC and JOHN BLOOD-affiliated investors.

57.    The facts concerned in the preceding paragraph illustrate another example of COOLEY LLP and the attorneys concerned using legal pretext to conceal their improper relationships with the Defendants, *or other similarly-situated predatory investors*, and, as a result, the benefits that those involved in the improper relationships would all receive through the aid of this particular kind of concealment. *See, e.g.,* ¶¶ 26-42 of **EXHIBIT 1**.

58.    The facts concerned in the preceding three paragraphs also illustrate examples of how COOLEY LLP provided aid to faithless fiduciaries and their affiliates, doing so to the detriment of a client, CERTA DOSE, to whom they owed fiduciary duties.

59.    In the late Summer of 2019, investors affiliated with COPIC and JOHN BLOOD made what appeared by all reasonable accounts to be a coordinated hostile takeover attempt, as JOHN BLOOD

had coordinated meetings with those involved, which were kept secret from CERTA DOSE'S CEO and Chair of the Board, coordinating efforts between his affiliated investors, as well as COPIC'S affiliated investors.

60.     With regard to the facts of the preceding paragraph, a demand was made by CERTA DOSE for candor form the referenced fiduciaries—*JOHN BLOOD and the COPIC-affiliated Directors*—as to the nature of their dealings with the affiliated investors, and further requesting candor with regard to the aims that the faithless fiduciaries and affiliated investors concerned had for the Company. Nonetheless, the demand was not honored, nor was the requested material information turned over to the Company or provided by the fiduciaries concerned (*despite the explicit acknowledgement by those fiduciaries that their fiduciary duties did indeed require them to provide candor to the Company*).

61.     The outright refusal to comply with candor requirements reference in the preceding paragraph—*particularly in light of the recognition by those fiduciaries of such obligations, as well as in light of statements which indicated that the COPIC-affiliated Directors intended to take part in the transaction concerned, along with statements that they also intended to invite only a specially invited list of family members and close affiliates, accidental admissions that they had discussed more with COPIC and the affiliated investors than they were willing to share with CERTA DOSE, INC., as well as the fact of the coordination between JOHN BLOOD, the COPIC-affiliated Directors and their related camps of secretly invited investors, which ultimately resulted in the hostile takeover offers that were made to CERTA DOSE, INC. progressively becoming worse through the elimination of any competition between these two camps*—raises the inference that there was self-dealing on the part of these evidently faithless fiduciaries and it also raises an inference that all of those involved in the two camps of affiliated investors were supporting the waste created by JOHN BLOOD, were benefiting from that waste, and were operating in an illicit manner that was benefited by the various forms of concealment employed by the various Defendants. *See also* **EXHIBIT 1** at ¶¶ 22, 44, 57, 60, 67, 69-70. These circumstances also demonstrate a certain meeting of the minds between all of the wrongful actors concerned and further demonstrate that there was mutual support in a material and significant way that benefited all of those involved in the hostile takeover scheme.

62.     Given the circumstances raised in the preceding paragraph, an inference is also raised by the facts involved that those concerned significantly supported the breach of fiduciary duties concerned by *coordinating with the evidently faithless fiduciaries* for mutual reward at the expense of CERTA DOSE, INC., through a meeting of the minds with those faithless fiduciaries, and through taking part in a common plan and scheme—*evidencing a meeting of the minds*—which would not have been possible if the parties concerned had refused to so aid the faithless fiduciaries involved or contribute to their efforts in the ways referenced.

63.     In September of 2019, the Board of CERTA DOSE voted to investigate the relationship between JOHN BLOOD, the COPIC-affiliated Directors, as well as the true nature of the offers that were being assembled for the Series A round. The Chair of the Board, DR. HERNANDEZ, who had urged the investigation and pushed through the vote for an investigation, noted to the Board that its members owed a duty to the noteholders and to the shareholders to make sure that their investments were protected.

64.     With regard to the facts of the preceding paragraph, CERTA DOSE'S outside counsel at the time, Defendant COOLEY LLP (*through* KELLY BARTLING), who was also a longtime associate of JOHN BLOOD, had suggested, in prior Board meetings, that there was no such duty owed to noteholders.

Nonetheless, the Chair of the Board took issue with that statement, even though COOLEY LLP'S aforementioned position—*presented through Defendant KELLY BARTLING*—was also voiced, and approved of, by the Directors that opposed the investigation.

65.     Ultimately, and outside of the Board meeting, CERTA DOSE'S counsel at the time (KELLY BARTLING of COOLEY LLP), after being confronted by CERTA DOSE'S Chairman, had to admit that there indeed was a duty owed to the noteholders to protect their investment, but this admission was only made to DR. HERNANDEZ after he had pressed her repeatedly outside of the Board meetings for clarity on the point she had previously offered as advice to the Board. (This, along with the fact that COOLEY, LLP refused to take action outside of board meetings, raises the strong inference not only that COOLEY, LLP had previously lied in the board meetings concerned, but that it was using the very mechanisms of the Company to actively avoid its legal obligations and to conceal its role in assisting COPIC and JOHN BLOOD in their hostile takeover efforts.)

66.     In subsequent meetings and communications to the other directors and to COOLEY LLP, the Chair of the Board noted that that the red flags and irregularities surrounding the apparent coordination between JOHN BLOOD, the waste he created and the offers of apparent hostile takeover, all indicated that there was danger, which should be investigated, that threatened the value of the investments that those who had already invested in the Company had made, and that such danger should be looked into before simply proceeding, blindly, with a sale round that was surrounded by warning signs.

67.     With regard to the facts of the preceding paragraph, there were also other indications, as noted from what was advocated by JOHN BLOOD and the COPIC-affiliated Directors, in Company meetings, that the promissory notes would not actually be treated with the same terms or ultimate valuation that was to be provided to the potential COPIC and JOHN BLOOD-affiliated investors, who were being jockeyed by the COPIC-affiliated Directors and JOHN BLOOD to come in on the Series A round. *See* **EXHIBIT 1** at ¶ 62.

68.     As could also be noted from the positions that the Defendant took as to the danger noted by DR. HERNANDEZ, the Directors who opposed the investigation, as well as JOHN BLOOD, were evidently working with certain of the "potential Series A investors," *i.e.*, those other Defendants in this litigation who are not attorneys, to eliminate the normal market factors and to drive down the value of CERTA DOSE'S stock, thereby driving down the value of the investments that had previously been made into the Company, while also driving down the value of the Company itself for all but those who would capitalize on the lowered value. *See, e.g.,* **EXHIBIT 1** at ¶¶ 48-53.

69.     JOHN BLOOD did not communicate to the good-faith noteholders, either before or after cooperating with COPIC to extend the note maturity dates, that the only investors for a Series A would be his and the COPIC-affiliated investors.  In short, although the affiliated investors were purportedly offered the chance to take part in the Series A, the other note holders were not offered the same opportunity. *See also id.* Conversely, and as noted above, JOHN BLOOD, the COPIC-affiliated Directors and COOLEY, LLP were unified in opposing disclosure to the 2017 noteholders of the opportunity or of other issues that greatly affected their investment.  (This further raises the inference that the waste that JOHN BLOOD and the COPIC-affiliated Directors wrought upon the funds that had been provided through the notes was to benefit their affiliated noteholders, both creating an opportunity for them and allowing *only* them to benefit in this

opportunity to purchase the Company stock at an artificially discounted rate.)  In this way, these interested parties used unjust/deceptive measures, benefiting themselves while systematically neglecting or harming weaker groups (*i.e.*, the investors who did not have similar influence within the Company on account of lacking involvement in the scheme), and the public good.

70.     Nonetheless, instead of even extending the notes another 6 months and/or doing another bridge round of investment (*as they had done before*), JOHN BLOOD and the COPIC-affiliated Directors moved to extend the maturity of the notes by only 45 days.  This was exactly enough time to "squeeze" CERTA DOSE, financially, into taking a bad deal to survive.  In September of 2019, the aforementioned employee who was also a noteholder asked DR. HERNANDEZ, "How many times did John and Steve mention the Company would be insolvent today if you didn't take the deal?" DR. HERNANDEZ responded, "At least 200 times today."  In this, it was evident that 45 days was just enough time to close a Series A deal with JOHN BLOOD'S friends and repel any existing/active, and then courting, investors due to the weak cash position.  DR. HERNANDEZ and the aforementioned employee who was also a noteholder were desperately trying to attract investors, yet JOHN BLOOD used some of his various financials to counter these efforts, only now he was using the Company's "high month" cash spend and its last cash position to give potential Series A investors a picture that would cause them to run from CERTA DOSE.

71.     CERTA DOSE'S outside counsel at the time, *i.e.*, COOLEY, LLP, refused to answer direct questions as to the likely harm that these circumstances posed for investors and the Company; nonetheless, the COOLEY Defendants concerned had previously admitted, after being pressed significantly, that the circumstances were generally problematic and suggestive of abuse. (Thus, they were willing to concede that there was a troubling set of issues present, but they still refused to help address the problem, as noted earlier, *supra*.)

72.     With regard to the facts referenced in the preceding paragraph, the COOLEY LLP counsel concerned had also noted that they represented COPIC, for which the two Directors who voted against the investigation worked or had worked; similarly, and as also stated in the convertible promissory notes, COOLEY LLP purported to represent the noteholders, although it had never notified the Company or the noteholders of how these provisions would negatively affect and/or impact the Company or the noteholders. *See, e.g.,* footnote 5 of **EXHIBIT 1**.

73.     At about this time (*August of 2019 through September of 2019*), COPIC had ordered an appraiser's valuation of CERTA DOSE, which came back at between $67 Million and $120 Million. Although it was evident that the COPIC-affiliated Directors certainly intended to use this valuation for setting the value that some investors would receive, it was also clear that they planned to offer a roughly $15 Million valuation to their affiliated investors, with whom they had close ties. *See, e.g.,* **EXHIBIT 1** at ¶ 62.  Thus, the existence and apparent significance of these two different valuations, among other factors which indicated that the noteholders would probably not be receiving the benefits that the COPIC and JOHN BLOOD-affiliated investors would be receiving, presented a potential for abuse that could not be ignored. *See id.*  It also raises an inference that the faithless fiduciaries concerned sought to benefit from the waste caused by JOHN BLOOD under the watch of the COPIC-affiliated Directors and that they also intended such waste as a means to benefit themselves and their affiliates at the expense of CERTA DOSE, INC.  (As such, the Chair of the Board pressed the issue of the investigation with COOLEY LLP and with the COPIC-affiliated Directors, reminding them all of the fiduciary duties implicated.) This raises an inference that the acts and

omissions of the Defendants concerned, both before and after being pressed by DR. HERNANDEZ, were knowing and intentional.

74.     Nonetheless, and despite the aforementioned vote for an investigation, the COPIC-affiliated Directors, who had opposed the investigation concerned, attempted to hold a meeting at COPIC headquarters in Colorado, on October 4, 2019, with the apparent intent of forcing the sale on through without an investigation. (Because the COPIC-affiliated Directors lacked the votes to do this, there were other circumstances and factors present which indicated that the meeting was suspect, irregular, and was being scheduled to facilitate the apparent hostile takeover concerned.)

75.     Because of the danger that proceeding without vetting a sale, or looking into potential self-dealing, posed for the Company and its investors, shareholder action was taken on October 4, 2019, supported by an action without vote of the majority of shares in the Company, to suspend the COPIC-affiliated Directors and JOHN BLOOD.  These evidently faithless fiduciaries were also asked by the Company to provide copies of the communications that they had exchanged with the potential Series A investors to whom they had close ties, *i.e.*, their affiliates, thus being further asked by the Company to comply with their duty of candor.  The evidently faithless fiduciaries concerned did not comply with these requests, resulting in admissions by silence of their involvement in the referenced hostile takeover.

76.     The faithless fiduciaries refused to turn over the requested communications and, instead, on October 21, 2019, attempted to conduct another meeting at which it appeared quite evident that they were seeking to force a sale through without an investigation.

77.     In similar fashion to the breach of fiduciary duties referenced in the preceding paragraph, and instead of providing advice to the sitting Board (*now that its prior excuses for refusing to give advice on the dangers to the Company had been removed by the suspension*), COOLEY LLP resigned as counsel for CERTA DOSE without addressing the pending questions that it had been asked, which was highly irregular given the requirements placed upon COOLEY LLP by the rules of professional conduct.  As such, these circumstances also raise a further inference that COOLEY LLP had been avoiding disclosure of the nature of its conflicts, *i.e.*, what COPIC was planning to do to CERTA DOSE, and that COOLEY LLP was, thus, working to conceal its role in the efforts of JOHN BLOOD, COPIC and their affiliates to prey upon CERTA DOSE (*to whom COOLEY LLP owed the duties of a fiduciary*), as these acts of avoidance amount to an admission of silence and *also* raise the inference that COOLEY, LLP was providing support for those involved in the referenced hostile takeover, supporting the efforts at earlier stages, including those efforts that the other Defendants took to bring about waste in the Company, as well as through obfuscation, concealment and even advice to COPIC and/or JOHN BLOOD'S affiliates. *See, e.g.,* **EXHIBIT 1** at ¶¶ 53-56.

78.     With further regard to concealment, the investigation following JOHN BLOOD'S suspension revealed that budgets, which JOHN BLOOD had shown investors, the Board of Directors and the controller are missing, including the vast body of Company documents that JOHN BLOOD kept on a hard drive he brought into the Company's Denver office.  It is evident that JOHN BLOOD did not save these materials on Company computers and that a fair amount of financial work which was in JOHN BLOOD'S direct control went missing when he was suspended.  Neither the controller nor the interim COO were able to find the entire collection of JOHN BLOOD'S spreadsheets.  This all raises an inference of

concealment, which raises inferences of intent and malfeasance on JOHN BLOOD'S part (*not merely misfeasance*).

79.    To prevent the unauthorized act of the suspended Directors referenced in ¶ 102 of **EXHIBIT 1**, and to provide the proper oversight (*especially as the unauthorized act was being taken by suspended fiduciaries before a sale's actual terms could be vetted*), the shareholder majority took additional action to remove the two suspended members of the Board. Nonetheless, these removed, COPIC-affiliated Directors were once more asked to provide their communications with potential/affiliated investors to the Company, which, once more, they refused to do.

80.    To fill these vacancies, new Board members were selected according to the governance provisions to help the Company investigate the issues concerned and to provide additional guidance and oversight. Following these appointments, the Board, with its new members and new counsel, became aware that certain provisions within the AMENDED AND RESTATED CERTIFICATE OF INCORPORATION, which had been amended with COOLEY LLP'S help between May 26, 2016 and June 13, 2016 in the aforementioned SERIES SEED 2 PREFERRED STOCK PURCHASE AGREEMENT that COPIC insisted was valid, were written to prevent the noteholders from being issued preferred stock on the terms they had been offered in their agreements (*or from receiving the discount that they had been offered*). CERTA DOSE'S prior outside counsel, COOLEY LLP, who had written both the notes and the aforementioned Certificate of Incorporation, evidently never informed the Company of this issue, as noted by the investigation and review of the Directors on the new Board.  Similarly, it became evident to the new Board, from the circumstances concerned, that the provisions concerned were not made known to the noteholders at the time they signed their agreements, nor at any time thereafter.  (This seemed exceptionally unfair to the new Board, as it further raised the inference that the waste of the funds of the noteholders, while keeping them out of equity, were being used to facilitate the evident hostile takeover attempt involving COPIC, JOHN BLOOD and their affiliated investors, while also raising the significant inference that the good faith noteholders would not be treated equally with the COPIC and JOHN BLOOD-affiliated investors and noteholders.)  In this, it was also evident that the COPIC and JOHN BLOOD-affiliated noteholders, although knowing of the waste, nonetheless expected to receive a significant benefit from the waste.  (The fact that the COPIC and JOHN BLOOD-affiliated noteholders were the only noteholders being invited by JOHN BLOOD and the COPIC-affiliated Directors to take part in the Series-A financing—*placing more money into CERTA DOSE, INC., despite the waste that their fiduciaries concerned supported*—further adds to these inferences.) Furthermore, JOHN BLOOD tacitly admitted that the consequences of his actions were that the CERTA DOSE, INC. shareholders would be receiving a "haircut," which was a reference to significantly or extremely diluting their ownership and control in the Company.

81.    With regard to the facts of the preceding paragraph, it became clear to the new Board that the noteholders had not been informed of these secret provisions, as the provisions were presented in a separate instrument that they were never provided or informed of—despite COOLEY, LLP'S statements to the contrary, *i.e.*, the CERTIFICATE OF INCORPORATION—which would actually override the noteholders' rights and what the noteholders had agreed to receive in the notes, *i.e.*, preferred stock and the promised discount. *See also* ¶ 97 of **EXHIBIT 1**. (If it had not ultimately been due to new legal advice, this would not have become evident to the Company, as the restrictions on acquiring preferred stock were well hidden in pages upon pages of the aforementioned Certificate of Incorporation.) *See id.*

82.      It was also discovered at this time, *i.e.*, in the investigation following the suspension of JOHN BLOOD and the COPIC-affiliated Directors, that JOHN BLOOD knew about the fact that the noteholders would not get preferred stock and had even planned that result out by calculating the noteholders' equity as common stock in spreadsheets identifying what would occur on the Series A round (*noteholders would evidently not receive the preferred stock that was promised to them in their note agreements*). *See also* ¶¶ 40-53 and 110-113 of **EXHIBIT 1**.

83.      Documents and e-mail discovered on JOHN BLOOD'S computer and related accounts also revealed that he had been calculating the financial benefit to his associated investor affiliates, as well as the related loss to the Company's majority shareholder, for about as long as he had been at the Company following his return in early 2018. For example, one spreadsheet that JOHN BLOOD had calculated for his affiliated investors—*a document titled "Certa Dose_Funding Calculations_9.3.19," which was made without Board approval and concealed from both the Board and the CEO*—listed a valuation for the Company of $15,000,000 on September 3, 2019, although the Board was still purportedly running due diligence following the Scalar valuation and ultimately determined, later that month, that it would endeavor for a market valuation. The document *only* calculated the gains in the Company that JOHN BLOOD'S affiliated investors would have at a valuation of $15,000,000, which was the valuation that all of those involved in the hostile takeover scheme ultimately used, although it bore no relationship to the appraised value and had an explicit and recognized connection to a change in the ownership structure of the Company. As noted in the previous paragraph, the documents had the notes converting as common stock instead of preferred. JOHN BLOOD also created a similar calculation for the COPIC-affiliated Defendants, raising the inference that the two groups were coordinating information and a common scheme to profit from a Series A funding round that would be sold to them at an artificial discount created by means of: (**1**) notes they purchased; (**2**) which were then knowingly converted into looming debt that brought no legitimate benefit to the Company on account of the management and fostering of that debt/waste by fiduciaries in the Company with whom these complicit noteholders were affiliated; (**3**) supporting the maintenance of those faithless fiduciaries within the Company; and (**4**) those faithless fiduciaries then setting an coordinating a low valuation of the Company from within, while inviting only their affiliated noteholders to the Series A financing at the exclusion of other investors and noteholders.

84.      Based on the best information that the Company has, stemming from its investigation after the suspension of JOHN BLOOD, JOHN BLOOD had also stated openly to subordinates who he intimidated that his goal was to drive up the debt of the Company so as to achieve the kind of Series A that he was trying to bring about, *i.e.*, one where the Company was forced to sell in a state of desperation to his associates and others with whom the associates cooperated, *i.e.*, the COPIC-affiliated investors. Although he kept this secret from upper management and the complete body of the Board (*except, evidently, for the removed COPIC-affiliated Directors, with whom, it was later found out, he spoke on a consistent basis in their unofficial, individual capacities, outside of Board meetings*), JOHN BLOOD'S actions, as referenced here and elsewhere in the Complaint, indicate that he actually intended to spend away the investment provided to the Company in the form of the notes, using it as a mechanism to lower the immediate value of the Company and provide it at a discount to his affiliates. *See, e.g.,* **EXHIBIT 1** at ¶¶ 44-53.

85.      In October and November of 2019, CERTA DOSE further cemented the evidentiary basis for the combined efforts of JOHN BLOOD, COPIC and their affiliated investors to assist the waste created by JOHN BLOOD and the other efforts that he had taken, with the COPIC-affiliated Directors to facilitate

the hostile takeover of CERTA DOSE.  CERTA DOSE did this by requesting further assurances from the investors affiliated with COPIC and JOHN BLOOD, as per the terms of the convertible note agreements and as per the requirements of the UCC, which also indicated that the failure to respond would be taken as an admission by silence of aiding and abetting JOHN BLOOD, COPIC, and the COPIC-appointed Directors in their efforts to cause and exploit waste to effect a hostile takeover. The COPIC and JOHN BLOOD-affiliated investors, however, refused and otherwise failed to comply with these requests, establishing admissions by silence, while also raising further inferences of their participation and support of the evident scheme to exploit waste caused by the CERTA DOSE fiduciaries who were affiliated with the investors that refused to provide further assurances.

86.    In short, and with reference to the facts noted in the preceding three paragraphs, noteholders expecting to receive preferred stock at the conversion of their notes in a Series A round would have, instead, received common stock, despite the representations that had been made to them earlier. *See, e.g.,* ¶ 97 of **EXHIBIT 1**.  The noteholders would have also been subject to a host of dilutive vehicles and provisions in the Certificate of Incorporation that COPIC and COOLEY LLP intended to enforce, of which the noteholders had evidently never been notified.  (The new Board discovered these facts in November of 2019, although COOLEY LLP, the firm that purportedly represented CERTA DOSE and even the noteholders, stated in the convertible notes that it had notified everyone concerned of what was really going on, despite the fact it had not actually provided any of the advice that would be necessary for there to be informed consent to either the good-faith noteholders or CERTA DOSE.)  As discovered once CERTA DOSE was able to speak with new counsel, the restrictive provisions and legends of the aforementioned Certificate of Incorporation would have pushed down the common stockholders and the noteholders' value, greatly diluting the value of their investment: doing so immediately, but, even more so, over time.

87.    There were also provisions within the note agreements themselves that, under the totality of the circumstances—*as discovered after JOHN BLOOD and the COPIC-appointed Directors had been removed*—had been used to prevent the conversion of the notes.  (This primarily took the form of a $1.5 Million Series A minimum requirement, which was purportedly there to help value the round, but which was instead used by COPIC to prevent the other 2017 noteholders from becoming equity holders as part of a scheme to gain control of the Company at the expense of shareholders and the 2017 noteholders.)  It became clear to the new CERTA DOSE Board, however, that this provision would not give the same benefit to noteholders that it would give to the potential investors to whom the removed Directors and suspended officer evidently had close ties, *i.e.*, the COPIC and JOHN BLOOD-affiliated investors. (All of the factors noted before made this readily evident in the late October and early November phases of CERTA DOSE'S 2019 investigation into these matters.)

88.    Based on the totality of the circumstances, the Board determined that the barrier to conversion had been used as an excuse to prevent the conversion of notes for some time, even though greater than $1.5 million had been raised at various times before the push for the Series A round.  Because the provisions had evidently been drafted by COOLEY LLP to the benefit of COPIC and its affiliated investors, it became evident that COOLEY LLP had coordinated with COPIC and JOHN BLOOD to both instruct them as to the provisions and the best means to use them to accomplish their evident combined ends, while affirmatively telling CERTA DOSE, INC. and the noteholders the opposite in the instruments concerned.

89.    To address the problems created by the instruments concerned (*as noted, supra*), the Board was limited by a number of obstacles that had evidently been worked into the instruments by COOLEY LLP to the benefit of COPIC and its affiliated investors. Thus, even though the 2017 noteholders had stated numerous times that they wished to convert the debt of their notes into equity, they had—*as per the direction of JOHN BLOOD, COPIC and COOLEY LLP*—simply agreed to push the notes back via previous amendments, without removing this barrier provision. Ultimately, the Board had to ask all the noteholders who had acted in good faith (*those who were not affiliated and/or evidently cooperating with COPIC and JOHN BLOOD in their efforts*), if they agreed to amend the notes and be released from that restrictive provision. Greater than 50% of these required holders consented, as measured by the amount of investment held in the notes concerned, and did so despite the previous amendments, agreeing to have that provision amended in the notes.

90.    This alone, however, would not have conclusively and absolutely removed the provisions from the aforementioned Certificate of Incorporation that COPIC, through COOLEY LLP'S aid, evidently sought to prevent the notes—*no matter how hard the Board may have otherwise tried*—from having the ability to become preferred stock with the negotiated 20% discount. The legal steps that were needed to prevent that injustice were taken by the Board on November 15, 2019 and are a matter of public record, as recorded in the state of Delaware. Those instruments, which had also been shared with the Defendants prior to the initiation of this litigation, are also incorporated herein by reference. *See id.*

### FIRST CAUSE OF ACTION
### (Breach of Fiduciary Duties)

91. Plaintiff repeats the foregoing paragraphs with the same effect as if fully set forth herein.

92. As alleged, all of the aforementioned fiduciary Defendant was an agent of the principal, CERTA DOSE, INC., owing it fiduciary duties.

93. Nonetheless, Defendant acted in a manner that breached his fiduciary duties to the principal, Plaintiff CERTA DOSE, INC., by acting adversely towards that principal's interests, by acting in bad faith, by acting in a manner inconsistent with their agency to the principal and/or by omitting to disclose interests which would naturally influence the conduct of the agents concerned when dealing within the scope of their agency, wherein disloyalty permeated the service of these agents in the most material and substantial part, substantially violating their contracts for service with CERTA DOSE, INC. *See, e.g.,* ¶¶ 30-31, 36, 44-53, 57-58, 60, 64-71, 76-82, 86, 90-91, 94, 98-99, 103-104, 106, 108, 110-112, 125, footnote 5 of **Exhibit 1**.

94. Given the facts referenced in the preceding paragraph and throughout this Complaint, the Defendant forfeited all right to payment and compensation, as his conduct substantiality violated his employment contracts and agency relationships with CERTA DOSE, INC., including any agreement to arbitrate. (This fact supports relief that CERTA DOSE, INC. seeks defensively with regard to any claims for payment that the faithless fiduciary may bring.)

95. The Defendant was a fiduciary of the Plaintiff, yet held on to undisclosed conflicts of interest and associated material facts that would have helped the Plaintiff avoid harm, by virtue of the facts alleged above and as created by COOLEY, LLP'S failure to comply with its obligations to obtain informed consent of any conflict waivers concerned.

96. Additionally, the Defendant had actual knowledge, notice and/or constructive knowledge that diversion, misappropriation and waste of Company funds was occurring, especially as facts sufficient to cause a reasonably prudent person to suspect that funds were being misappropriated and wasted, and which would trigger a duty of inquiry on the part of agents owing a fiduciary duty, had come to their attention. *See, e.g.,* **EXHIBIT 1** to this Complaint at ¶¶ 44-53, 60, 69-71, 76-77, 86, 91, 94, 99, 103, 106, 112.

97. Furthermore, the Defendant failed to conduct a reasonable inquiry and, as a result, are nonetheless charged with such knowledge as inquiry would have disclosed. *See, e.g.,* ¶¶ 44, 60, 69, 70-71, 76-77, 86, 91, 94, 99, 103, 106, 112 of **EXHIBIT 1**.

98. As is evident, the Defendant concealed significant and material facts from Plaintiff CERTA DOSE, INC. in order to mislead or defraud said Plaintiff, wherein CERTA DOSE, INC. and the majority stockholders reasonably relied upon the Defendant concerned and suffered damage as a result of the reliance, thereby causing damages to the Company. *See, e.g.,* ¶¶ 30-31, 36, 44, 48-51, 57-58, 64-69, 74-83, 86, 90, 98, 103-104, 108, 110-112, 125, footnote 5 of **EXHIBIT 1**. In this, the damages concerned include, but are not limited to those referenced in ¶ 185 of **EXHIBIT 1**.   (Nonetheless, damages would, of course, at a minimum include nominal damages.)

99. As is evident, the Defendant concealed significant and material facts from CERTA DOSE, The aforementioned employee who was also a noteholder and the other 2017 noteholders in order to mislead or defraud them, wherein CERTA DOSE and the good faith 2017 noteholders reasonably relied upon the Defendants concerned and suffered damage as a result of the reliance. *See, e.g., id.*; *see also* ¶¶ 53-57 and footnote 5 of **EXHIBIT 1**. In this, the damages concerned include, but are not limited to, those referenced in ¶ 185 of **EXHIBIT 1**. (Nonetheless, damages would, of course, at a minimum include nominal damages.)

100.       As per the facts recounted above, the Defendant was, at best, willfully blind and/or overlooked the careless, reckless, willful and/or intentional efforts of JOHN BLOOD to drive up the debt of the Company and to cause waste of the Company's assets (*which, itself, is a breach of fiduciary duties*); thus, placing the Company in a position where it was weakened, had lost available revenue and funds, and where it's control and assets could more easily be taken over and/or away from its good faith shareholders and its good faith investors. *See, e.g.,* **EXHIBIT 1** at ¶¶ 29, 44, 57, 60, 67, 69-71, 77, 109-111.   This was particularly the case because these fiduciary Defendant had failed to take proper action, had failed to disclose material information that the Defendant knew and/or should have known would have helped the Company to avoid harm, and because these Defendant even failed to inform or advise the Company as to dangers about which they were specifically asked to address. *See, e.g.,* ¶¶ 72-83 of **EXHIBIT 1**.

101.     Furthermore, JOHN BLOOD worked and/or coordinated with entities and persons, *i.e.*, the other non-attorney Defendants listed in ¶¶ 129 and 131 of **EXHIBIT 1**, to lower the value of the Company's stock and the value or its shares via—*among other things*—endeavoring to coordinate the offers that said investors made to the Company in such a way as to remove the market force of competition, thereby manipulating the value of the Company's stock in a way that was improper and to the detriment of CERTA DOSE, INC.  *See, e.g.,* ¶¶ 29, 44-57, 60-62, 67, 69, 70, 71-72, 77, 85, 88, 96, 98-102, 108-110 of **EXHIBIT 1**.

102.     Despite being an officer and CFO of Plaintiff CERTA DOSE, INC., JOHN BLOOD exercised greater loyalty to a group of outside investors with whom he was affiliated—*including* ANTHONY R. MAYER,  PHOEBE FISHER, LFD III GRAT-TRUST U/A 8-26-2015 (KATHERINE DRISCOLL, Trustee), *and* LEE F. DRISCOLL—than he gave to CERTA DOSE, INC., doing so to the direct detriment of the CERTA DOSE, INC., which he did by acting as an agent to the benefit of these Defendants, yet at the expense of Plaintiff CERTA DOSE, INC., which he also did by endeavoring, within CERTA DOSE, INC., to position these investors in a place where they could more easily gain control, and have a better position than the shareholders of, and good-faith investors in, CERTA DOSE, as well as any other interested investors who were providing and/or offering benefits and/or better terms to the Company and the interests of its shareholders that JOHN BLOOD'S affiliated investors were evidently willing to offer. *See, e.g.,* ¶¶ 29, 44, 57, 60, 67, 69-71, 77, 109-111 of **EXHIBIT 1**.

103.     In addition to the waste he caused within the Company (*so as to better the position of himself and his affiliated investors*), JOHN BLOOD purposefully and intentionally neglected and endeavored to waste opportunities that came to the Company from other outside sources, doing so to benefit the aforementioned affiliated investors, which he ultimately did as a part of the harm that he brought to CERTA DOSE, INC. in his efforts to bring about a transaction that his affiliated investor Defendants sought to enter with the Company in late September of 2019 and October of 2019, which included the purchase of Plaintiff CERTA DOSE'S stock. *See, e.g.,* ¶¶ 29, 44, 57, 60, 67, 69-71, 77, 109-111 of **EXHIBIT 1**.

104.     By the actions identified in the preceding two paragraphs, JOHN BLOOD breached his duty of loyalty to CERTA DOSE through conflicts of interest, through self-dealing, and through the harms referenced in the preceding two subparagraphs, as well as through the damage to CERTA DOSE that ultimately stems from the harms attributed to JOHN BLOOD in this Complaint.

105.     As such, the Defendant was a foreseeable, probable, effective, natural and direct cause of the harm suffered by the Plaintiff and therefore (*in addition to the liability they share for the economic harm, devaluation and damages caused to Plaintiff CERTA DOSE, INC.*), caused damage whenever he received and/or charged for services, which were rendered meaningless due to said Defendant's disloyalty.

24

106.     Thus, the Defendant, although being a fiduciary of Plaintiff CERTA DOSE, INC., acted in ways that constituted misconduct, in ways that included self-dealing and personal interest conflicts, wherein the Defendant acted contrary to the interests of CERTA DOSE, INC. and its shareholders, to whom they owed duties of loyalty, candor and care, and whom he ultimately caused damages on account of said breaches of his fiduciary duties, including, but not limited to: (**1**) waste of the $8,000,000 invested in CERTA DOSE, INC. via the promissory notes; (**2**) holding the Company back from what would otherwise be its realized value of $127,000,000, and bringing it to a point where it had to settle with noteholders at a negotiated value of $25,000,000, a difference of $102,000,000; and (**3**) lost revenues in an amount to be provided in discovery. *See* ¶ 185, ¶¶ 44-57, footnote 4 of **EXHIBIT 1**.

107.     In the alternative, the Defendant caused the Plaintiff—*at the very least*—nominal damages.

## SECOND CAUSE OF ACTION
### (Breach of the Covenant and Duty of Good Faith and Fair Dealing)

108.     Plaintiff repeats the foregoing paragraphs with the same effect as if fully set forth herein.

109.     At all times herein reference, Plaintiff acted in good faith and performed its part of the contracts and instruments referenced, particularly the employment contracts it had with the Defendant.

110.     By taking part in, and by also aiding and abetting of a breach of fiduciary duties, as referenced above, by taking part in an improper takeover attempt, and as otherwise noted in the circumstances that are alleged in this Complaint, the Defendant acted improperly and/or in bad faith and, therefore, is subject to claims for breach of the implied covenant of good faith and fair dealing as well as the associated duty of good faith and fair dealing, which the Defendant breached in all of the contracts in which they are parties with the Plaintiff.

111.     As such, the actions and omissions of the Defendant, and his associated actions constituting breaches, which are summarized and recounted in ¶¶ 120-148 of **EXHIBIT 1**, caused damages to the Plaintiff in the ways recounted above, including, but not limited to those referenced in ¶ 185 of **EXHIBIT 1**.  In the alternative, the Defendant should not be able to enforce any provision of any contract that he may have with the Plaintiff, against the Plaintiff, as per the first breach rule and should also lose the right to enforce all equitable rights against the Plaintiff.

## THIRD CAUSE OF ACTION
### (Breach of Contract)

112.     Plaintiff repeats the foregoing paragraphs with the same effect as if fully set forth herein.

113.     At all times herein reference, the Plaintiff acted in good faith and performed its part of the contracts and instruments referenced, particularly any employment agreement that it had with Defendant.

114.     By breaching the implied covenant and duty of good faith and fair dealing through the actions that the Defendant took, as noted above, and ***by failing to provide further assurances***, the Defendant breached and repudiated their duties to the Plaintiff in the respective contracts and agreements concerned through anticipatory breach, as recognized in the common law and the UCC (*by their conduct and by their refusal to give further assurances*), thereby **demonstrating** that he had breached the purposes of the agreements, which involved, as an implicit terms, that the Defendant would not taking part in the hostile takeover, contribute to and/or cause waste to the funds provided through the notes, or interfere in such a way as to cause interference with the economic and prospective economic (*as later evidenced by the Defendants' failure to provide further assurances and/or through their associated admissions by silence, which breached a specific term in the agreements*).  (The Defendant, therefore, cannot enforce the terms of the contracts against the Plaintiff, having repudiated the agreements through anticipatory breach.)

115.     As such, the Defendant is subject to claims for breach of contract, including a breach of all the securities instruments and other agreements that the Defendant entered into with the Plaintiff, as well as all the amendments and restatements thereof.

116.     As such, the Defendant harmed the Plaintiff and caused damages to Plaintiff, including damages to the Plaintiff's interests in the investments concerned, as referenced in this Complaint, especially as the Defendant caused measurable damage to the Company itself. *See* ¶ 185 of **EXHIBIT 1**.  The Defendant, therefore, cannot enforce the terms of the contracts against the Plaintiff, particularly any arbitration agreement that was a part of his overall scheme to defraud the Plaintiff, having repudiated the agreements through anticipatory breach.  Furthermore, the Defendant is at least liable for nominal damages.

## FOURTH CAUSE OF ACTION
**(Fraud, Constructive Fraud, and Aiding and Abetting Fraud and/or Constructive Fraud)**

117.     Plaintiff repeats the foregoing paragraphs with the same effect as if fully set forth herein, including, but not limited to the allegations that identify fiduciaries, facts that would—*as a matter of law*—require disclosure by the Defendant, and those facts depicting deception, affirmative misrepresentation and a failure to disclose material facts and information to the Plaintiff. *See, e.g.,* ¶¶ 30-31, 36, 48-53, 57-58, 64-69, 74-83, 86, 90, 98, 103-104, 108, 110-112 of **EXHIBIT 1**.

118.     By keeping material information from the Company, although he was a Company fiduciary, the Defendant harmed CERTA DOSE, INC. when he deprived the Company of funds and assets after it reasonably relied on communications that were false and/or false in the absence of the material information withheld, as noted above, subjecting said Defendant

to claims for fraud, constructive fraud and/or aiding and abetting such fraud and/or constructive fraud, including the Defendant's inducement of the Plaintiff to enter the agreements and instruments listed, *supra*, and the withholding of the following material information:

a. Information wherein the Company's counsel, COOLEY LLP, was cooperating with COPIC INSURANCE COMPANY to draft Plaintiff's corporate instruments identified in ¶¶ 33, 37 and 53 of **EXHIBIT 1**, in a way that would ultimately provide all ownership of the Company, and ownership of its assets, to COPIC—*in a hostile takeover*—if the transactions were entered (*something that went against the legitimate and purported intent of the transactions and which COOLEY, LLP specifically stated was not the case, providing affirmative misrepresentations*);

b. The coordination and cooperation that the parties took part in with regard to the actions of a hostile takeover, which are—*by definition*—deceptive acts. General Business Law § 349; N.Y. Bus. Corp. Law § 1609(c); Delaware Tender Offer Act, 8 Del.C. § 203;

c. Relevant and material information as to the intentional and the artificial nature of JOHN BLOOD'S efforts to drive up of debt and to create waste, thereby preventing the Company from having rightful access to material information that would have changed how it approached all of the transactions that involved any of the Defendants concerned, including those transactions listed in ¶¶ 33, 37 and 53 of **EXHIBIT 1**, which specifically include dates of the transactions wherein such material information was withheld from Plaintiff (*see, e.g.,* ¶¶ 42-53, 72-83 of **EXHIBIT 1**. *supra*); and

d. That JOHN BLOOD created and used multiple copies of the Company's books, with competing and inconsistent information, to conceal the true nature of JOHN BLOOD'S efforts at CERTA DOSE, INC., and which he used to conceal true and material information from the Company that would have alerted it as to his aims. *See, e.g.,* **Exhibit 1** at ¶ 159.

e. As such, *i.e.,* in these ways, the Defendant made representations of fact that were either untrue or recklessly made;

f. As such, the Defendant made false and misleading statements to the Plaintiff;

g. As such, the Defendant made misrepresentation of facts that he knew to be false and/or which were deceitful, and which were made with intent to induce the Plaintiff's reliance upon such statements; and

h. Plaintiff justifiably relied upon the Defendant's false, deceitful and misleading statements, especially as the deceptions were based on the Defendant gaining the confidence of the Plaintiff, *i.e.,* a confidential relationship, the use of agents, and also

made use of fiduciaries and attorneys on matters in which it is the rule that one should be able to trust the party making the communication and/or should trust that all material information needed for one's own good is provided and not intentionally withheld. *See, e.g.,* **EXHIBIT 1** at ¶ 159.

119.     As such, by his actions the Defendant was the cause of damages to the Plaintiff and is liable for such damages. *See* ¶ 185 of **EXHIBIT 1**.

## FIFTH CAUSE OF ACTION
### (Conversion)

120.     Plaintiff repeats the foregoing paragraphs with the same effect as if fully set forth herein.

121.     JOHN BLOOD'S efforts to drive up the debt of the Company through the aforementioned efforts to benefit from weakening the Company, and too cooperate with others in a destructive hostile takeover attempt, the Defendant received a benefit in the form of strengthening his position ant that of his affiliates to take over the Company; thus, JOHN BLOOD converted Company funds which he did not have a right to so convert. *See, e.g.,* ¶¶ 42-53, footnote 4, 60, 69, 70-71, 76-77, 86, 91, 91, 94, 99, 103, 106, 112 of **EXHIBIT 1**.

   a.   In the ways identified, the Defendant took part in unauthorized dominion over identifiable funds, particularly the $8 Million in investment funds, to which the Plaintiff had an immediate and superior right of possession.

122.     By the waste concerned, and by attempting to acquire a benefit therefrom, the Defendant caused damages to the Plaintiff in the ways otherwise recounted in the Complaint, including but not limited to the foreseeable damages to the Company that stemmed from the waste of the roughly $8 Million invested in CERTA DOSE, INC. *See* ¶ 185 of **EXHIBIT 1**.

## SIXTH CAUSE OF ACTION
### (Equitable Relief, Amotion, Disgorgement of Shares and Loss of Status as Stockholders)

123.     Plaintiff repeats the foregoing paragraphs with the same effect as if fully set forth herein.

124.     Given the above-referenced breaches of good faith and fair dealing, the breaches of fiduciary duties, and the aiding and abetting of the breach of those duties—*all of which are inequitable*—the Defendant has broken the bonds essential to membership and to being part of a company, and are, therefore, subject to claims for amotion.

125.     Given that the Defendant may purport to own stock, some stake, interest or equity in Plaintiff, CERTA DOSE, INC., but has broken the bonds essential to membership, equity, recoupment, profit, and even to being part of a company, and has thus caused the

Company damages in excess of the value of any stock he could claim to have right in; and given that it would be improper to permit such a disloyal and faithless fiduciary and/or member to maintain a benefit in any instrumentality of their wrongdoing, said Defendant is subject to claims for disgorgement of stock and shares, unjust enrichment, equitable fraud, and estoppel, particularly as, by his aforementioned actions which are recounted here by incorporation, the Defendant was the cause of damages and harm to the Plaintiff. *See* ¶ 185, of **EXHIBIT 1**.  (Furthermore, any disenfranchisement by the Company against Defendant should also be recognized in Court.)

## STATEMENT AS TO THE DAMAGES AND RESULTS OF THE DEFENDANT'S AFOREMENTIONED ACTIONS

126.    Plaintiff repeats the foregoing paragraphs with the same effect as if fully set forth herein.

127.    By the breaches referenced above, and by the actions and omissions referenced, the Defendant breached duties owed to the Plaintiff, and to society, which were the actual, expected, foreseeable, natural, direct and proximate cause of the associated damages referenced, including those damages referenced in the relief requested, *supra*.  In short, the Defendant caused waste of the funds borrowed from investors, charged for services for which he, given his faithlessness and disloyalty, had no right, and caused the Company to reach a position where its value was treated as roughly $15 Million, ultimately necessitating the Company to settle with most good faith investors at a valuation of $25 Million.  In this, the Defendant caused the Company to be set back in reaching the full potential of the objective valuation of roughly $127 Million, a present difference of roughly $100 Million, as well as the waste of roughly $8 Million in investments moneys previously referenced.  These numbers are supported by an accountant's review of where the Company would be and would also likely be in the absence of the harms perpetrated, an accounting of the damages stemming from those harms, and as also based on the appraisals of the Company that were made by a licensed appraisal firm, *i.e.*, Scalar.  Furthermore, because the damages were a result of wanton and reckless behavior, and of malicious acts, it is just to punish the Defendant to protect society from similar acts.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff seeks relief from the Court that includes judgement against the Defendant on all of the claims and causes of action referenced above, for money damages of $102,500,000 (*and the highest amount permitted, if ultimately including punitive damages that may be awarded by the Court*), for interest thereon, respectively, from the date of December 20, 2014, as well as for equitable relief in the form of amotion, disgorgement of shares and recognition of disenfranchisement in the status of a stockholder in CERTA DOSE, INC., for the costs in this action, for all equitable remedies affordable to the Plaintiff on the facts alleged, and for any and all other relief or claims that may be just and proper under the circumstances and/or facts referenced in this Complaint.

**J<small>URY</small> D<small>EMAND</small>**

PLAINTIFFS DEMAND TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

DATED: January 19, 2021.

Respectfully submitted,

*/s/ Josue David Hernandez*
JOSUE D. HERNANDEZ
P.O. Box 838
Denver, CO  80201
*Telephone:*  (720) 312-9553
*Facsimile:*  (303) 200-7801
jhernandez@DenverContractLaw.com
CO BAR No. 44509

ATTORNEY FOR THE PLAINTIFF

P<small>LAINTIFF'S</small> A<small>DDRESS:</small>

C<small>ERTA</small> D<small>OSE</small>, I<small>NC.</small>
101 Avenue of the Americas,
3rd Floor
NY, NY 10013